**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RICU LLC,

                                *Plaintiff*,

*v.*                                                    Civil Action No. 1:21-cv-452

U.S. DEP'T OF HEALTH AND HUMAN
SERVICES, *ET AL*.,

                                *Defendants*.

---

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants United States Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS"), Xavier Becerra, and Elizabeth Richter (collectively "Defendants") move to dismiss the complaint (ECF No. 1) for lack of subject matter jurisdiction and failure to state a claim. Defendants further oppose Plaintiff RICU LLC's ("RICU") motion for a preliminary injunction. For the reasons below, Defendants' motion should be granted, RICU's motion should be denied, and the case should be dismissed. A proposed order is attached.

Dated March 23, 2021                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        *Acting Assistant Attorney General*

                                        MICHELLE R. BENNETT
                                        *Assistant Branch Director*

                                        /s/ *Christopher D. Dodge*
                                        CHRISTOPHER D. DODGE
                                        (MA Bar No. 696172)

*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICU LLC, | |
| *Plaintiff*, | |
| *v.* | Civil Action No. 1:21-cv-452 |
| U.S. DEP'T OF HEALTH AND HUMAN SERVICES, *ET AL*., | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.    Statutory and Regulatory Framework ..................................................................... 2

     A.    Medicare's longstanding prohibition on extraterritorial payments ........................ 3

     B.    Medicare's laws and rules governing telehealth services. ...................................... 3

          1.    Congress expands Medicare reimbursement to limited kinds of telehealth services. ........................................................................ 4

          2.    The HHS rulemaking process and 2001 Telehealth Rule. .......................... 5

          3.    Congress authorizes waiver of requirements to expand access to Medicare telehealth services in response to the COVID-19 pandemic. ................................................................................................. 7

     C.    Medicare's Physician Fee Schedule and Geographic Practice Cost Index. ............ 8

II.    Plaintiff RICU LLC and This Lawsuit ................................................................. 10

     A.    RICU LLC. .......................................................................................... 10

     B.    RICU's efforts to have Medicare make payment for its telehealth services ......... 10

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ..................................................................................................................... 14

I.    The Complaint Must Be Dismissed For Lack Of Subject Matter Jurisdiction Because RICU Has Not Channeled Its Claims ................................................................. 14

     A.    RICU's claims "arise under" Medicare. ................................................. 15

     B.    RICU has not presented a claim or exhausted its administrative remedies. ......... 19

     C.    Judicial review remains available for RICU's claims ............................................ 22

II.    Plaintiff Has Failed To Carry Its Heavy Burden for Preliminary Relief ......................... 24

     A.    RICU is unlikely to prevail on the merits. ............................................................ 25

          1.    The Medicare statute bars the payments that RICU seeks. ....................... 25

i

        2.      RICU offers a flawed construction of the telehealth laws. ....................... 26

        3.      Medicare's longstanding rules are not arbitrary and capricious. .............. 31

    B.     RICU cannot establish irreparable harm. ................................................................ 33

        1.      RICU unjustifiably delayed seeking preliminary relief. ............................ 34

        2.      RICU seeks to upset a longstanding status quo. ........................................ 35

        3.      RICU's speculative and vague claims of financial harm do not rise
              to the level of irreparable harm. ................................................................. 36

    C.     The balance of the equities and public interest weigh against a preliminary
        injunction. ............................................................................................................. 42

CONCLUSION ....................................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Action on Smoking & Health v. Harris*,
    655 F.2d 236 (D.C. Cir. 1980) ................................................................. 32

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank*,
    840 F. Supp. 2d 327 (D.D.C. 2012) .............................................. 36, 38, 39

*Alcresta Therapeutics, Inc. v. Azar*,
    318 F. Supp. 3d 321 (D.D.C. 2018) ..................................................... 38, 39

*Alphapointe v. VA*,
    416 F. Supp. 3d 1 (D.D.C. 2019) ............................................................. 39

*Am. Chiropractic Ass'n, Inc. v. Leavitt*,
    431 F.3d 812 (D.C. Cir. 2005) .......................................................... 22, 24

*Am. Hosp. Ass'n v. Azar*,
    415 F. Supp. 3d 1 (D.D.C. 2019) ............................................................. 19

*Am. Hosp. Ass'n v. Azar*,
    895 F.3d 822 (D.C. Cir. 2018) ...................................................... 19, 20, 21

*Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*,
    62 F. Supp. 3d 114 (D.D.C. 2014) ...................................................... 19, 20

*Apotex, Inc. v. FDA*,
    No. CIV.A. 06-0627 JDB, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ................................ 40

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 12

*Ass'n of Am. Med. Colls. v. Califano*,
    569 F.2d 101 (D.C. Cir. 1977) ................................................................. 15

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
    No. CV CCB-20-3531, 2020 WL 7640818 (D. Md. Dec. 23, 2020) ......................... 17, 18, 39

*Astellas Pharma US, Inc. v. FDA*,
    642 F. Supp. 2d 10 (D.D.C. 2009) ............................................................. 40

*Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*,
    987 F.2d 821 (D.C. Cir. 1993) ................................................................. 31

*Bayer HealthCare, LLC v. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013) ............................................................. 43

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 12

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ........................................................................................................... 22

*Branch v. Smith*,
  538 U.S. 254 (2003) ........................................................................................................... 29

*Bristol-Myers Squibb Co. v. Shalala*,
  923 F. Supp. 212 (D.D.C. 1996) ....................................................................................... 41

*Cal. Clinical Lab'y Ass'n v. HHS*,
  104 F. Supp. 3d 66 (D.D.C. 2015) ............................................................................... 23, 24

*Cal. Life Scis. Ass'n v. CMS*,
  No. 20-CV-08603-VC, 2020 WL 7696050 (N.D. Cal. Dec. 28, 2020) ............................... 18

*Campbell v. Schmidt*,
  No. 1:20-CV-1785 (CRC), 2020 WL 6445874 (D.D.C. Nov. 3, 2020) ............................... 38

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012) ................................................................................... 41

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ..................................................................................... 13, 33

*Cisneros v. Alpine Ridge Grp.*,
  508 U.S. 10 (1993) ............................................................................................................. 28

*Cmty. Oncology All., Inc. v. OMB*,
  987 F.3d 1137 (D.C. Cir. 2021) .......................................................................... 15, 19, 20

*Colo. Heart Inst., LLC v. Johnson*,
  609 F. Supp. 2d 30 (D.D.C. 2009) ............................................................................... 23, 24

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014) ................................................................................. 38, 39

*Dallas Safari Club v. Bernhardt*,
  453 F. Supp. 3d 391 (D.D.C. 2020) ................................................................................... 35

*District of Columbia v. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................................... 38

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) ......................................................................................... 13

*EEOC v. Arab. Am. Oil Co.*,
  499 U.S. 244 (1991) .................................................................................. 29

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) .................................................................................. 12

*Fam. Rehab., Inc. v. Azar*,
  886 F.3d 496 (5th Cir. 2018) .................................................................... 22

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .................................................................................. 27

*Feinerman v. Bernardi*,
  558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................... 39

*Felder v. Johanns*,
  595 F. Supp. 2d 46, 58 (D.D.C. 2009) ....................................................... 6

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .................................................................. 12

*Friends of Animals v. Jewell*,
  82 F. Supp. 3d 265 (D.D.C. 2015), *aff'd*, 824 F.3d 1033 (D.C. Cir. 2016) ............................ 31

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ............................................................ 34, 35

*GEO Specialty Chemicals, Inc. v. Husisian*,
  923 F. Supp. 2d 143 (D.D.C. 2013) .......................................................... 41

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft*,
  185 F. Supp. 2d 9 (D.D.C. 2001) .............................................................. 12

*Gulf Oil Corp. v. Dep't of Energy*,
  514 F. Supp. 1019 (D.D.C. 1981) ............................................................. 37

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ................................................................ 14, 15, 19, 20

*Humane Soc'y of U.S. v. Johanns*,
  No. CV 06-265 (CKK), 2006 WL 8460551 (D.D.C. Mar. 14, 2006) ....................................... 35

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1977) .................................................................... 44

*Kaiser v. Blue Cross of Cal.*,
  347 F.3d 1107 (9th Cir. 2003) .................................................................. 15

*Kondapally v. USCIS*,
No. CV 20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020) ..................... 13, 35, 43

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .................................................................................................. 33

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................................................. 12

*Mallinckrodt Ard LLC v. Verma*,
No. 19-CV-1471 (TFH), 2020 WL 7265325 (D.D.C. May 29, 2020) ...................................... 42

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) .................................................................................................. 29

*Mount Sinai Med. Ctr. of Greater Miami v. Sullivan*,
No. CIV. A. No. 89-2224 RCL, 1990 WL 204693 (D.D.C. Nov. 30, 1990) .......................... 15

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*,
472 U.S. 237 (1985) .................................................................................................. 27

*Muvvala v. Wolf*,
No. 1:20-CV-02423 (CJN), 2020 WL 5748104 (D.D.C. Sept. 25, 2020) .............................. 38

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) .......................................................................... 13, 35, 40

*N. Air Cargo v. USPS*,
756 F. Supp. 2d 116 (D.D.C. 2010) ............................................................................ 37

*Nalco Co. v. EPA*,
786 F. Supp. 2d 177 (D.D.C. 2011) ............................................................................ 39

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .................................................................................................. 29

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*,
773 F. Supp. 2d 151 (D.D.C. 2011) ............................................................................ 38

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .................................................................................................. 33

*Nat'l Hospice & Palliative Care Org., Inc. v. Weems*,
587 F. Supp. 2d 184 (D.D.C. 2008) ............................................................................ 24

*Nat'l Min. Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) .......................................................................... 38, 39

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................................... 13

*NLRB v. Sw Gen., Inc.,*
   137 S. Ct. 929 (2017) ................................................................................................... 28

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.,*
   901 F. Supp. 2d 54 (D.D.C. 2012) ............................................................................. 36

*Physician Hosps. of Am. v. Sebelius,*
   691 F.3d 649 (5th Cir. 2012) ...................................................................................... 22

*Posadas v. Nat'l City Bank of N.Y.,*
   296 U.S. 497 (1936) .............................................................................................. 28, 29

*Power Mobility Coal. v. Leavitt,*
   404 F. Supp. 2d 190 (D.D.C. 2005) ........................................................................... 36

*Protect Democracy Project, Inc. v. Dep't of Def.,*
   263 F. Supp. 3d 293 (D.D.C. 2017) ........................................................................... 43

*Puerto Rican Ass'n of Physical Medicine and Rehabilitation, Inc. v. United States,*
   521 F.3d 46 (1st Cir. 2008) .................................................................................. 17, 23

*Radzanower v. Touche Ross & Co.,*
   426 U.S. 148 (1976) ..................................................................................................... 29

*Raoof v. Sullivan,*
   315 F. Supp. 3d 34 (D.D.C. 2018) ............................................................................. 33

*Regeneron Pharm., Inc. v. HHS,*
   No. 20-CV-10488 (KMK), 2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020) ................. 17, 18, 40

*Safari Club Int'l v. Jewel,*
   47 F. Supp. 3d 29 (D.D.C. 2014) ......................................................................... 36, 38

*Save Jobs USA v. DHS,*
   105 F. Supp. 3d 108 (D.D.C. 2015) ........................................................................... 38

*Sensory Neurostimulation, Inc. v. Azar,*
   977 F.3d 969 (9th Cir. 2020) ............................................................................. *passim*

*Shalala v. Ill. Council on Long Term Care, Inc.,*
   529 U.S. 1 (2000) ................................................................................... 14, 21, 22, 24

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) ................................................................................... 12

vii

*Silver v. N.Y. Stock Exch.*,
  373 U.S. 341 (1963) ............................................................................................ 29

*Tex. Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014) ....................................................................... 38

*Three Lower Cntys. Cmty. Health Servs. Inc. v. HHS*,
  517 F. Supp. 2d 431 (D.D.C. 2007), *aff'd*, 317 F. App'x 1 (D.C. Cir. 2009) .................... 20, 21

*Toxco, Inc. v. Chu*,
  724 F. Supp. 2d 16 (D.D.C. 2010) ....................................................................... 41

*Traynor v. Turnage*,
  485 U.S. 535 (1988) ............................................................................................ 28

*Trudeau v. FTC*,
  384 F. Supp. 2d 281 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir 2006) ............................. 41

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ............................................................................................ 35

*Verma v. USCIS*,
  2020 WL 7495286 (D.D.C. Dec. 18, 2020) ........................................................... 38

*ViroPharma, Inc. v. Hamburg*,
  898 F. Supp. 2d 1 (D.D.C. 2012) ......................................................................... 36

*Watt v. Alaska*,
  451 U.S. 259 (1981) ............................................................................................ 28

*Winter v. NRDC*,
  555 U.S. 7 (2008) ................................................................................................ 12

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 36

*Woodstream Corp. v. Jackson*,
  No. CIV.A. 11-867 JEB, 2011 WL 8883395 (D.D.C. June 3, 2011) ................................. 39, 40

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ........................................................................... 34

**STATUTES**

42 U.S.C. § 405 ...................................................................................................... *passim*

42 U.S.C. § 1315a ................................................................................................. 18, 19

42 U.S.C. § 1320b-5 .............................................................................................. 7, 33

42 U.S.C. § 1395 *et seq.* ........................................................................................... 2

42 U.S.C. § 1395f ........................................................................................... 3, 15, 31

42 U.S.C. § 1395m ................................................................................................. *passim*

42 U.S.C. § 1395w-4 ........................................................................................... 8, 9

42 U.S.C. § 1395x ........................................................................................... 26, 30

42 U.S.C. § 1395y ................................................................................................. *passim*

42 U.S.C. § 1395ii ........................................................................................... 13

42 U.S.C. § 1395ff ........................................................................................... 15

Social Security Amendments of 1965,
    Pub. L. No. 89-97, 79 Stat. 286 (1965) ........................................................... 2

Social Security Amendments of 1972,
    Pub. L. No. 92-603, 86 Stat. 1329 (1972) ....................................................... 3

Omnibus Budget Reconciliation Act of 1989,
    Pub. L. No. 101-239, 103 Stat. 2106 (1989) *codified at* 42 U.S.C. § 1395w-4 ......... 8

Balanced Budget Act of 1997,
    Pub. L. No. 105-33, 111 Stat. 251 ................................................................. 3

Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000,
    Pub. L. No. 106-554, 114 Stat. 2763 (2000) ..................................................... 4

Coronavirus Preparedness and Response Supplemental Appropriations Act,
    Pub. L. No. 116-123, 134 Stat. 146 (2020) ...................................................... 7

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, 134 Stat. 178 (2020) ...................................................... 7

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) ...................................................... 7

**RULES**

Fed. R. Civ. P. 12 ........................................................................................... 12

**REGULATIONS**

42 C.F.R. § 405.904 ........................................................................................... 20

42 C.F.R. § 410.20 ........................................................................................... 26

42 C.F.R. § 410.78 ..................................................................................................... *passim*

42 C.F.R. § 411.9 ................................................................................................ 3, 8, 25, 34

42 C.F.R. § 424.44 ............................................................................................................ 37

Medicare Program; Revisions to Payment Policies and Five-Year Review of and Adjustments
    to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 2002,
    66 Fed. Reg. 55246 (Nov. 1, 2001) ................................................................................ *passim*

Medicare and Medicaid Programs; Policy and Regulatory Revisions in Response to the
    COVID-19 Public Health Emergency,
    85 Fed. Reg. 19230 (Apr. 6, 2020) ............................................................... 7, 10, 34

Most Favored Nation Rule ("MFN Rule"),
    85 Fed. Reg. 76180 (Nov. 27, 2020) ......................................................................... 17

Medicare Program; CY 2021 Payment Policies Under the Physician Fee Schedule and Other
    Changes to Part B Payment Policies; Medicare Shared Savings Program Requirements;
    Medicaid Promoting Interoperability Program Requirements for Eligible Professionals;
    Quality Payment Program; Coverage of Opioid Use Disorder Services Furnished by Opioid
    Treatment Programs; Medicare Enrollment of Opioid Treatment Programs; Electronic
    Prescribing for Controlled Substances for a Covered Part D Drug; Payment for
    Office/Outpatient Evaluation and Management Services; Hospital IQR Program; Establish
    New Code Categories; Medicare Diabetes Prevention Program (MDPP) Expanded Model
    Emergency Policy; Coding and Payment for Virtual Check-in Services Interim Final Rule
    Policy; Coding and Payment for Personal Protective Equipment (PPE) Interim Final Rule
    Policy; Regulatory Revisions in Response to the Public Health Emergency (PHE) for COVID-
    19; and Finalization of Certain Provisions from the March 31st, May 8th and September 2nd
    Interim Final Rules in Response to the PHE for COVID-19,
    85 Fed. Reg. 84472 (Dec. 28, 2020) ................................................................... 8, 35

## OTHER AUTHORITIES

CMS, *2020 PFS Locality Key*,
    https://www.cms.gov/files/document/cy2020-locality-key.pdf .................................................. 8

CMS, *COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-for-Service
    (FFS) Billing*,
    https://www.cms.gov/files/document/03092020-covid-19-faqs-508.pdf. .................................. 6

CMS, Physician Fee Schedule,
    https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/
    PhysicianFeeSched ......................................................................................... 7, 8, 34

DOJ Press Release, *National Health Care Fraud and Opioid Takedown Results in Charges
    Against 345 Defendants Responsible for More than $6 Billion in Alleged Fraud Losses*
    (Sept. 30, 2020), ................................................................................................. 42

H. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of
    Administrative Orders*,
    1969 Duke L.J. 199 (1969) ................................................................................ 31

H.R. Rep. No. 92-231 (1972) ..................................................................................... 3

Kinney, *The Affordable Care Act and the Medicare Program: Linking Medicare Payment
    to Quality Performance*,
    68 N.Y.U. Ann. Surv. Am. L. 567 (2013) ................................................................ 9

Kwong, *Telehealth and Public Programs - Evolution of Telehealth Policy in Medicare
    and Medicaid*,
    15 J. Health & Biomedical L. 7 (2019) ............................................................... 3, 4

Medicare Claims Processing Manual Chapter 12 - Physicians/Nonphysician Practitioners
    (Rev. September 18, 2020),
    https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/
    clm104c12.pdf. ......................................................................................................... 6

Provide, Merriam-Webster (11th ed. 2003) .............................................................. 25

Smolensky, *Telemedicine Reimbursement: Raising the Iron Triangle to A New Plateau*,
    13 Health Matrix 371 (2003) ............................................................................ 4, 28

S. Rep. No. 92-1230 (1972) ........................................................................................ 3

Weresh, *Geographic Inequity in Medicare Rates*,
    5 Rutgers J.L. & Pub. Pol'y 361 (2008); ................................................................ 9

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) .............................. 13

**INTRODUCTION**

Plaintiff RICU, a company that offers critical-care telehealth services, seeks to preliminarily enjoin a two-decade-old regime for making Medicare payment for telehealth services.[1]  But the Court should not even reach RICU's motion because it lacks subject-matter jurisdiction to do so.  RICU's claim—that the government, under Medicare rules, must pay for RICU's services—arises under the Medicare laws.  Congress has conferred federal courts with jurisdiction over such challenges only where the claimant first presents the issue to the agency, in the context of a specific claim for payment, and then exhausts administrative remedies.  Neither RICU nor the hospitals with which it works has presented a claim for payment to the agency and, in fact, RICU has not identified a *single* claimant that has yet sought Medicare payment for its services, undermining its claimed need for emergency relief.  Because RICU did not adhere to Medicare's channeling requirements, the Medicare statute bars this Court from hearing its claims.

RICU's claims fare no better on the merits.  The Medicare statute prohibits payment for services furnished outside of the United States; this payment exclusion has existed since 1965.  But according to RICU, longstanding Medicare rules dictate that telehealth services are furnished exclusively where the patient is located, known as the "originating site."  RICU therefore asserts that Medicare must pay for its services even when its physicians are located outside of the United States, despite the half-century-old statutory bar on such payments.  But in fact the opposite is true.  The statute directs CMS to pay physicians the same amount that they would have been paid if the service had been furnished without the use of a telecommunications system, with the fee schedule rate based on the physical location where the physician provides the telehealth services, known as the "distant site."  Medicare therefore cannot pay for services when the physicians are abroad both because the Medicare statute bars such payments and because no fee schedule exists for foreign locations.  Twenty years of agency practice confirm the legal and practical soundness of this view.  RICU simply ignores the statutory provisions undermining its position, grasping at slivers of

---

[1] Telehealth refers to the provision of health care services from a distance through the use of technology.  *See infra* at 3.

isolated text to construct a strained alternate reading.  But RICU's reading of the relevant laws cannot survive even cursory scrutiny, and accordingly its complaint also fails to state a claim upon which relief can be granted.

Beyond its flawed reading of the statute, RICU presents an exceptionally weak claim for preliminary relief.  RICU waited ***nearly nine months*** after CMS told it that Medicare still could not pay for telehealth services offered outside of the United States before filing the instant motion, undercutting any plausible claim of irreparable harm.  Aside from this unjustified delay, RICU offers only speculative and vague claims of economic harm that, even if true, fail to rise to the level of *irreparable* harm.  Despite its weak claim of harm, RICU seeks to affirmatively enjoin Medicare from denying claims for telehealth services where the physician is located outside of the United States even though CMS has never paid such claims over two decades of paying for certain telehealth services.  If granted, this injunction would force Medicare to pay for services for which no lawful rate exists and, further, pay physicians that it lacks any power to regulate, imperiling program integrity. For these reasons, the public interest and balance of equities strongly cut against RICU's claim for relief.  Its motion for preliminary relief, if reached, should therefore be denied.

## **BACKGROUND**

### I.      **Statutory and Regulatory Framework**

Medicare is a federal health insurance program for the elderly and disabled, *see* 42 U.S.C. § 1395 *et seq.*, which is administered on behalf of the Secretary of HHS by CMS.  Congress created Medicare in 1965 through the Social Security Amendments of 1965.  *See* Pub. L. No. 89-97, 79 Stat. 286 (1965).  Three components of Medicare's complex regulatory regime are relevant here: (1) Medicare's statutory bar on payment for services provided outside of the United States; (2) Medicare's laws and regulations governing telehealth services; and (3) its annual physician fee schedule, which sets payment rates for physicians, non-physician practitioners, and certain others based on geographic location.

A.      **Medicare's longstanding prohibition on extraterritorial payments.**

From its creation in 1965, subject to exceptions not relevant here, the Medicare statute has barred payment for items or services "which are not provided within the United States." Pub. L. No. 89-97, Sec. 1862(a)(4) (codified at 42 U.S.C. § 1395y(a)(4)). This basic rule is codified in Medicare's implementing regulations. *See* 42 C.F.R. § 411.9(a) ("Basic rule. . . . Medicare does not pay for services furnished outside the United States.").

Congress has only once modified this longstanding prohibition. In 1972, Congress added two narrow exceptions to the bar on foreign payments. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329 (Jan. 18, 1972). Recognizing the "special problems of border residents," *see* H.R. Rep. No. 92-231, at 77 (1972), Congress expanded Medicare to cover foreign inpatient hospital expenses where the hospital "was closer to, or substantially more accessible from, the residence of such individual than the nearest hospital within the United States" that could provide service. 42 U.S.C. § 1395f(f)(1). Congress also extended Medicare coverage for hospital services resulting from an emergency occurring while traveling on land between Alaska and the continental United States. *Id.* § 1395f(f)(2). In crafting these additional, narrow exceptions, Congress reaffirmed the existing prohibition on reimbursement of services performed outside of the United States. *See* H.R. Rep. No. 92-231, at 77 ("Under present law, services furnished outside the United States are excluded from coverage . . ."); S. Rep. 92-1230, at 232 ("Under present law, services furnished outside the United States . . . are excluded from coverage."). Congress has not altered Medicare's foreign payment bar since 1972.

B.      **Medicare's laws and rules governing telehealth services.**

"Telehealth is the delivery of health services from a distance through the use of technology." Kwong, *Telehealth and Public Programs - Evolution of Telehealth Policy in Medicare and Medicaid*, 15 J. Health & Biomedical L. 7, 8 (2019). Congress and HHS developed the legal framework for telehealth service payments in the late 1990's and early 2000's. In response to the COVID-19 pandemic, Congress granted HHS greater discretion to temporarily waive certain conditions of payment for telehealth services, but no discretion to waive

longstanding statutory rules limiting payment for services furnished outside the United States.

1.   *Congress expands Medicare reimbursement to limited kinds of telehealth services.*

Congress first permitted Medicare to pay for telehealth services in 1999.  *See* Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4206(a), 111 Stat. 251, 377-78; *see also* Kwong, *Telehealth and Public Programs*, 15 J. Health & Biomedical L. at 10.  In late 2000, Congress broadened Medicare's ability to pay for certain telehealth services as part of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, Pub. L. No. 106-554, § 223, 114 Stat. 2763 (2000); *see also* Smolensky, *Telemedicine Reimbursement: Raising the Iron Triangle to A New Plateau*, 13 Health Matrix 371, 375 (2003) (explaining that the act expanded the number of reimbursable telehealth services and removed certain regulatory requirements).  The act, codified at 42 U.S.C. § 1395m(m) ("Telehealth Statute"), provides most of the present statutory framework for telehealth services under Medicare.

The Telehealth Statute requires that Medicare "pay for telehealth services that are furnished via a telecommunications system . . . to an eligible telehealth individual . . . notwithstanding that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary."  42 U.S.C. § 1395m(m)(1).  Under the statute, a physician provides services from a "distant site," meaning "the site at which the physician or practitioner is located at the time the service is provided via a telecommunications system."  *Id.* § 1395m(m)(4)(A).  An "eligible telehealth individual" is an enrolled Medicare Part B beneficiary who "receives a telehealth service furnished at an originating site."  *Id.* § 1395m(m)(4)(B).  "Originating sites," in turn, are limited under the statute to certain kinds of facilities located in primarily rural areas of the country.  *See id.* § 1395m(m)(4)(C) (describing requirements for qualifying as an "originating site" under the statute).  The statute expressly designates certain services, identified by procedure codes, as "telehealth services" while granting HHS the ability to add or remove additional services (and their codes) to the telehealth services list on an annual basis.  *See id.* § 1395m(m)(4)(F).

The Telehealth Statute prescribes how Medicare will pay both the physician located at the

distant site and the facility at the originating site.  The statute requires two different payments: *first*, the Secretary must  "pay to a physician or practitioner located at a distant site . . . an amount equal to the amount that such physician or practitioner would have been paid under this subchapter" had the service been furnished without use of a telecommunications system.   42 U.S.C. § 1395m(m)(2)(A).   In other words, the Telehealth Statute contemplates paying the physician or practitioner **at the distant site** based on the relevant fee schedule rate **for that locality**. *Id*.  *Second*, the statute requires payment of a modest "facility fee" to the originating site facility where the patient is located.  *See id.* § 1395m(m)(2)(B).[2]  Nothing in the Telehealth Statute speaks to Medicare paying for services provided outside of the United States.

### 2.     The HHS rulemaking process and 2001 Telehealth Rule.

On November 1, 2001, after a notice-and-comment period, HHS issued a final rule implementing the Telehealth Statute.   *See* 66 Fed. Reg. 55246.  In response to comments, the agency reiterated that the Telehealth Statute "provides for a professional fee for the physician or practitioner at the distant site (equal to the applicable Part B fee schedule amount) and a $20 facility fee for the originating site."  *Id.* at 55,282; *see also id.* at 55,281 (Telehealth Statute requires paying "an amount equal to the amount that physician or practitioner would have been paid under Medicare had the service been furnished without the use of a telecommunications system").  HHS therefore concluded that Congress requires Medicare to pay a physician the same "fee schedule amount" as if they provided the same services, in the same location, without a telecommunications system.  Originating site facilities, by contrast, receive a flat fee that is not geographically adjusted.

The agency also addressed licensure rules for "interstate telehealth services," explaining that it "defer[red] to State law regarding licensure issues."   *See* 66 Fed. Reg. at 55,283-84.  In explaining what fee schedule rates would apply to such services, the agency clarified that "for payment purposes, **the site of service for the telehealth service is the location of the physician or**

---

[2] The Telehealth Statute states that "[n]o facility fee shall be paid" when the originating site is a person's home.  *See id.* § 1395m(m)(2)(B)(ii).

**practitioner at the distant site**."[3]  *Id.* at 55,284.  HHS explained this reading was required by Congress's command that "payment to the physician or practitioner at the distant site must be equal to the amount that would have been paid without the use of telehealth," requiring reference to "the Geographic Practice Cost Index (GPCI) relevant to the distant site."  *Id.*  (citing 42 U.S.C. § 1395m(m)).  By contrast, the GPCI "would not apply to the facility fee for the originating site" because the "fee is statutorily set and is not subject to the geographic payment adjustments authorized under the physician's fee schedule."  *Id.* at 55,282.

The final rule, codified at 42 C.F.R. § 410.78 ("Telehealth Rule"), permits payment for certain telehealth services "if the following [five] conditions are met."  *First*, the physician at the distant site must be licensed to furnish the service under State law.  *See id.* § 410.78(b)(1).  *Second*, the physician or provider must qualify as a physician or specific kind of practitioner as defined by statute and Medicare's implementing regulations.  *See id.* § 410.78(b)(2)(i)-(ix).  *Third*, the telehealth services must be furnished to a beneficiary at an enumerated type of originating site.  *See id.* § 410.78(b)(3)(i)-(xii).  *Fourth*, the originating site must meet certain geographic requirements.  *See id.* § 410.78(b)(4)(i)-(iv).  *Finally*, the medical examination must be under the control of the physician or practitioner at the distant site.  *See id.* § 410.78(b)(5).

After issuing the final rule, Medicare published guidance about payment for telehealth services .  On May 16, 2003, HHS and CMS published an update to the Medicare Carriers Manual specifying that "[w]ith regard to payment amount, [the Telehealth Statute] specified that payment for the professional service performed by the distant site practitioner (**i.e., where the expert physician or practitioner is physically located at time of telemedicine encounter**) is equal to what would have been paid without the use of telemedicine."  *See* Declaration of Christopher D. Dodge ("Dodge Decl."),[4] Ex. A (CMS, Medicare Carriers Manual at 15-95 (May 16, 2003)).  The update explained that the Telehealth Statute provided a separate "expanded payment under Medicare to

---

[3] All emphases are added unless otherwise noted.

[4] The exhibits cited by Defendants are all public records that may be considered by the Court in reviewing the motion to dismiss.  *See Felder v. Johanns*, 595 F. Supp. 2d 46, 58 (D.D.C. 2009) (collecting authority).

include a $20 originating site facility fee (location of beneficiary)." *Id.* When Congress expanded the scope of permissible originating sites as part of the Medicare Improvements for Patients and Providers Act of 2008, HHS and CMS again issued this same guidance. *See* Ex. Dodge Decl., Ex. B (CMS, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 1635 at 8 (Nov. 14, 2008)) (same). This same guidance remains in the current Medicare Claims Processing Manual. *See* Medicare Claims Processing Manual Chapter 12 - Physicians/Nonphysician Practitioners at 150 (Rev. September 18, 2020), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf.

> 3.   *Congress authorizes waiver of requirements to expand access to Medicare telehealth services in response to the COVID-19 pandemic.*

In response to the outbreak of the COVID-19 pandemic, Congress expanded the existing HHS emergency powers to temporarily waive a broad swath of Medicare and other statutory and regulatory requirements. *See Coronavirus Preparedness and Response Supplemental Appropriations Act*, Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020); *Families First Coronavirus Response Act*, Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020); *Coronavirus Aid, Relief, and Economic Security Act*, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). The legislation allowed HHS "to temporarily waive or modify the application" of requirements of various healthcare regulations over a wide-range of services, including, among others, telehealth services furnished in the emergency area during an emergency period for the COVID-19 pandemic. *See* 42 U.S.C. § 1320b-5(b)(8), (g)(1)(B).

Using this new authority, on April 6, 2020, HHS released an interim final rule ("IFR") that, among other things, loosened Medicare regulations concerning where a patient could obtain Medicare-covered telehealth services and also significantly expanded the scope of services that can be covered as telehealth. *See* 85 Fed. Reg. 19230. This expansion of services included critical-care services. *Id.* at 19236. Nothing in the IFR amended the interpretation of the Telehealth Statute or the payment structure under the Telehealth Rule.

To help Medicare providers and suppliers understand the IFR, CMS published and

periodically updated an FAQ sheet.  *See generally* CMS, *COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-for-Service (FFS) Billing* (last updated on March 5, 2021) ("CMS COVID-19 FAQs"), *available at* https://www.cms.gov/files/document/03092020-covid-19-faqs-508.pdf.  On June 19, 2020, CMS added a response to the question: "What types of health care practitioners are permitted to furnish telehealth services under broadened 1135 waiver authority granted by the CARES Act?"  *See id.* at 66-67.  The response explained the loosened restrictions on Medicare payment for telehealth services but closed by noting, "We note that Medicare ***cannot pay for services that are furnished by a physician or practitioner located outside of the United States*** (see 42 CFR 411.9)."  *Id.* at 67.  Similarly, on July 28, 2020, the FAQs were updated to address the precise question at issue here: "Can Medicare pay for telehealth services furnished by physicians or practitioners who are physically located outside of the United States?"  *Id.* at 82.  The FAQ then explained why such payments were not possible, even in view of the new IFR:

> Answer: ***No. Section 1862(a)(4) of the Act [42 U.S.C. § 1395y(a)(4)] and our corresponding regulation at 42 CFR § 411.9 prohibit Medicare payment for services that are not furnished within the United States***. This payment exclusion remains in effect during a public health emergency and is not affected by telehealth flexibilities put in place for the COVID-19 PHE. While section 1834(m) of the Act permits payment for telehealth services that are furnished by a physician or practitioner at a distant site via a telecommunications system to a Medicare beneficiary at an originating site, ***a telehealth service is considered to be furnished at both the originating site and the distant site***. Therefore, ***both the originating site and the distant site are subject to the statutory payment exclusion that prohibits Medicare payment for services that are not furnished within the United States***.

*Id.*

HHS published a final rule on December 28, 2020.  *See* 85 Fed. Reg. 84,472 (Dec. 28, 2020).  Like the IFR, nothing in the final rule purported to amend HHS's longstanding interpretation of the Telehealth Statue's payment provisions or the Telehealth Rule.  *Id.*

### C.    Medicare's Physician Fee Schedule and Geographic Practice Cost Index.

Medicare pays for physicians' services through an annually promulgated fee schedule known as the Physician Fee Schedule ("PFS").  *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6102(a), 103 Stat. 2106 (1989) (codified at 42 U.S.C. § 1395w-4); *see*

*generally* CMS, Physician Fee Schedule, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched.  To set the PFS, HHS each year determines the "relative value" for a service, in comparison with other services. *See* 42 U.S.C. § 1395w-4(b)(1).  The relative value for a service is based on three components—a work component, a practice expense component, and a malpractice component.  *See id*. § 1395w-4(c)(1), (2).

The PFS also applies a geographic adjustment factor, known as the geographic practice cost index ("GPCI"), for each applicable fee schedule area, which adjusts the payment to reflect the costs of providing a particular medical service in that geographic area, relative to national averages.  *See* 42 U.S.C. § 1395w-4(b)-(e).  For purposes of calculating the geographic adjustment factors, Congress directed HHS to divide the United States into regions referred to as "fee schedule areas." *See* 42 U.S.C. § 1395w-4(e)(2)-(5); *see also* 42 U.S.C. § 1395w-4(j)(2) (defining "fee schedule area" as "a locality" used "for purposes of computing payment amounts for physicians' services").  Congress further required the agency, every three years, to review the various indices on which the GPCI is based.  *See* 42 U.S.C. § 1395w-4(e)(1)(C).  Congress therefore mandates that Medicare pay physicians at different rates depending on the geographic location in which their services are provided, accounting for the practice costs of those locations.

The PFS presently recognizes 112 total localities, including 34 localities that are statewide areas, 75 localities for metropolitan areas within the remaining 16 states, plus localities for the District of Columbia and its suburbs, Puerto Rico, and the Virgin Islands.  *See* CMS, *2020 PFS Locality Key*, *available at* https://www.cms.gov/files/document/cy2020-locality-key.pdf.  No localities exist outside of the United States or its territories.  *Id.*  A GPCI exists for each PFS locality, intended to ensure that reimbursements "reflect geographic variations in costs associated with performing services."  Weresh, *Geographic Inequity in Medicare Rates*, 5 Rutgers J.L. & Pub. Pol'y 361, 365 (2008); *see also* Kinney, *The Affordable Care Act and the Medicare Program: Linking Medicare Payment to Quality Performance*, 68 N.Y.U. Ann. Surv. Am. L. 567, 576 (2013) ("GPCIs are adjustments that are applied to the three relative values to account for geographic variations in the costs of practicing medicine in different areas within the country.").  Likewise,

no GPCI exists for regions outside of the United States or its territories.

## II.     Plaintiff RICU LLC and This Lawsuit

### A.     RICU LLC.

RICU was founded in January 2009 and is one of the nation's largest inpatient telehealth companies.  *See* ECF No. 3-2, Declaration of Seth Rabinowitz ¶ 6 ("Rabinowitz Decl.").  RICU focuses its telehealth services on so-called critical care services, or those typically provided in an intensive care unit (or "ICU").  *Id.* ¶¶ 4, 7.  Physicians providing such critical-care services are known as intensivists.  *Id.* ¶ 8.  RICU works with approximately 60 intensivists located outside of the United States, but who purportedly are U.S. board-certified and have had significant educational or training experiences in the United States.  *Id.* ¶¶ 8-10.

RICU's business has successfully grown since its founding in 2009.  According to Seth Rabinowitz, the company's President, RICU's "business model has led to success in providing tele-ICU services throughout the United States," providing services to "more than 250 hospitals located in 34 states, accessible to more than 35 million American residents in rural areas."  Rabinowitz Decl. ¶ 20.  RICU's business "grew at a rate of more than thirty-five percent per year" over the past decade and "at the beginning of the COVID-19 crisis, its business grew at an even faster rate."  *Id.* ¶ 34.  RICU achieved this success without any payments from Medicare because "[b]efore 2020, tele-ICU services were not eligible for Medicare reimbursement."  *Id.* ¶ 23.

### B.     RICU's efforts to have Medicare make payment for its telehealth services.

Critical-care telehealth services first generally became eligible for Medicare payments as a result of the IFR issued by Defendants on April 6, 2020.  *See* 85 Fed. Reg. 19230; *see also* Rabinowitz Decl. ¶ 23.[5]  In response to the IFR, Mr. Rabinowitz sent an email to CMS officials on April 22, 2020 "seeking an urgent clarification" about Medicare's rules barring payment for services provided outside of the United States.  *See* ECF No. 1, Compl., Ex. 2 at 1 ("Compl.").  The recipients forwarded Mr. Rabinowitz's email to the appropriate component at CMS.  *Id.* at 1.

---

[5] Two critical care consultation codes not at issue in this case (G0508 and G0509) have been eligible for Medicare payments as telehealth on a permanent basis since 2017.

Later that same evening, Ms. Laura A. Dash, the Deputy Director of the Division of Technical Payment Policy at CMS, followed up with Mr. Rabinowitz asking for more details about his inquiry.  *See* Compl., Ex. 3 at 14.  Mr. Rabinowitz responded the next day with a lengthy email seeking clarification as to whether, in view of the IFR's expansion of telehealth services, Medicare could now make payments on RICU's overseas critical-care telehealth services.  *Id.* at 9-15.  Ms. Martha Kuespert, Director of the Division of Technical Payment Policy at CMS, responded late that evening indicating that CMS would look into the matter.  *Id.* at 14.

CMS responded to Mr. Rabinowitz's question with a June 1, 2020 letter sent by Jason E. Bennett, the Acting Director of the Chronic Care Policy Group.  *See* Compl., Ex. 4.  The letter explained that, after careful review, CMS determined it could not lawfully make payment for critical-care telehealth services when the physician at the distant site is located outside of the United States.  *Id.*  Mr. Bennett pointed to three longstanding Medicare rules as the basis for this conclusion: (1) the half-century-old bar on such payments in the original Medicare statute; (2) the payment scheme adopted by Congress in 2000 in the Telehealth Statute; and (3) the 2001 rulemaking implementing the Telehealth Statute.  *Id.*

On July 6, 2020, Mr. Rabinowitz followed up with several individuals at CMS, taking issue with the conclusion reached by Mr. Bennett in the June 1 letter.  *See* Compl., Ex. 5.  Kimberly Brandt, CMS Principal Deputy Administrator for Policy and Operations, responded on July 9, 2020, referring Mr. Rabinowitz back "to the letter from Jason [Bennett] for CMS's answer to the issues you raised."  *Id.* at 1.

Not content with this second response, Mr. Rabinowitz continued emailing CMS officials, eventually obtaining a teleconference with staff of Mr. Demetrios L. Kouzoukas, Principal Deputy Administrator of CMS and Director of the Center for Medicare, in mid-October.  *See* Compl., Ex. 6.  On October 28, 2020, sometime after the teleconference, Mr. Kouzoukas sent Mr. Rabinowitz a brief letter indicting that CMS "again confirmed the findings that were detailed in the June 1, 2020 letter from Jason Bennett and affirmed in the July 9, 2020 email from Kim Brandt."  Compl., Ex. 7.  He stated that CMS continued to "believe that the change you request is inconsistent with

the statutory prohibition against Medicare payment for services furnished outside of the United States." *Id.*

On February 22, 2021, nearly four months after Mr. Kouzoukas's letter reaffirmed Mr. Bennett's earlier June 1, 2020 letter, RICU filed this lawsuit and on the same day moved for a preliminary injunction "enjoining the Defendants from denying Medicare reimbursement for telehealth services on the basis of a physician's or practitioner's physical location outside of the United States at the time of service."  ECF No. 3-1 at 40 ("Pl.'s Mem.").

## <u>LEGAL STANDARD</u>

Defendants move to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  A federal court is presumed to lack jurisdiction until jurisdiction is established in a case.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 551 (2005).  The court must ensure itself of jurisdiction before proceeding.  *See Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.").  The party invoking the court's jurisdiction bears the burden of demonstrating that jurisdiction exists.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants further move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  When considering such a motion, the Court must accept as true all well-pleaded facts and allegations in the complaint, but does not need to accept a plaintiff's legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679 (citing *Twombly*, 550 U.S. at 556).

Plaintiff seeks a preliminary injunction which is "an extraordinary remedy never awarded as of right."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain such relief, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm

in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The plaintiff must do more than merely show the possibility of prevailing on the merits, but rather must show "a substantial likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). "[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Id.* The movant also must establish irreparable harm, as failure do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *accord* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction" as "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief"). Where, as here, the government is a party to the suit, the final two factors—the balance of hardships and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Mandatory injunctions that "would change the status quo" are disfavored as "an even more extraordinary remedy" than the typical preliminary injunction, "especially when directed at the United States Government." *Kondapally v. USCIS*, No. CV 20-00920 (BAH), 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (citations omitted); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) ("In this Circuit, 'the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))). "Plaintiffs seeking this type of relief . . . face 'an additional hurdle' when proving their entitlement to relief," and courts "exercise extreme caution in assessing" such motions. *Kondapally*, 2020 WL 5061735, at *3. "As a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* (cleaned up).

13

## ARGUMENT

I. **The Complaint Must Be Dismissed For Lack Of Subject Matter Jurisdiction Because RICU Has Not Channeled Its Claims**

Congress has limited the jurisdiction of federal courts to review "any claim arising under" the Medicare laws. *See* 42 U.S.C. § 405(h) ("No action against the United States, the [Secretary], or any other officer or employee thereof shall be brought under section 1331 or 1346 of title 28, United States Code, to recover on any claim arising under [the Medicare statute]."); *see also id.* § 1395ii (incorporating § 405(h) into the Medicare statute). To obtain judicial review, a claimant must first administratively present its claim and then exhaust its administrative remedies. *See* 42 U.S.C. § 405(g). The agency renders the necessary "final decision" for judicial review "only after the individual claimant has pressed his claim through all designated levels of administrative review." *Heckler v. Ringer*, 466 U.S. 602, 606 (1984).

"[A]ssessing whether a court has subject matter jurisdiction to hear a claim related to Medicare requires a three-step analysis." *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 976 (9th Cir. 2020). *First*, the Court must decide whether the claims "arise" under the Medicare laws. *Id.* *Second*, if the claims do arise under Medicare, the Court determines "whether the plaintiff has satisfied the channeling requirements by properly presenting the claim and exhausting the appropriate administrative channel." *Id.* *Finally*, if the plaintiff has not channeled its claims, the Court must decide if the channeling requirement would result in "no review at all" of the claims, in which case the plaintiff may proceed under the federal-question jurisdiction statute. *Id.*

RICU's claims arise under the Medicare laws, but it does not even allege that it or ***any*** claimant has ever presented a specific claim for payment to Medicare for RICU's services. RICU has not obtained a final decision nor exhausted its administrative appeals. Because RICU's claims may still be reviewed administratively when an appropriate claimant properly brings them, this is not a case where declining jurisdiction results in "no review at all." Section 405(h) therefore removes this Court's jurisdiction to hear RICU's claims, which must be dismissed.

A.    RICU's claims "arise under" Medicare.

"The Supreme Court has held that a wide range of claims 'arise under' Medicare." *Sensory*,
977 F.3d at 975.   Accordingly, "virtually all legal attacks" concerning Medicare must be
"channel[ed] . . . through the agency."  *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S.
1, 13 (2000) (quotation marks omitted); *see Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1112 (9th
Cir. 2003) ("[C]ourts have considered numerous cases that do not, on their face, appear to claim
specific Medicare benefits or reimbursements yet have been found to arise under Medicare").

The question here is not a close one: RICU claims that Medicare must—under its own
rules—make payment for overseas critical-care telehealth services.  *See* Compl. ¶ 82 (alleging
refusal to make payments "*violates the Telehealth Statute*" at 42 U.S.C. § 1395m(m)); *id.* ¶ 94
(alleging refusal to make payments "*violates the Telehealth Rule*" at 42 C.F.R. § 410.78); *id.* ¶
102 (alleging refusal to make payments is improper "in light of 42 U.S.C. § 1395f(f)" of the
Medicare statute); *id.* ¶ 103 (refusal to make payments is "contradicted by the agency's own
positions" in the Telehealth Rule at 42 U.S.C. § 410.78); *id.* at Prayer for Relief (asking the Court
declare "[t]hat Defendants *violated the Medicare Act* and the APA in announcing a policy that
Medicare will not pay for critical-care telehealth services" when the physician is outside the United
States).  A claim that Medicare must make payments under the Medicare laws, on its face, arises
under Medicare.  *See Cmty. Oncology All., Inc. v. OMB*, 987 F.3d 1137, 1143 (D.C. Cir. 2021)
(claims "plainly" arose under Medicare where an association "assert[ed] that its members are
entitled to additional reimbursement under the Medicare Act").  Even if there was any doubt, RICU
itself claims that this Court has jurisdiction *under the Medicare laws*.  *See* Compl. ¶ 18 (claiming
jurisdiction exists under 42 U.S.C. §§ 405(g) and 1395ff(b)(1)(A)).

Determining whether a claim arises under Medicare requires the Court to look at the
claim's "essence" to determine whether its "substantive basis" is in Medicare, including but not
limited to whether it is "inextricably intertwined with [a] claim for benefits."  *Heckler*, 466 U.S.
at 614-615 (concluding declaratory and injunctive claims seeking to compel Medicare to cover a
particular procedure arose under Medicare).  RICU places the substantive basis of its claims in the

Telehealth Statute and Telehealth Rule, which are both part of the Medicare laws.  And the "essence" of its claim—that Medicare must make the critical-care telehealth payments RICU seeks—is inextricably intertwined with prospective future benefits claims for RICU's services. *See* Compl. ¶ 84 (alleging hospitals would be more likely to contract with RICU if Medicare paid for its services); *id.*, Prayer for Relief (seeking an injunction requiring Medicare to pay future claims regardless of "a physician's or practitioner's physical location outside of the United States at the time of service").  But § 405(h) "precludes Section 1331(a) jurisdiction of suits seeking eventual realization" of such claims for "reimbursement under the Medicare Act."  *Ass'n of Am. Med. Colls. v. Califano*, 569 F.2d 101, 107 (D.C. Cir. 1977); *see also Mount Sinai Med. Ctr. of Greater Miami v. Sullivan*, No. CIV. A. No. 89-2224 RCL, 1990 WL 204693, at *6 (D.D.C. Nov. 30, 1990) ("[N]o matter how plaintiff frames its challenge, the essence of the claim is for additional reimbursement under the Medicare Act.").

It is immaterial that RICU's challenge seeks to obtain injunctive relief that will permit *other* parties (namely, its hospital clients or Medicare beneficiaries) to make claims on Medicare— such a challenge still ***arises*** under Medicare.  In *Sensory*, the appellant was a medical device company that was informed by CMS that one of its products—a prescription leg massager—was a personal comfort item that was not covered by Medicare.  *See* 977 F.3d at 976-977.  The device manufacturer argued it did not need to comply with § 405(g)'s channeling requirements because "it [wa]s seeking to create an entitlement to benefits for others, but not for itself."  *Id.* at 979.  The Ninth Circuit rejected that argument, concluding the device maker's attempt to make its product reimbursable for Medicare beneficiaries arose under Medicare.  *Id.* at 978-981.  RICU, like the device manufacturer in *Sensory*, "is a third party to the relationship between Medicare beneficiaries and the government."  *Id.* at 979.  But for purposes of § 405(g)-(h) that distinction is "immaterial."  *Id.*  As the Ninth Circuit further explained, permitting third-party challengers—like RICU—to "circumvent Medicare's administrative channeling scheme" by seeking injunctive relief on behalf of beneficiaries or providers would undermine the purpose of agency review.  *Id.* at 980.  Thus, § 405(h) forecloses "third-party providers or suppliers bring[ing] declaratory

judgment actions in federal court before the beneficiaries undergo the medical procedure or obtain the device in question." *Id.* This case proves the wisdom of that rule, as RICU has not alleged that even a ***single*** claimant has yet sought Medicare payment for its services.

The First Circuit reached the same conclusion as the Ninth Circuit in *Puerto Rican Ass'n of Physical Medicine and Rehabilitation, Inc. v. United States*, 521 F.3d 46, 48 (1st Cir. 2008). In that case an association of medical doctors challenged limitations on Medicare reimbursement for physical therapy. *Id.* at 47. The First Circuit rejected the association's argument that its challenge was to "a regulation and does not directly request payment," because "it seeks at its heart the extension of Medicare benefits." *Id.* at 48. The challenged regulation was "simply a limitation on the claims that Medicare will pay and so foreshadows the denial of such claims." *Id.* Even though the association sought "to challenge an administrative regulation rather than a particular factual determination," for purposes of § 405(g)-(h) the difference "does not matter." *Id.* at 49.

RICU's challenge here is on all fours with the rejected claims in *Sensory* and *P.R. Ass'n*. Like those prior challengers, RICU is a "third party suing to create coverage for medical care that it [can] provide." *See Sensory*, 977 F.3d at 980-981 ("Like Sensory, the plaintiff in *Puerto Rican Ass'n* was a third party suing to create coverage for medical care that it could provide. The First Circuit held that that lawsuit arose under Medicare. We hold the same as to Sensory's."); *see also P.R. Ass'n*, 521 F.3d at 48 (finding claim that "seeks at its heart the extension of Medicare benefits" would "appear barred by section 405(h) as construed by the Supreme Court."). The relief it seeks is to require Medicare to pay for services performed outside the United States so that hospitals will give RICU business. *See, e.g.,* Compl., ¶ 84; *id.*, Prayer for Relief (seeking an injunction requiring Medicare to "pay for critical-care telehealth services provided to patients located in the United States by physicians physically located outside of the United States"); Pl.'s Mem. at 40 (same). As the Ninth and First Circuits have explained, such a claim arises under Medicare.

RICU has indicated that it is likely to rely upon three recent district court decisions, all concerning related challenges to the same rule, where the courts found the claims at issue did not arise under Medicare, and thus did not require channeling. *See* Pl.'s Response to Defs.' Mot. to

Extend Their Time to Respond & to Set a Briefing Schedule, at 3, ECF No. 13 (citing *Regeneron Pharm., Inc. v. HHS*, No. 20-CV-10488 (KMK), 2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020); *Cal. Life Scis. Ass'n v. CMS*, No. 20-CV-08603-VC, 2020 WL 7696050 (N.D. Cal. Dec. 28, 2020); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, No. CV CCB-20-3531, 2020 WL 7640818 (D. Md. Dec. 23, 2020)). All three of those cases concerned challenges to the Most Favored Nation Rule ("MFN Rule"), *see* 85 Fed. Reg. 76180 (Nov. 27, 2020), which sought to lower Medicare drug prices through a payment model that would take greater account of international prices. *See Ass'n of Cmty. Cancer Ctrs.*, 2020 WL 7640818, at *1. Critically, the MFN Rule was "promulgated pursuant to 42 U.S.C. § 1315a," which is located in **Subchapter XI** of Title 42 of the United States Code. *Id.*;[6] *see also Regeneron Pharm.*, 2020 WL 7778037, at *8 (MFN Rule was "promulgated pursuant to § 1315a of **Subchapter XI**"); *Cal. Life Scis. Ass'n*, 2020 WL 7696050, at *1 ("[T]he plaintiffs challenge the government's implementation of a model under 42 U.S.C. § 1315a, which is in **subchapter XI**").[7] By contrast, the challenged rules and regulations here—Medicare's foreign payment bar (42 U.S.C. 1395y(a)(4)), the Telehealth Statute (42 U.S.C. § 1395m(m)), and the Telehealth Rule (42 C.F.R. § 410.78)—are all located in, or implemented under, **Subchapter XVIII** of the Medicare statute, which is titled "Health Insurance for Aged and Disabled."

This distinction, while bookish, makes all the difference. In the three cases above, the courts found that the MFN Rule did not arise under Medicare specifically because the rule was promulgated under Subchapter XI, rather than Subchapter XVIII like each of the challenged statutes and rules here. *See Regeneron Pharm.*, 2020 WL 7778037, at *7 (Section 405(h) "does not bar review **because it applies to Subchapter XVIII**, and **Plaintiff's claim arises under Subchapter XI**."); *Cal. Life Scis. Ass'n*, 2020 WL 7696050, at *1 ("Section 1395ii similarly incorporates section 405(h) into the Medicare statute, **but only 'with respect to this subchapter'**—

---

[6] Subchapter XI is titled "General Provisions, Peer Review, and Administrative Simplification."

[7] Section 1315a, enacted as part of the Patient Protection and Affordable Care Act of 2010, created the Center for Medicare and Medicaid Innovation to "test innovative payment and service delivery models" for purposes of "reduc[ing] program expenditures" in Medicare. 42 U.S.C. § 1315a(a)(1).

*subchapter XVIII*. Here, the plaintiffs challenge the government's implementation of a model under 42 U.S.C. § 1315a, *which is in subchapter XI*." (citation omitted)); *Ass'n of Cmty. Cancer Ctrs.*, 2020 WL 7640818, at *1 ("[T]he plaintiffs' claims arise under 42 U.S.C. § 1315a, *which is in subchapter XI* ('General Provisions, Peer Review, and Administrative Simplification'), *whereas section 1395ii is in subchapter XVIII ('Health Insurance for Aged and Disabled')*."). All three decisions found that because § 405(h) applies only "with respect to this subchapter"— Subchapter XVIII—it posed no bar to the MFN Rule challenges. *Id.* These decisions, even assuming that they are correct, reinforce that RICU's challenge arises under Medicare because its claims, unlike those challenging the MFN Rule, indisputably target laws within the Medicare subchapter—Subchapter XVIII.

## B.   RICU has not presented a claim or exhausted its administrative remedies.

Because RICU's claims arise under Medicare, it must obtain a "final decision" within the meaning of Medicare's channeling requirements before invoking this Court's jurisdiction. *See Sensory*, 977 F.3d at 976; 42 U.S.C. § 405(g). "The Supreme Court has held that § 405(g) imposes two distinct preconditions for obtaining judicial review of covered Medicare claims." *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018). "First, the plaintiff must have 'presented' the claim to the Secretary." *Id.* "Second, the plaintiff must fully exhaust all available administrative remedies[.]" *Id.* at 826. Channeling further demands that a plaintiff present its claim to the Secretary "in the context of a specific administrative claim for payment." *Id.*; *accord Heckler*, 466 U.S. at 622 (concluding the requirements of § 405(g) are not met where the plaintiff "has not given the Secretary an opportunity to rule on a concrete claim for reimbursement"). RICU has not met either precondition for a final decision.

RICU does not allege that it has presented a "specific administrative claim for payment" or "concrete claim for reimbursement" to the Secretary. In fact, RICU has not even alleged that a *single* Medicare claimant has *ever* sought payment for its critical-care telehealth services. "Therefore, [RICU has] neither presented [its] claim nor obtained any administrative decision at all, much less the 'final decision' required under § 405(g)." *Am. Hosp. Ass'n*, 895 F.3d at 826; *see*

*also Cmty. Oncology All.*, 987 F.3d at 1144 ("Because [plaintiff] did not identify any concrete reimbursement claim that its members presented to the agency, section 405(g) does not confer subject-matter jurisdiction."); *Am. Hosp. Ass'n v. Azar*, 415 F. Supp. 3d 1, 4 (D.D.C. 2019) (concluding third-party hospital organization failed to present claim challenging Medicare reimbursement rule where it had not challenged the rule "in the context of a specific administrative claim for payment" (quoting *Am. Hosp. Ass'n*, 895 F.3d at 826)); *Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*, 62 F. Supp. 3d 114, 123 (D.D.C. 2014) (finding no presentment where claims "were not tied to any concrete claims" for payment and plaintiff instead only offered letters with "detailed critiques" and "general complaints").

RICU has, for substantially the same reasons, failed to "exhaust all available administrative remedies." *Am. Hosp. Ass'n*, 895 F.3d at 826. It makes no allegation that it, or any other claimant, has availed itself of Medicare's administrative review process. *See generally* 42 C.F.R. § 405.904; *see also Cmty. Oncology All., Inc.*, 987 F.3d at 1144 (affirming dismissal where plaintiff could not demonstrate "complete exhaustion" necessary for jurisdiction under § 405(g)). RICU's complaint and motion fail to explain why it or another claimant could not pursue such a review process and obtain a final decision from the Secretary.

RICU's complaint suggests that its correspondence with CMS in the summer and fall of 2020 is sufficient to comply with § 405(g). *See* Compl. ¶ 18; *see also id.*, Exs. 1-7. But this informal correspondence merely shows RICU seeking, and Defendants providing, guidance about the meaning of longstanding Medicare rules. *Id.* None of RICU's inquiries presented a "specific administrative claim for payment" or "concrete claim for reimbursement" to the Secretary. *Id.* Courts within this Circuit have appropriately rejected attempts to skip Medicare's channeling requirement through letter-writing campaigns that do not present concrete claims for payment. *See Am. Orthotic & Prosthetic Ass'n,*, 62 F. Supp. 3d at 123 (finding "generalized grievance letters" offering "detailed critiques" to be "insufficient to establish presentment"). RICU cannot "circumvent the Medicare appeals process by relying upon its correspondence" with CMS. *Three Lower Cntys. Cmty. Health Servs. Inc. v. HHS*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (collecting

cases), *aff'd,* 317 F. App'x 1 (D.C. Cir. 2009).  Rather, it "must pursue its claim under [§ 405(g)] in the manner which Congress has provided."  *Id.* (quoting *Heckler*, 466 U.S. at 622).

It does not matter that Mr. Kouzoukas's October 29, 2020 letter purports to have been sent "on . . . behalf" of then-Secretary Azar.  *See* Compl., Ex. 7.  That one-page, three-paragraph letter merely responded to numerous "letters [from RICU] to Secretary Azar asking Medicare to pay for telehealth services furnished by physicians who are physically located outside of the United States."  *Id.*  Nothing in Mr. Kouzoukas's letter purports to be a "final decision" from the Secretary or to adjudicate a specific claim, and indeed the letter offers no legal analysis, merely readopting the position CMS took in its earlier June 1, 2020 letter.  *Id.*  Such a rote letter sent only "on . . . behalf" of the Secretary in response to informal correspondence is not a substitute for a final decision from the Secretary intended to adjudicate a specific administrative claim for payment.  *See Three Lower Cntys.*, 517 F. Supp. 2d at 435 (collecting cases).

This case is no different from *Sensory*, where the same Mr. Kouzoukas *also* "sent [plaintiff] a brief letter affirming" an earlier letter from CMS explaining it could not pay for the medical device at issue.  *See Sensory*, 977 F.3d at 977.  The court nonetheless concluded plaintiff "ha[d] not obtain a 'final decision' within the meaning of § 405(g)."  *Id.* at 981-982.  Mr. Kouzoukas's letter in *Sensory* is materially the same as the letter he sent RICU—it does not claim to be a "final decision," offers no legal analysis, summarily reaffirms earlier correspondence, and does not offer any information about appellate rights.  *Compare* ECF No. 1-7 *with* Dodge Decl., Ex. C.

The complaint also repeatedly stresses that CMS made a self-described "exhaustive review" of its regulations in response to RICU's inquiries.  *See* Compl. ¶¶ 7, 18, 74-75, 78.  But the fact that officials at CMS undertook a careful and thorough review of existing regulations to offer RICU guidance is **not** a substitute for RICU itself exhausting all available administrative channels, as required by § 405(g).  To the extent RICU suggests this meets Medicare's channeling requirements, RICU gets it backwards—it is the **claimant's** obligation to exhaust all possible administrative remedies before invoking federal jurisdiction, **not** the agency's.  *See Am. Hosp. Ass'n*, 895 F.3d at 826 ("the ***plaintiff*** must fully exhaust all available administrative remedies").

RICU has made no effort to exhaust available administrative channels and there is no dispute that a proper claimant could file a claim with Medicare seeking payment for use of RICU's telehealth services. RICU has therefore neither presented its claim nor exhausted administrative review.

### C.  Judicial review remains available for RICU's claims.

RICU's challenge does not fall within the narrow exception that permits judicial review where requiring channeling would result in "no review at all" of the claims. *See Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680 (1986). The Supreme Court has explained the exception does not apply in instances where channeling would merely result in "postponement [that] would mean added inconvenience or cost in an isolated, particular case." *Ill. Council*, 529 U.S. at 22. "Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id.* at 23 (emphasis in original). The channeling requirement here does ***not*** completely preclude judicial review; proper claimants are free to file claims for the telehealth services offered by RICU and then pursue those claims through the administrative review process to, ultimately, federal judicial review. Though this review is available, RICU fails to point to a single claimant who has pursued such review.

It does not matter that RICU itself may never be able to seek administrative review; the "no review" exception applies only where the channeling requirement results in ***complete*** preclusion of judicial review to ***all possible claimants***. The D.C. Circuit explained that a challenger's "objection that it could not itself become a party to the administrative proceedings is an objection the Supreme Court rejected." *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 817 (D.C. Cir. 2005) (citing *Ill. Council*, 529 U.S. at 24). In that case a chiropractic association challenged a rule defining who could provide Medicare-covered chiropractic services, but the D.C. Circuit found it lacked jurisdiction under § 405(g)-(h) because the association failed to present its claim to the agency. *Id.* at 816. The court explained that even if the association could not present a claim, judicial review remained available so long as a Medicare enrollee could file a claim and, after being refused payment, file a grievance. *Id.* That "would trigger the administrative process,

at the end of which is judicial review of the Secretary's final decision." *Id.* at 817.   Numerous other federal appeals courts have reached the same conclusion, holding that judicial review remains available so long as ***some claimant***—even if not the plaintiff—retains the ability to seek judicial review after channeling its claim. *See, e.g.*, *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 505 (5th Cir. 2018) ("[W]e have required channeling so long as 'there potentially were other parties with an interest and a right to seek administrative review.'" (quoting *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 657 (5th Cir. 2012))); *Sensory*, 977 F.3d at 983 (agreeing with other appeals courts that "if another party can bring the same claim through the existing administrative channel, and is sufficiently incentivized to do so, then some review is available, and the *Michigan Academy* exception does not apply"); *cf. P.R. Ass'n*, 521 F.3d at 49-50 ("Appellants could provide service to a couple of patients through therapists who do not qualify, submit claims for reimbursement, and candidly admit in their filings that their only challenge is to the regulation.")

RICU's situation resembles the plaintiffs in *Colo. Heart Inst., LLC v. Johnson*, 609 F. Supp. 2d 30, 36 (D.D.C. 2009).   There, several laboratories providing cardiac catheterization services challenged a Medicare rule that permitted only hospitals (and not laboratories) to bill for such catheterization services, without first channeling their claim. *Id.* at 32-33.   The district court found that it lacked jurisdiction despite the plaintiffs' "lack of a direct avenue to administrative review" because that did "not mean that they could not get their *claim* heard." *Id.* at 37 (emphasis in original).   Rather, judicial review remained available because "[a]ny one of the hospitals 'under arrangement' with [the laboratories] could get administrative and judicial review" of the rule, and "[l]ike the chiropractors in *American Chiropractic* whose claims could be heard indirectly through their patients, the [laboratories] here could have their claim heard indirectly through a hospital with which they contract." *Id.* at 36.   RICU—which claims to have contracts with hundreds of hospitals in dozens of states—could similarly have its claim heard indirectly if a proper claimant, such as one of its client-hospitals or a beneficiary, seeks reimbursement from Medicare and then pursues an administrative claim. *See also Cal. Clinical Lab'y Ass'n v. HHS*, 104 F. Supp. 3d 66, 82 (D.D.C. 2015) (finding "no review" exception did not apply where it was "undisputed that

23

[plaintiff's] members are Medicare providers that are entitled to appeal initial coverage determinations through the administrative Medicare claims review process"); *Nat'l Hospice & Palliative Care Org., Inc. v. Weems*, 587 F. Supp. 2d 184, 195 (D.D.C. 2008) (concluding "no review" exception did not apply to challenge brought by national palliative care organization where individual members could still pursue administrative claims).

Judicial review remains available to these other possible claimants regardless of the fact that a challenge might involve certain costs, risks, or inconveniences.  "[I]t is not enough that claimants would encounter 'potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review,' or that their claims might not receive adequate administrative attention." *Am. Chiropractic Ass'n*, 431 F.3d at 816 (quoting *Ill. Council*, 529 U.S. at 23).  "The difficulties must be severe enough to render judicial review unavailable as a practical matter." *Id.*  RICU's papers suggest that its hospital clients strongly desire that Medicare pay for RICU's services, and therefore have ample incentive to file a claim. *See, e.g.* Compl. ¶ 84; Pl.'s Mem. at 35; Rabinowitz Decl. ¶¶ 36-40.  Courts within this Circuit have routinely found similar hypothetical claimants to have sufficient incentive to pursue claims and obtain judicial relief, voiding the "no review" exception. *See, e.g.*, *Am. Chiropractic Ass'n*, 431 F.3d at 817; *Colo. Heart*, 609 F. Supp. 2d at 36; *Cal. Clinical Lab'y Ass'n*, 104 F. Supp. 3d at 82. Because judicial review remains available for RICU's claims, the Court may not look past its failure to properly channel those claims.

## II.   Plaintiff Has Failed To Carry Its Heavy Burden for Preliminary Relief

RICU presents a deeply flawed request for preliminary relief.  Its merits theory that Medicare must pay for overseas telehealth services—and that Defendants have misread their own rules governing telehealth payments for over two decades without legal challenge—is belied by statutory text that RICU simply ignores.  RICU's claim of irreparable harm is fatally undermined by, among other things, its decision to wait ***nearly nine months*** before seeking relief.  Its already vague and speculative claims of harm are further undermined by the fact that it cannot identify a ***single*** claimant that has yet filed a claim with Medicare for its services.  Finally, the public interest

and balance of equities *strongly* weigh against granting RICU's injunction which, if granted, would force Medicare to make payments for which no lawful rate exists and pay physicians that it lacks any ability to regulate or police, compromising program integrity.

### A.     RICU is unlikely to prevail on the merits.

RICU brings two claims: one seeking a declaration that Medicare's refusal to make payments for RICU's overseas telehealth services is contrary to law (Compl. ¶¶ 86-97) and another alleging the refusal is arbitrary and capricious under the Administrative Procedure Act ("APA") (Compl. ¶¶ 98-108).   Both claims lack merit, and fail to state a claim, because the governing statutes and rules expressly bar Medicare from making the payments RICU seeks.

### 1.     The Medicare statute bars the payments that RICU seeks.

Medicare bars payment for physician services "which are not provided within the United States."  42 U.S.C. § 1395y(a)(4); *see also* 42 C.F.R. § 411.9(a) ("Basic rule. . . . Medicare does not pay for services furnished outside the United States.").   A physician or practitioner outside of the United States does not "provide" their services within the United States.   Instead, they "supply or make available" their services from their physical location overseas.  *See* Provide, Merriam-Webster (11th ed. 2003).   That a patient *receives* such services domestically does not alter the fact that, as offered by RICU, those services are made available and supplied from abroad.  Medicare's statutory bar on payments for physician services provided outside the United States therefore resolves this case.

Even absent the foreign payment bar, the Telehealth Statute makes clear that Medicare has no discretion to make payments for services provided abroad.  That statute requires that Medicare pay the physician or practitioner located at the distant site "an amount equal to the amount that such physician or practitioner would have been paid under this title had such service been furnished without the use of a telecommunications system."  42 U.S.C. § 1395m(m)(2)(A).  In other words, the physician must be paid the same fee under the PFS that he or she would be paid for providing the same service, in the same location, without a telecommunications system.  The Telehealth Statute reinforces that the PFS rate is tied to the provider's location by mandating a *separate*

facility fee for the originating site.  *Id.* § 1395m(m)(2)(B).  Though the statutory text is plain, CMS has consistently reiterated its meaning over the past two decades through its rulemaking, its manuals, and its COVID-19 FAQ.  *See supra* Section I.B.2-3.

Remarkably, RICU does not acknowledge, discuss, or even cite § 1395m(m)(2) in its complaint or motion, even though that provision reflects Congress's express command about telehealth payments—a PFS payment to the provider at the distant site based on their geographic location and a flat facility fee for the originating site.  *See* 42 U.S.C. § 1395m(m)(2).  RICU's construction of the relevant telehealth laws collapses in view of Congress's decision to peg fee schedule payments to the location of the provider at the distant site.  Medicare ***cannot*** provide "an amount equal" to what a provider offering their services at a foreign distant site would typically be paid because ***no such fee schedule amount exists***.  The PFS, naturally, does not include fee schedule areas outside of the United States and CMS does not issue GPCIs for such areas.  In view of the foreign payment bar in § 1395y(a)(4), CMS lacks power to even promulgate such fees.[8]

### 2. *RICU offers a flawed construction of the telehealth laws.*

RICU offers three arguments in support of its construction of the telehealth laws, but none overcome the clear statutory language.  *See* Pl.'s Mem. at 23.  *First*, RICU notes that the Telehealth Statute defines an "eligible telehealth individual" as a person who "receives a telehealth service furnished at an originating site."  42 U.S.C. § 1395m(m)(4)(B).  Plaintiff suggests this language implies that the originating site "is where a telehealth service is both provided by the physician . . . and obtained by the patient."  Pl.'s Mem. at 24.  RICU places immense significance on this sliver

---

[8] The relevant telehealth laws include additional indicia that the provider of telehealth services cannot be located outside of the United States under Medicare.  For example, both the Telehealth Statute and Telehealth Rule adopt definitions of "physician" and "practitioner" that restrict such terms to individuals providing services within states.  *See, e.g.*, 42 U.S.C. § 1395x(aa)(5) (defining "physician assistant" and "nurse practitioner" as individuals who "perform[] such services as . . . legally authorized to perform (***in the State in which the individual performs such services***) in accordance with State law"); *id.* § 1395x(bb)(2) (defining "certified registered nurse anesthetist" in reference to "***the State in which the services are furnished***"); *id.* § 1395x(hh)(2) (defining "clinical social worker" in reference to "***the State in which such services are performed***"); *see also* 42 C.F.R. § 410.20(b) (defining "physician" as a professional "legally authorized to practice by the State ***in which he or she performs the functions or actions***[.]"  Accordingly, RICU's overseas providers likely do not qualify as "physicians" or "practitioners" under the telehealth laws.

of text but its construction is misguided for several reasons.  As an initial matter, it erases from the statute the express language tying the provider's PFS fee to their geographic location at the distant site—statutory text that RICU does not even cite in its papers.  *See* 42 U.S.C. § 1395m(m)(2)(A); *see also supra* at 25-26.  RICU offers no explanation for how the Telehealth Statute could simultaneously compensate providers based on their geographic location, but also consider their services as being "furnished" solely at the originating site.  Contrary to RICU's buffet-style approach, the Telehealth Statute must be read "as a symmetrical and coherent regulatory scheme," with all provisions "fit . . . into an harmonious whole."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

RICU's construction further ignores that the Telehealth Statute mandates a ***separate*** fee for the facility at the originating site.  *See* 42 U.S.C. § 1395m(m)(2)(B).  In contrast to the PFS fee paid to the provider at the distant site, the GPCI does "not apply to the facility fee for the originating site" because the "fee is statutorily set and is not subject to the geographic payment adjustments authorized under the physician's fee schedule."  66 Fed. Reg. at 55,246.  This twin payment scheme reflects that telehealth services may be "furnished" simultaneously by two entities in two places—by the provider at the distant site ***and*** the facility at the originating site. That understanding provides logical meaning to the language fixed upon by RICU—that a patient "receives a telehealth service furnished at an originating site" ***by the originating site facility***— without reading § 1395m(m)(2)(A) out of the statute altogether, as RICU urges.  *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative").

RICU's *second* argument—made in a single, brief paragraph—is that the Telehealth Statute implicitly repealed the foreign payment bar in the organic Medicare statute for purposes of telehealth services.  *See* Pl.'s Mem. at 26.  RICU notes that the Telehealth Statute compensates for telehealth services "***notwithstanding*** that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary," *id.* (quoting 42 U.S.C. § 1395m(m)(1)) (emphasis in original), and reasons that the term "notwithstanding" means the

Telehealth Statute must prevail over the organic Medicare statute in cases of conflict. *Id.* This argument, too, is wrong. The cited language merely clarifies that, contrary to the then-longstanding rule, Medicare could pay for traditional services when furnished as telehealth rather than in-person. *See* Smolensky, 13 Health Matrix at 375 (explaining that Medicare did not traditionally pay for in-person services when provided as telehealth). The language does not purport to define where the services occur for purposes of payment. RICU notably omits any reference to the actual provisions of the Telehealth Statute that do govern such payments.

As it does with § 1395m(m)(4)(B), *see supra* at 26, RICU seeks to squeeze implied meaning into the text of § 1395m(m)(1) where none exists. RICU repeatedly argues that Defendants ignore the "notwithstanding" language in § 1395m(m)(1) by refusing to pay for its services. *See e.g.*, Pl.'s Mem. at 4, 23-27, 29. But Medicare routinely pays for telehealth services "notwithstanding" the differing locations of the physician and patient, provided each are within the United States. Contrary to RICU's arguments, CMS is barred from paying for its telehealth services not because RICU's physicians and their patients are in different locations, but rather because CMS cannot pay for services provided outside of the United States. *See* Compl., Ex. 4 (citing 42 U.S.C. § 1395y(a)(4)). These same physicians could provide Medicare-covered telehealth services "notwithstanding" their differing locations from the patient provided they do so within the United States. Nothing in the language latched upon by RICU, or the Telehealth Statute generally, speaks to permitting Medicare to pay for services provided outside of the United States.[9]

---

[9] RICU's strained reading of the "notwithstanding" language in the statute is not aided by its cited cases (Pl.'s Mem. at 26) as both cases concerned instances where the term "notwithstanding" was used in direct reference to provisions meant to be excluded. *See NLRB v. Sw Gen., Inc.*, 137 S. Ct. 929, 936 (2017) ("notwithstanding" in statute referred to specific paragraph in the same statute); *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 14 (1993) ("notwithstanding" referred to other provisions of the same contract, tracking statutory language). By contrast, the "notwithstanding" in § 1395m(m) is directed towards the location of doctor and patient, ***not*** other provisions of the Medicare statute.

RICU's argument suggests that Congress, in the Telehealth Statute, chose to overrule a foundational rule in the organic Medicare statute solely by implication. But such "'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662-663 (2007) (quoting *Watt v. Alaska,* 451 U.S. 259, 267 (1981)). Courts will not infer such implicit repeal "unless the later statute expressly contradicts the original act" or unless such a construction "is absolutely necessary . . . in order that the words of the later statute shall have any meaning at all." *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (cleaned up); *accord Posadas v. Nat'l City Bank of N.Y.,* 296 U.S. 497, 503 (1936) ("[T]he intention of the legislature to repeal must be clear and manifest"). RICU points to nothing in the Telehealth Statute even suggesting— never mind showing "clear and manifest" intent—that Congress desired to take the dramatic step of expanding Medicare payments to overseas physicians and practitioners.

The Telehealth Statute's payment for services "notwithstanding that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary" is, against the backdrop of the longstanding foreign payment bar, comfortably understood as permitting ***domestic*** telehealth services. That would be the best reading of the Telehealth Statute even without the foreign payment bar because it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arab. Am. Oil Co.*, 499 U.S. 244, 248 (1991)). RICU's argument that Congress silently intended for the Telehealth Statute to extend Medicare extraterritorially, over a decades-old statutory bar on such payments, cannot support a finding of implicit repeal. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("Repeal is to be regarded as implied only if necessary to make the (later enacted law) work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." (quoting *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 357 (1963))); *accord Branch v. Smith*, 538 U.S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes

are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" (quoting *Posadas*, 296 U.S. at 503)).[10]

RICU's *third* merits argument is largely just a recitation of its first—that telehealth services are actually furnished at the originating site.  *See* Pl.'s Mem. at 26-29.  RICU observes that the Telehealth Rule specifies "services are furnished to a beneficiary at an originating site."  *Id.* at 26 (quoting 42 C.F.R. § 410.78(b)(3)).  But as previously explained, this isolated bit of text does not supply the meaning RICU desires.  *See supra* at 26-27.  The Telehealth Statute recognizes that telehealth services may be furnished at a distant site by a provider paid according to the PFS, and simultaneously by a facility at the originating site, compensated through a statutorily proscribed facility fee.  *See* 42 U.S.C. § 1395m(m)(2)(A)-(B).  RICU points to nothing in the Telehealth Rule that purports to extend Medicare coverage abroad.  *See generally* 42 C.F.R. § 410.78.

RICU next attacks Defendants' ostensible reliance upon the 2001 rulemaking for the Telehealth Statute, alleging that only a "single sentence" in the rule's preamble supports linking physician compensation with the geography of the distant site.  *See* Pl.'s Mem. at 27-28 (alleging HHS relies upon a "fleeting statement" and a "passing remark" to support its position).  This attack is a sideshow because the statutory text already supplies the answer here.  *See* 42 U.S.C. § 1395m(m)(2).  RICU, again, fails even to acknowledge this fatal statutory language in its papers. *See generally* Compl.; Pl.'s Mem.  But even if resort to the rulemaking was necessary to construe the statute, RICU is again wrong on all counts.  HHS's rulemaking is in fact replete with discussion linking the PFS fee to the geographic location of the provider.  *See, e.g.*, 66 Fed. Reg. at 55281 (explaining Telehealth Statute requires paying the provider "an amount equal to the amount that physician or practitioner would have been paid under Medicare had the service been furnished without the use of a telecommunications system"); *id.* at 55282 (Telehealth Statute "provides for

---

[10] RICU's argument is further undermined by the fact that the Telehealth Statute adopts a statutory definition of "physician" that expressly refers to § 1395y(a)(4).  *See* 42 U.S.C. § 1395m(m)(1) (adopting the statutory definition of "physician" codified at 42 U.S.C. § 1395x(r), which in turn expressly refers to § 1395y(a)(4)). Congress therefore intended the Telehealth Statute to be read in reference to the foreign payment bar's specific exemptions, not as an implicit repeal.

a professional fee for the physician or practitioner at the distant site (equal to the applicable Part B fee schedule amount) and a $20 facility fee for the originating site"); *id.* at 55284 ("for payment purposes, **the site of service for the telehealth service is the location of the physician or practitioner at the distant site**").  And nothing in the Telehealth Rule is inconsistent with that discussion.  *See generally* 42 C.F.R. § 410.78.[11]

> ### 3.    *Medicare's longstanding rules are not arbitrary and capricious.*

RICU's second claim, that Medicare's refusal to make payment for its service is arbitrary and capricious (*see* Pl.'s Mem. at 29-33), fails for substantially the same reasons as above.  A rule "compelled by the one true reading of a statute cannot be arbitrary and capricious."  *Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 832 (D.C. Cir. 1993) (citing *H. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 210 (1969)) (Ginsburg, J., concurring); *see also Friends of Animals v. Jewell*, 82 F. Supp. 3d 265, 279 (D.D.C. 2015) (a rule "compelled by the statute" is "consistent with congressional intent" and "therefore not arbitrary and capricious under the APA"), *aff'd,* 824 F.3d 1033 (D.C. Cir. 2016).  As explained (*supra* at 25-26), Congress mandated that Medicare pay physicians based on the applicable PFS rate for their location at the distant site.  For over two decades, Medicare and its applicable rules have complied with that mandate.  *See supra* Sections I.B.2-3.

RICU's arbitrary and capricious arguments mostly rehash the above.  It contends Defendants ignored Congress's instruction to pay for telehealth services "notwithstanding" that the physician and patient are in separate locations.  *See* Pl.'s Mem. at 29-30.  But as explained,

---

[11] RICU briefly tosses in the argument, without serious explanation, that the statutory exemptions to the foreign payment bar in § 1395f(f)(1) permit payment for its services.  *See* Pl.'s Mem. at 28-29.  But that section, which Congress passed due to the "special problems of border residents," *see* H.R. Rep. No. 92-231 at 77, permits payments to foreign hospitals for "***inpatient*** hospital services" provided to a Medicare beneficiary where the foreign hospital is closer "than the nearest hospital within the United States" that could provide care.  *See* 42 U.S.C. § 1395f(f)(1).  RICU offers no explanation at all as to how this section could cover care where the patient does not receive inpatient care at a hospital outside of the United States.

that language does not suggest Congress intended Medicare to apply extraterritorially, particularly in view of Medicare's longstanding bar on foreign payments. *See supra* at 27-30.  RICU suggests Defendants have ignored that telehealth services are "furnished" at an originating site (*see* Pl.'s Mem. at 30-31), but it is again RICU that ignores the Telehealth Statute's mandate to provide two separate payments—a PFS fee accounting for the GPCI at the distant site provider's location and a statutory fee for the originating site facility. *See supra* at 25-27.[12]

RICU next argues that Medicare's refusal to make payment is arbitrary and capricious in view of the need to expand telehealth services during the pandemic. *See* Pl.'s Mem. at 30-31.  To the extent RICU believes the Telehealth Statute is too narrow as a policy matter, its dispute is with Congress, not Defendants.  "If the statute requires expansion, that is the job of Congress." *Action on Smoking & Health v. Harris*, 655 F.2d 236, 243 (D.C. Cir. 1980) (rejecting arbitrary and capricious claim where rule was consistent with the "statutory provision at issue here").  Just as importantly, and as explained in greater detail *infra* at Section II.B.3, RICU's requested relief would ***harm*** provision of telehealth services by forcing CMS into the untenable position of paying for services that lack any lawfully-authorized rate and without any corresponding mechanisms for ensuring program integrity and compliance.

Finally, RICU contends that Medicare's refusal to pay for its services is arbitrary and capricious in view of the waiver authority Congress gave the agency in response to the COVID-19 pandemic.  *See* Pl.'s Mem. at 33.  Defendants exercised that waiver authority to dramatically expand the kinds of services that could be covered under Medicare as telehealth (including critical-care services), and further to loosen restrictions on where a patient could receive Medicare-covered telehealth services.  *See supra* Section I.B.3.  But Congress's grant of power to waive certain

---

[12] RICU similarly argues that because Congress chose to impose limitations on what qualifies as an "originating site" but not on a "distant site," the "patient's location is the one that matters" for purposes of the telehealth laws.  *See* Pl.'s Mem. at 31.  This assertion, too, ignores that the statute expressly commands PFS payment based on the distant site.  *See* 42 U.S.C. § 1395m(m)(2)(A).

requirements in view of the pandemic did not empower Defendants to rewrite statutory mandates governing payment of telehealth services.[13]  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (a "construction [that] follows from the unambiguous terms of the statute . . . leaves no room for agency discretion").  Because these statutory mandates control the issue here, RICU cannot prevail on the merits of either of its claims, nor does it adequately plead a claim upon which relief can be granted.  *See, e.g.*, *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43 (D.D.C. 2018) (dismissing claims, including APA claim, where barred by unambiguous statutory text).  Nor did Congress intend for RICU to exercise the broad and discretionary waiver authority it committed to Defendants.  *See Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (issues "committed to agency discretion" are not reviewable under 5 U.S.C. § 701(a)(2)).

> **B.     RICU cannot establish irreparable harm.**

RICU has failed to establish that, absent preliminary relief, it will suffer irreparable harm for at least three reasons.  *First*, RICU delayed for most of a year before seeking preliminary relief, undermining any credible claim that the longstanding rules it challenges are causing it irreparable harm.  *Second*, RICU seeks a mandatory injunction that would require Defendants to rewrite a two-decade old scheme that has, to date, never been challenged on the grounds presented by RICU. The longstanding and unchallenged nature of the status quo strongly cuts against a claim of irreparable harm.  *Third*, even setting aside RICU's delay in seeking relief, the speculative and vague financial impairment described in its motion and supporting affidavit simply does not rise to the level of *irreparable* harm.  RICU's failure to establish irreparable is, alone, a sufficient reason to deny its motion.  *See Chaplaincy*, 454 F.3d at 297.

---

[13] Even if the waiver power extended so broadly, the scope of that power is restricted to waiving rules "in an emergency area" as declared by either the President or Secretary.  *See* 42 U.S.C. §§ 1320b-5(a), (g)(1).  On January 7, 2021, then-Secretary Azar declared a "nationwide" emergency area.  *See* Dodge Decl., Ex. E ("Renewal of Determination That A Public Health Emergency Exists").  The agency's emergency waiver power therefore does not extend overseas.

### 1.   *RICU unjustifiably delayed seeking preliminary relief.*

Defendants issued the IFR that expanded Medicare to cover critical-care telehealth services on April 6, 2020.  *See* 85 Fed. Reg. 19230 (Apr. 6, 2020).  RICU, recognizing that Medicare does not cover services provided outside of the United States, sought guidance from CMS on the issue. *See* Compl., Ex. 2.  CMS responded on June 1, 2020 explaining Medicare could not reimburse such services, pointing to the (1) half-century-old ban on such payments in the original Medicare statute; (2) payment scheme adopted by Congress in 2000; and (3) 2001 final rule implementing payment for telehealth services.  *See* Compl., Ex. 4 (citing 42 U.S.C. § 1395y(a)(4); *id.* § 1395m(m)(2)(A); 66 Fed. Reg. 55,246).  Shortly thereafter CMS published an FAQ explaining, even under the IFR, that "Medicare ***cannot pay for services that are furnished by a physician or practitioner located outside of the United States*** (see 42 CFR 411.9)" and further that for telehealth services "both the originating site ***and the distant site are subject to the statutory payment exclusion that prohibits Medicare payment for services that are not furnished within the United States***."  *See* CMS COVID-19 FAQs at 66, 82.  After more inquiries from RICU, CMS responded by pointing to the reasoning of the June 1 letter several times.  *See* Compl., Exs. 5, 7.

RICU successfully operated for its first ***eleven years*** without any prospect of Medicare payment for its critical-care telehealth services, but now claims this Court must issue extraordinary relief to immediately reverse that decade-old status quo.  Nonetheless, RICU waited ***ten months*** after issuance of the IFR, ***nearly nine months*** after CMS reaffirmed that existing statutes and rules barred the payments RICU desires, and ***seven months*** after publication of the IFR FAQ before filing the instant lawsuit and request for preliminary relief.  This unjustified delay dooms any claim of irreparable harm.  *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm" because "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits."); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding a delay of forty-four days before bringing a motion for preliminary injunction "inexcusable" where plaintiff

had knowledge of pending alleged harm); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) ("Courts in this jurisdiction have found that an unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." (cleaned up and collecting cases)).[14]   RICU has no excuse for this dilatory conduct as its complaint reveals that it was aware of this issue as early as April 22, 2020— ***ten months*** before it filed this case.  *See* Compl., Ex. 2.

> ### 2.   *RICU seeks to upset a longstanding status quo.*

Plaintiff's request for preliminary relief is further inappropriate because it "actually seeks to change the status quo in this case." *Humane Soc'y of U.S. v. Johanns*, No. CV 06-265 (CKK), 2006 WL 8460551, at *12 (D.D.C. Mar. 14, 2006) (denying preliminary injunction motion challenging a thirty year old program); *see also Kondapally*, 2020 WL 5061735, at *3 (observing that "[m]andatory injunctions that would change the status quo are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government" (citations omitted)).   Such a request is "highly atypical," because "'[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Johanns*, 2006 WL 8460551, at *12 (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).   The "sheer longevity" of the telehealth services payment regime that RICU seeks to overturn "essentially refutes [RICU's] irreparable injury arguments." *Id.* (finding plaintiff's alleged injuries "lack[ed] the kind of magnitude, immediacy, and imminence . . . necessary to establish the need for a preliminary injunction.").   RICU notably

---

[14] Mr. Kouzoukas reaffirmed on October 28, 2020 that existing regulations barred payment for services performed outside of the United States. *See* Compl., Ex. 7.  Defendants converted the IFR into a final rule on December 28, 2020. *See* 85 Fed. Reg. 84472. Even if that correspondence or a Federal Register document could be a proper basis for filing a lawsuit, neither of these dates serve as the appropriate starting point for when Plaintiff should have brought a claim, as the challenged rule was issued in 2001 and RICU was aware that Medicare would begin reimbursing critical-care telehealth as early as April 2020 when the IFR was published.  But even reading these facts as charitably as possible, RICU still waited nearly two months before filing suit, undermining any claim of irreparable harm. *See Mylan Pharm.*, 81 F. Supp. 2d at 44 (finding delay of two months "militates against a finding of irreparable harm"); *accord Frizzell*, 530 F.2d at 987.

fails to identify even a ***single*** Medicare claimant over the past two decades that has sought, and been denied, payment for telehealth services furnished outside of the United States, never mind a single claimant that sought Medicare payment for ***RICU's*** services over the past year.  The longstanding status quo of Medicare's telehealth service payments regime therefore further cuts against a claim of irreparable harm and warrants denying RICU's motion.  *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 54, 57-59 (D.D.C. 2012) (exercising "extreme caution" over a request for preliminary relief where the movant sought "to alter—not preserve—the status quo" and concluding movant could not show irreparable harm).

> 3.    *RICU's speculative and vague claims of financial harm do not rise to the level of irreparable harm.*

*Finally*, setting aside the flaws above, the speculative and vague harms that RICU describes in its papers simply do not rise to the level of irreparable harm warranting preliminary relief. Demonstrating such harm is a "considerable burden" and requires "proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (citing *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (emphases in original)).  RICU does not carry that burden here.

RICU presents two theories of irreparable harm.  *First*, it claims that Medicare's refusal to pay for its services is causing the company irretrievable revenue losses.  *See* Pl.'s Mem. at 33-35. But as an initial matter, these supposed losses are entirely speculative because RICU does not allege that any Medicare claimant has yet sought payment for RICU's services, nor has RICU even identified a single potential claimant for its services.  *See Safari Club Int'l v. Jewel*, 47 F. Supp. 3d 29, 35 (D.D.C. 2014) ("Irreparable harm must be great and certain, not speculative.").

Even if the alleged economic losses were not speculative, RICU simply fails to offer sufficient detail to establish the irreparability of the harm.  Economic loss "generally does not constitute irreparable harm," *Power Mobility*, 404 F. Supp. 2d at 204 (citing *Wisc. Gas Co.*, 758 F.2d at 674), and even where a movant claims that such losses are unrecoverable due to sovereign

immunity, it still must establish that the losses are significant and pose severe harm, *see, e.g., Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank*, 840 F. Supp. 2d 327, 335-336 (D.D.C. 2012) (explaining that an asserted "economic harm" must "be significant, even where it is irretrievable because a defendant has sovereign immunity"); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 26 (D.D.C. 2012) (stating that "it remains incumbent on plaintiffs" claiming unrecoverable losses "to demonstrate, first, that they are threatened with serious injury." (emphasis omitted) (citing *N. Air Cargo v. USPS*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)); *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981) (requiring the injury to be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff").[15]

RICU makes no specific claim to this effect, instead only offering vague and general assertions about potential lost revenue. For example, RICU's sole supporting affiant, Mr. Rabinowitz, claims that "some existing clients have decreased the amount of services they are procuring from RICU," but he fails to identify the clients, by how much they are decreasing procurement from RICU, or the significance of that revenue to RICU's operations. *See* Rabinowitz Decl. ¶ 36. Mr. Rabinowitz similarly claims that one hospital gave "notice that it was reducing the ICU coverage provided by RICU," *id.* ¶ 37, but he does not say by how much or what impact the reduction has on RICU's ability to operate. That same hospital "continues to inquire" about whether Medicare will pay for RICU's services, *id.* ¶ 37, but Mr. Rabinowitz offers no detail about the size or significance of the revenue at issue. He further claims that RICU's business with another unnamed hospital "would have continued to grow" if Medicare paid for RICU's services, *id.* ¶ 38, but he offers no foundation for that claim, nor does he identify the rate of growth or the revenue at stake. Mr. Rabinowitz claims that there are additional unnamed "hospitals that are

---

[15] It is not clear that RICU's alleged lost revenue even is irretrievable. Claims for services under Medicare typically must be filed within one calendar year after the date of service, *see* 42 C.F.R. § 424.44(a)(1), and accordingly claims for Medicare payment for services provided by RICU as far back as late March 2020 (which extends before announcement of the IFR) could still be made if an appropriate claimant submits a proper claim. The one year time limit also may be extended due to error by CMS. *Id.* § 424.44(b)(1). But RICU's papers fail to even describe how much revenue it stands to lose, never mind how much may be irretrievable or not. *See infra* at 37-42.

interested in beginning to use tele-ICU services" and that have made inquiries of RICU, *id.* ¶ 39, but he does not claim those hospitals are actually using telehealth services, that contracts with RICU definitively would occur if Medicare paid for RICU's services, that those hospitals have since contracted with RICU's competitors, or that the revenue at stake was significant.  Finally, Mr. Rabinowitz notes that various (again, unnamed) hospital representatives "have indicated to RICU their concern that HHS may eventually approve tele-ICU services permanently but that RICU's services will continue to be excluded from payment." *Id.* ¶ 40.  But he offers no details about how this "concern" about future HHS action causes **irreparable** harm to RICU's business, which Mr. Rabinowitz also claims "grew at a rate of more than thirty-five percent per year" prior to the pandemic and "grew at an even faster rate" at the outset of the COVID-19 crisis.  *Id.* ¶ 34. Such vague and unsubstantiated claims of economic loss, even if theoretically irretrievable, do not meet the high standard for establishing irreparable harm.  *See Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) ("[T]he fact that economic losses may be unrecoverable does not absolve the movant from its considerable burden of proving that those losses are *certain, great and actual*." (citations omitted) (emphases in original)).

RICU attempts to salvage its vague claims of economic harm by suggesting this district applies a *per se* rule that unrecoverable economic losses constitute irreparable harm.  *See* Pl.'s Mem. at 35.  But RICU's cited cases either expressly reject that rule or are readily distinguishable. To wit, *District of Columbia v. Dep't of Agric.* quoted the "*per se*" language relied upon by RICU only to reject it, explaining that typically "some form of a significance test has been imposed in this district on claims of irreparable harm from irrecoverable financial loss."  444 F. Supp. 3d 1, 37 n.25 (D.D.C. 2020) (collecting cases).  Indeed, the general rule within this district is that "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Min. Ass'n*, 768 F. Supp. 2d at 53 (collecting authority);[16] *see also Air*

---

[16] The overwhelming, if not unanimous, number of courts within this Circuit presently use this same formulation in considering whether unrecoverable economic losses rise to the level of irreparable harm.  *See, e.g.*, *Verma v.USCIS*, No. CV 20-3419 (RDM), 2020 WL 7495286, at *11

*Transp. Ass'n of Am.*, 840 F. Supp. 2d at 335 (explaining that a *per se* rule is "not the law of this Circuit" and "would also effectively eliminate the irreparable harm requirement").

RICU's reliance on *Feinerman v. Bernardi* is misplaced, as the court there found the plaintiff made a specific showing of irreparable harm by establishing that forty percent of his business was at stake. *See* 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008) (explaining even then that the plaintiff "hardly present[ed] an overwhelming case for a finding of irreparable injury"). RICU fails to make any similar showing here.[17] Similarly, in *Nalco Co. v. EPA*, the plaintiff made a "substantial" showing that it "ha[d] already, and w[ould] inevitably further, suffer the loss" of clients and revenue, *see* 786 F. Supp. 2d 177, 188 (D.D.C. 2011), but RICU only makes vague and unsubstantiated claims to that effect here.[18] Such vague claims of economic loss do not suffice. *See Alcresta Therapeutics*, 318 F. Supp. 3d at 327 (where movant "declined to place its alleged lost profits in the context of its overall financial health, the Court cannot find that its alleged lost

---

(D.D.C. Dec. 18, 2020); *Campbell v. Schmidt*, No. 1:20-CV-1785 (CRC), 2020 WL 6445874, at *12 (D.D.C. Nov. 3, 2020); *Muvvala v. Wolf*, No. 1:20-CV-02423 (CJN), 2020 WL 5748104, at *5 (D.D.C. Sept. 25, 2020); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018); *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014); *Safari Club Int'l*, 47 F. Supp. 3d at 36; *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014); *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 180 (D.D.C. 2011).

[17] The continued precedential value of *Feinerman* is also doubtful. Judge Walton, the author of *Feinerman*, has since explained that any *per se* rule suggested in that decision "goes too far" and that "the inability to recover economic losses can more accurately be considered as a factor in determining whether the movant has shown irreparable harm." *See ConverDyn*, 68 F. Supp. 3d at 49 (Walton, J.); *see also Nat'l Min. Ass'n*, 768 F. Supp. 2d at 53 (explaining that *Feinerman* "also recognized that 'the alleged injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm'" (quoting 558 F. Supp. 2d at 50)) (Walton, J.); *see also id.* (explaining that "recoverability is but one factor the court must consider in assessing alleged irreparable harm in the form of economic losses" and that "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm").

[18] *Nalco*, like *Feinerman*, has also been repeatedly distinguished by courts within this Circuit and appears to be in significant tension with the current predominant rule articulated by Judge Walton in *Nat'l Min. Ass'n*. *See, e.g.*, *Alphapointe v. VA*, 416 F. Supp. 3d 1, 9 (D.D.C. 2019) (distinguishing both *Feinerman* and *Nalco*); *Woodstream Corp. v. Jackson*, No. CIV.A. 11-867 JEB, 2011 WL 8883395, at *8 (D.D.C. June 3, 2011) (explaining that any *per se* rule purported adopted in *Feinerman* and *Nalco* is "not the law of this Circuit" and would "effectively eliminate the irreparable harm requirement); *Air Transport Ass'n*, 840 F. Supp. 2d at 335 (same).

profits are 'certain' or 'great,' as is required to grant a preliminary injunction"); *Astellas Pharma US, Inc. v. FDA*, 642 F. Supp. 2d 10, 22 (D.D.C. 2009) (denying preliminary injunction where movant "has not indicated to what extent it predicts its revenues will decline" in view of any lost business opportunities "or how such a decline would affect its overall business operations.").[19]

RICU's second alleged source of irreparable harm is the competitive and reputational harm it claims that it will incur if its competitors are able to obtain Medicare payments but it cannot. *See* Pl.'s Mem. at 35-36.  But these claims of harm are, like RICU's alleged economic losses, highly speculative—RICU does not identify any competitors to whom it is losing business, specifically identify any client whose business it has lost, enumerate the market share or revenue it stands to lose to its competitors, or make any claim that these harms threaten its ability to operate. *See generally* Rabinowitz Decl.; Pl.'s Mem.  Instead it offers only general and vague claims of harm, such as that "at least some hospitals that chose RICU's competitors will remain with those competitors" due to Medicare's bar on foreign payments, which also "significantly diminishes RICU's chances of maintaining and securing business in the future."  Pl.'s Mem. at 36; *see also* Rabinowitz Decl. ¶ 44 (speculating that "many of the hospitals that chose RICU's competitors will remain with those competitors because of the business relationships that have formed").

Courts routinely reject such speculative claims of lost market share or lost market advantage as a basis for irreparable harm.  *See, e.g.*, *Mylan Pharm.*, 81 F. Supp. 2d at 42 ("Courts within the Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share."  (collecting cases)).  In *Woodstream Corp.*, the court found

---

[19] RICU suggests several out-of-circuit decisions have adopted a *per se* approach (Pl.'s Mem. at 35), but not a single one of the cases cited by it does so.  *Regeneron*, for example, did not even contemplate the *per se* rule urged by RICU, instead explaining that "where a plaintiff cannot recover damages due to sovereign immunity, monetary loss *may* amount to irreparable harm." *Regeneron*, 2020 WL 7778037, at *4.  The Court then specifically considered "cases suggesting that the magnitude of the monetary harm affects whether it is irreparable" before concluding that the plaintiff in that specific case made a sufficient factual showing of harm to warrant preliminary relief.  *Id.  Regeneron*'s sister case, also cited by RICU, similarly did **not** consider a *per se* approach, instead explaining that "economic loss *may* constitute irreparable harm" where, as in that case, the plaintiff could show "*severe* economic losses."  *Ass'n of Comm. Cancer Ctrs.*, 2020 WL 7640818, at *9 (explaining that "*severe* economic losses *can* qualify as irreparable harm").

the movant's claim of lost sales and market share "speculative at best" where it "could not even estimate the size of [lost] income as a percentage of the company's overall revenue." 2011 WL 8883395, at *9 (concluding such claims could not establish the "sort of substantial financial loses that might rise to the level of irreparable harm"). RICU, too, offers no specific estimate of lost income or market share here, rendering its claims of harm too speculative and vague to be deemed irreparable. *See GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 150 (D.D.C. 2013) (concluding movant "failed to demonstrate the certainty or imminence of its financial deficits" where it offered only "speculative allegations of loss of revenue and other market advantages"); *Apotex, Inc. v. FDA*, No. CIV.A. 06-0627 JDB, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) ("speculative sales loss" and general "concerns about a lost market share" fell "well short of the serious, irretrievable damage to [a] business required to warrant a preliminary injunction"); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) (rejecting claim of irreparable harm from alleged loss of market share "supported by mere speculation").

The same is true of its claims of reputational harm. A "showing of reputational harm must be concrete and corroborated, not merely speculative." *Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006). But RICU offers only speculation about the hypothetical, and unsubstantiated, future actions of other market actors. For example, Mr. Rabinowitz theorizes that "one of two things will naturally occur," due to Medicare's foreign payment bar, including that "hospitals will simply contract with tele-ICU companies" whose services are eligible for Medicare payment and that such decisions "will lead to lost sales and reduced revenue for RICU." Rabinowitz Decl. ¶ 42. But that is all pure guesswork and Plaintiff offers no corroborating evidence that hospitals are presently contracting with its competitors in a manner harming RICU's bottom line. Courts within this Circuit reject claims of irreparable reputational harm "based solely upon pure conjecture." *Bristol-Myers Squibb Co.*, 923 F. Supp. at 220 (rejecting claimed reputational and competitive harm). In *Toxco, Inc. v. Chu*, the court rejected "claims of reputational harm . . . based solely upon the uncorroborated and speculative assertions made in an affidavit" by one of its officers. 724 F. Supp. 2d 16, 30 (D.D.C. 2010).

Although the officer offered "logical and inevitable" predictions about the future actions of other market actors, he offered "nothing to substantiate his conjecture about what the industry" will do. *Id.* Mr. Rabinowitz's predictions here, while perhaps logical or even plausible, similarly do not substantiate RICU's claims of reputational harm. *See also Mallinckrodt Ard LLC v. Verma*, No. 19-CV-1471 (TFH), 2020 WL 7265325, at *13 (D.D.C. May 29, 2020) (finding no irreparable harm where declarant "present[ed] the reputational harms as possible, but not necessarily certain"); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (rejecting "vague and speculative" claims that "harm to [plaintiff's] reputation will cause current customers to leave [it] and potential customers to avoid doing business with [it]").

### C. The balance of the equities and public interest weigh against a preliminary injunction.

RICU contends that the balance of equities and public interest favor a mandatory injunction due to the ongoing COVID-19 pandemic and the significant need for qualified critical-care providers. *See* Pl.'s Mem. at 37-40. RICU further summarily asserts that "Defendants will suffer no harm if this Court enjoins enforcement" of longstanding Medicare telehealth payment rules. *Id.* at 37. RICU is wrong on both counts.

There is no dispute that broadening access to quality and reliable health care services is in the public interest, particularly during an ongoing pandemic. But RICU's requested mandatory injunction would do the opposite, forcing CMS to pay for RICU's services despite the lack of any lawfully-determined rate applicable to foreign distant sites and without any ability to ensure program integrity abroad. As explained above, the Telehealth Statute ***requires*** Medicare to pay telehealth physicians or practitioners the same rate as if they performed the same services without a telecommunications system. *See supra* at 25-26. RICU fails to identify what rate would govern payment for services provided by a physician at a foreign distant site, presumably because no such lawful rate exists. *See supra* Section I.C.

Telehealth services also pose regulatory challenges with respect to physician enrollment, licensure, billing, HIPAA privacy protections, and particularly fraud. "Since 2016, HHS OIG has

seen a significant increase in telefraud." *See* Dodge Decl., Ex. D (HHS Office of Inspector General, *National Health Care Fraud Takedown Factsheet*). The Department of Justice ("DOJ") and HHS recently brought charges in a Medicare fraud scheme—the largest in history—involving "345 charged defendants across 51 federal districts, including more than 100 doctors, nurses and other licensed medical professionals." DOJ Press Release, *National Health Care Fraud and Opioid Takedown Results in Charges Against 345 Defendants Responsible for More than $6 Billion in Alleged Fraud Losses* (Sept. 30, 2020), *available at* https://www.justice.gov/opa/pr/national-health-care-fraud-and-opioid-takedown-results-charges-against-345-defendants. More than $4.5 billion of the fraud at issue was "connected to telemedicine." *Id.* Defendants' ability to combat fraud, or to recoup ordinary overpayments to physicians, would be severely limited if forced to pay physicians outside of federal jurisdiction.

Medicare is a complex regulatory scheme with many interlocking parts, but RICU does not even try to answer the many practical questions raised by its novel demand for extraterritorial payment. For example, if Medicare is compelled to reimburse RICU's services, what PFS rate should it use for physicians offering identical services from locations in Ireland, Russia, Sri Lanka, China, and Argentina? Would Medicare be required to promulgate new, extraterritorial PFS rates including GPCIs for these locations accounting for local costs? What consequences would such a policy have for state licensure rules? How would Medicare regulate physicians outside of the jurisdiction of the United States? How would Medicare audit to identify or collect overpayments to physicians located overseas? These thorny and unresolved questions show why courts strongly disfavor mandatory injunctions that upset the status quo, particularly when sought against the government. *See Kondapally*, 2020 WL 5061735, at *3 (collecting cases). Rather than force Defendants to confront these thorny issues from a preliminary posture, the public is better served by Defendants continuing to manage telehealth services payments, as they have for two decades, in compliance with the relevant statutory and regulatory regime. *See Protect Democracy Project, Inc. v. Dep't of Def.*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017) ("[A]n agency's compliance with a mandatory statutory regime is presumably always in the public interest."); *Bayer HealthCare, LLC*

*v. FDA*, 942 F. Supp. 2d 17, 27 (D.D.C. 2013) ("The public has an interest in federal agency compliance with its governing statute."); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.").  This factor therefore also weighs against granting a mandatory preliminary injunction.

<u>**CONCLUSION**</u>

For the reasons above, Defendants' motion to dismiss the case for lack of subject matter jurisdiction and failure to state a claim should be granted and RICU's motion for a preliminary injunction should be denied.

Dated March 23, 2021

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

MICHELLE BENNETT
*Assistant Branch Director*

<u>/s/ *Christopher D. Dodge*</u>
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*