## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RICU LLC,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *ET AL.,*

        Defendants.

Case No. 1:21-cv-452

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ........................................................................................... 1

I.     This Court Has Jurisdiction. ............................................................... 5

       A.     Legal Standard. .................................................................... 5

       B.     RICU Has Satisfied the Presentment Requirement and HHS has Provided
              a Final Decision or Waiver Thereof. ....................................... 6

       C.     RICU Satisfies the Exception to Administrative Channeling. ............ 13

II.    RICU Is Likely To Prevail On The Merits And Has Stated A Claim For Which
       Relief Can Be Granted. ..................................................................... 17

       A.     Legal Standard. .................................................................... 17

       B.     The Telehealth Statute Requires Medicare to Pay for RICU's Services,
              and HHS Ignores and Misconstrues the Text of that Statute. ............ 17

              1.     HHS Ignores the Express Terms of the Telehealth Statute's
                    Payment Mandate and Definitions. ...................................... 18

              2.     HHS Ignores Its Own Telehealth Rule. ................................. 20

              3.     HHS Misconstrues the "Payment Amount" Provision. ............... 21

              4.     The Facility Fee Does Not Alter Where Services Are Furnished. ..... 25

              5.     HHS Misrepresents RICU's Arguments Regarding the Payment
                    Mandate's Notwithstanding Clause. ..................................... 26

       C.     Section 1395y(a)(4) Does Not Bar Payment For RICU's Services. ......... 28

              1.     Section 1395y(a)(4) Is Not Implicated Because RICU's Services
                    Are Provided Domestically. ............................................... 29

              2.     HHS Has No Response for RICU's Argument that Even Under
                    HHS's "Simultaneous Provision" Interpretation, Section
                    1395y(a)(4) Is Inapplicable. .............................................. 31

              3.     HHS Has No Response for RICU's Argument that Its Services
                    Qualify for Reimbursement Under the Exception to 42 U.S.C. §
                    1395y(a)(4). ................................................................ 31

       D.     HHS's Adoption of the Critical Care Ban Was Arbitrary and Capricious. ..... 34

i

III.    The Equities Weigh Decidedly In RICU's Favor. ............................................................. 35

    A.    RICU Has Established It Is Suffering Irreparable Harm. ...................................... 35

        1.    RICU Timely Sought Its Requested Preliminary Injunction. ................... 36

        2.    A Preliminary Injunction Would Not Upset a "Longstanding" Status Quo. ........................................................................................... 38

        3.    The Damages HHS Caused and Continues to Cause RICU are Neither Speculative nor Vague. ...................................................... 39

            a.    Monetary Damages ........................................................ 39

            b.    Competitive and Reputational Harm ............................. 42

    B.    The Balance of Equities and the Public Interest Both Support a Preliminary Injunction. ........................................................................................... 43

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action All. of Senior Citizens v. Johnson,*
  607 F. Supp. 2d 33 (D.D.C. 2009) ........................................................................... 7

*Action All. of Senior Citizens v. Leavitt,*
  483 F.3d 852 (D.C. Cir. 2007) ................................................................................. 7

*Action All. of Senior Citizens v. Leavitt,*
  No. 06-1607-HHK, 2007 WL 4822376 (D.D.C. Dec. 3, 2007) ................................. 7

*Action All. of Senior Citizens v. Sebelius,*
  607 F.3d 860 (D.C. Cir. 2010) ...................................................................... 2, 6, 7, 10

*American Chiropractic Ass'n, Inc. v. Leavitt,*
  431 F.3d 812 (D.C. Cir. 2005) ................................................................................. 16

*American Hospital Ass'n v. Azar,*
  415 F. Supp. 3d 1 (D.D.C. 2019) .............................................................................. 9

*American Hospital Ass'n v. Azar,*
  895 F.3d 822 (D.C. Cir. 2018) ................................................................................. 9

*American Orthotic & Prosthetic Ass'n, Inc. v. Sebelius,*
  62 F. Supp. 3d 114 (D.D.C. 2014) ........................................................................... 10

*Arc of Cal. v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) .................................................................................... 37

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
  2020 WL 7640818 (D. Md. Dec. 23, 2020) .............................................................. 5

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
  928 F.3d 1102 (D.C. Cir. 2019) ............................................................................... 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................. 17

*Bowen v. Mich. Acad. of Family Physicians,*
  476 U.S. 667 (1986) ................................................................................................. 13

*Brewster v. CIR,*
  607 F.2d 1369 (D.C. Cir. 1979) ............................................................................... 10

*Bristol-Myers Squibb Co. v. Shalala*,
  923 F. Supp. 212 (D.D.C. 1996) ........................................................ 43

*Cal. Clinical Lab'y Ass'n v. HHS*,
  104 F. Supp. 3d 66 (D.D.C. 2015) ...................................................... 16

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012) .................................................... 43

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*,
  436 F. Supp. 3d 354 (D.D.C. 2020) .................................................... 17

*Colo. Heart Inst., LLC v. Johnson*,
  609 F. Supp. 2d 30 (D.D.C. 2009) ...................................................... 16

*Community Oncology All., Inc. v. OMB*,
  987 F.3d 1137 (D.C. Cir. 2021) .......................................................... 12

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
  543 U.S. 157 (2004) ............................................................................ 10

*Council for Urological Ints. v. Sebelius*,
  668 F.3d 704 (D.C. Cir. 2011) ..................................................... passim

*Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*,
  153 F. Supp. 3d 338 (D.D.C. 2016) ...................................................... 5

*Feinerman v. Bernardi*,
  558 F. Supp. 2d 36 (D.D.C. 2008) ...................................................... 41

*Franklin v. Capitol Hilton Hotel*,
  325 F. Supp. 3d 25 (D.D.C. 2018) ...................................................... 17

*GEO Specialty Chemicals, Inc. v. Husisian*,
  923 F. Supp. 2d 143 (D.D.C. 2013) .................................................... 42

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*,
  926 F.3d 819 (D.C. Cir 2019) ............................................................. 23

*Joyner v. Reno*,
  466 F. Supp. 2d 31 (D.D.C. 2006) ...................................................... 10

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehabilitation Servs.*,
  31 F.3d 1536 (10th Cir. 1994) ............................................................ 38

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................ 39

*Mallinckrodt Ard LLC v. Verma*,
  2020 WL 7265325 (D.D.C. May 29, 2020) ........................................................................ 43

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................................... 2, 6, 9, 11

*Mohasco Corp. v. Silver*,
  447 U.S. 807 (1980) ................................................................................................. 20

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*,
  472 U.S. 237 (1985) ........................................................................................... 19, 28

*Nat'l Hospice & Palliative Care Org., Inc. v. Weems*,
  587 F. Supp. 2d 184 (D.D.C. 2008) ......................................................................... 16

*National Mining Association v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) ........................................................................... 42

*Open Communities All. v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ......................................................................... 41

*Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*,
  2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020) ..................................................... 5, 14, 40

*Rehab., Inc. v. Azar*,
  886 F.3d 496 (5th Cir. 2018) ................................................................................... 16

*Scolaro v. D.C. Bd. of Elections & Ethics*,
  104 F. Supp. 2d 18 (D.D.C. 2000) ............................................................................. 5

*Sensory Neurostimulation, Inc. v. Azar*,
  977 F.3d 969 (9th Cir. 2020) ............................................................................... 11, 16

*Shalala v. Illinois Council on Long Term Care, Inc.*,
  529 U.S. 12 (2000) ........................................................................................... passim

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ................................................................................. 30

*Student Loan Servicing All. v. D.C.*,
  317 F. Supp. 3d 89 (D.D.C. 2018) ............................................................................. 5

*Tex. Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014) ........................................................................... 38

*Three Lower Counties Community Health Services, Inc. v. HHS*,
  517 F. Supp. 2d 431 (D.D.C. 2007) ......................................................................... 11

*Toxco, Inc. v. Chu*,
    724 F. Supp. 2d 16 (D.D.C. 2010) ........................................................................ 43

*United States v. Sheffield*,
    832 F.3d 296 (D.C. Cir. 2016) ........................................................................... 10

*United States v. W. Elec. Co.*,
    46 F.3d 1198 (D.C. Cir. 1995) ........................................................................... 39

*Weinberger v. Salfi*,
    422 U.S. 749 (1975) ........................................................................................... 13

*Woodstream Corp. v. Jackson*,
    2011 WL 8883395 (D.D.C. June 3, 2011) ........................................................ 42

**Statutes**

5 U.S.C. § 702 ............................................................................................................. 41

28 U.S.C. § 1331 .................................................................................................... 13, 16

28 U.S.C. § 1346 .................................................................................................... 13, 16

42 U.S.C. § 405 ................................................................................................... passim

42 U.S.C. § 1395 ................................................................................................. passim

D.C. Mun. Regs. tit. 17, § 4618 ................................................................................ 44

Fla. Stat. § 456.47(4)(a) .............................................................................................. 44

**Regulations**

42 C.F.R. § 410.78 ................................................................................................ 21, 35

42 C.F.R. § 413.74 ...................................................................................................... 24

42 C.F.R. § 424.120 .................................................................................................... 32

42 C.F.R. § 424.121 .................................................................................................... 32

42 C.F.R. § 424.122 ................................................................................................ 32–33

42 C.F.R. § 424.123 .................................................................................................... 33

42 C.F.R. § 424.126 .................................................................................................... 24

42 C.F.R. § 424.127 .................................................................................................... 24

42 C.F.R. § 482.21 ...................................................................................................... 27

66 Fed. Reg. 55,246 (Nov. 1, 2001)...................................................... 20, 26, 34, 44

71 Fed. Reg. 47,870 (Aug. 18, 2006)......................................................................... 34

85 Fed. Reg. 84,472 (Dec. 28, 2020) ........................................................................ 15

Exec. Order 13,997, 86 Fed. Reg. 7,201 (Jan. 26, 2021)........................................... 37

**Other Authorities**

*CDC Director Gives Emotional Warning of "Impending Doom,"* CNN (Mar. 29, 2020),
   https://edition.cnn.com/videos/health/2021/03/29/cdc-walensky-warning-30-million-
   cases-vpx.white-house ...................................................................................... 1, 43

CMS, *COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-for-Service
   (FFS) Billing* (Mar. 31, 2021) ............................................................................. 25

CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual* (2020)................................. 30

CMS, Pub. No. 100-04, *Medicare Claims Processing Manual* (2020) ........................ 24

*COVID Data Tracker Weekly Review, Interpretative Summary for April 9, 2021*, CDC
   (Apr. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-
   data/covidview/index.html ..................................................................................... 1

*Fact Sheet: How Joe Biden Would Help You Get Health Insurance Coverage During the
   Coronavirus Crisis,* BIDEN-HARRIS, https://joebiden.com/fact-sheet-how-joe-biden-
   would-help-you-get-health-insurance-coverage-during-the-coronavirus-crisis/ (last
   visited April 13, 2021) ......................................................................................... 37

*Incur*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ............................... 30

*Joe and Kamala's Plan to Beat COVID-19*, BIDEN-HARRIS,
   https://joebiden.com/covid19/ (last visited April 13, 2021).................................... 37

Letter from Deputy Solicitor General Edwin S. Kneedler to Hon. Scott S. Harris, Clerk,
   Supreme Court of the United States, *California, et al. v. Texas, et al.*, No. 19-840, and
   *Texas, et al. v. California, et al.*, No. 19-1019 (Feb. 10, 2021) ................................. 23

Melanie Evans, *Record Covid-19 Hospitalizations Strain System Again*, WALL ST. J.
   (Nov. 11, 2020, 7:11 PM) ..................................................................................... 15

*Past Participle*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)................................ 29

DOJ Press Release, *U.S. Citizen Extradited from Brazil to Face Wire Fraud Charges*
   (May 31, 2019), https://www.justice.gov/usao-ma/pr/us-citizen-extradited-brazil-face-
   wire-fraud-charges ................................................................................................ 44

DOJ Press Release, *U.S. Citizen Extradited from Costa Rica in Connection with International-Based Business Opportunity Fraud* Ventures (Feb. 12, 2015), https://www.justice.gov/opa/pr/us-citizen-extradited-costa-rica-connection-international-based-business-opportunity-fraud........................................................................ 44

*What is Telehealth?*, HHS (Feb. 25, 2021), https://telehealth.hhs.gov/patients/understanding-telehealth/ .................................... 28

Will Stone, *Getting Health Care Was Already Tough in Rural Areas. The Pandemic Has Made It Worse*, NPR (Oct. 7, 2020, 5:00 AM) ........................................................................ 33

## INTRODUCTION

> I am going to reflect on the recurring feeling I have of impending doom.… I know what it's like as a physician to stand in that patient room gowned, gloved, masked, shielded, and to be the last person to touch someone else's loved one.… I know what it's like when you're the … healthcare provider and you're worried that you don't have the resources to take care of a patient in front of you.… We do not have the luxury of inaction.[1]

This was the impassioned plea from Dr. Rochelle Walensky—Director of the Department of Health and Human Services ("HHS") Centers for Disease Control and Prevention—on March 29, 2021.  Just six days earlier, however, HHS[2] filed its opposition to the preliminary injunction motion in this case, and the contrast could not be more stark.  The "luxury of inaction" is precisely what HHS seeks here, even though retreating from its illegal Critical Care Ban would immediately increase "the resources [hospitals have] to take care of [the] patient[s] in front" of them.

Hospital inpatients admitted to intensive care units are often at death's door.  Study after study has shown that, for such ICU patients, both morbidity and mortality decrease when they are treated by intensivists—that is, physicians who specialize and are board certified in critical care.  And the United States has an urgent shortage of intensivists.  That means that Medicare patients in U.S. hospitals are suffering from more death and disease than they otherwise would if adequate critical care physician staff were available.  The COVID-19 pandemic has driven this grim reality home, as seriously ill patients have overwhelmed the critical-care capacity of hospitals.  Even with the vaccination campaign underway, the situation remains serious.[3]  RICU, with its team of U.S.-

---

[1] *CDC Director Gives Emotional Warning of "Impending Doom,"* CNN (Mar. 29, 2020), https://edition.cnn.com/videos/health/2021/03/29/cdc-walensky-warning-30-million-cases-vpx.white-house.

[2] Defendants are collectively referred to herein as HHS.  HHS's brief, Doc. 20, is referred to as "HHS Br."  RICU's initial brief is referred to as "PI Motion."  If a docket entry has internal page numbering, then page citations are to that numbering rather than to the pagination assigned by the CM/ECF system.

[3] *See COVID Data Tracker Weekly Review, Interpretative Summary for April 9, 2021*, CDC (Apr. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html

trained and U.S.-licensed intensivists, can help fill this urgent need through telehealth, thus reducing death and disease among Medicare beneficiaries.  RICU stands ready to provide life-saving care, but these hospitals cannot afford it without participation from Medicare.  And Medicare is illegally refusing to pay for such care.

HHS, in its brief, does not dispute the facts.  Nor could it.  As recently as December 29, 2020, HHS's Chief Medical Officer told RICU that, during the pandemic, the existing gap in critical care "is going to have the greatest impact in acute care hospitals in rural areas" and it would be a "reasonable course of action to exhaust all possible avenues in the pursuit of decreasing morbidity and mortality, and truly doing the most good for those with the greatest need." Doc. 3-9.  Because HHS cannot dispute the facts on the ground, it simply ignores them, and suggests that adjudication of this issue should be channeled further through the agency's claims adjudication process, which currently takes about five years to navigate.

HHS trots out this jurisdictional argument in *every* Medicare case, no matter how meritless. Here, controlling precedent, this Court has jurisdiction to hear RICU's claims.  First, RICU has satisfied the presentment requirement and HHS has completed or waived any exhaustion requirement by engaging in a self-described "exhaustive review" and coming to a final decision from the Secretary, which it then memorialized in a public guidance document.  *See  Mathews v. Eldridge*, 424 U.S. 319 (1976); *Action All. of Senior Citizens v. Sebelius*, 607 F.3d 860 (D.C. Cir. 2010).  Second, even if RICU had not satisfied the presentment and exhaustion requirements, its claims would qualify for the exception to the channeling requirement under *Shalala v. Illinois*

---

(reporting that: "[t]he United States is in the fourth week of an upward trend in COVID-19 cases"; "[t]he current 7-day moving average of daily new cases (64,152) increased 2.0% compared with the previous 7-day moving average"; and hospital admissions had "a 7.3% increase from the previous 7-day period").

*Council on Long Term Care, Inc.*, 529 U.S. 1, 17–22 (2000), and *Council for Urological Interests v. Sebelius*, 668 F.3d 704 (D.C. Cir. 2011).

As for the merits, HHS misreads the Telehealth Statute.  The text is quite clear: "the Secretary shall pay for telehealth services that are furnished by a physician … to an eligible telehealth individual," and such eligibility is triggered when such a person "***receives*** a telehealth service ***furnished at*** an originating site."  42 U.S.C. §§ 1395m(m)(1), (4)(B) (emphasis added).  The Telehealth Statute clearly defines where telehealth services are "furnished," and it is "at" the patient site.  As HHS admits, "a patient *receives* such services domestically" and "the patient does not receive inpatient care at a hospital outside the United States."  Doc. 20 ("HHS Br.") 25, 31 n.11.  HHS's main response is to say that the separate provision establishing the rate of, rather than entitlement to, reimbursement defines telehealth services as being furnished at the physician's distant site.  But the provision says no such thing.  HHS's other argument is that it cannot figure out how to reimburse physicians locate abroad, but this contention falters on the fact that HHS has already done so.  *See, e.g.*, 42 C.F.R. §§ 424.120–127.  Finally, and in the alternative, if HHS is correct and telehealth services are furnished abroad, then it has no answer as to why the services do not qualify for reimbursement under 42 U.S.C. § 1395f(f), the exception to 42 U.S.C. § 1395y(a)(4), and the associated implementing regulations.

Two hypotheticals help put this case in perspective.  First, suppose Ms. Jones lives in northern Minnesota, just off the banks of Lake Superior and just south of the border with Canada, and equidistant from the only two hospitals within an hour's drive: a small hospital in Minnesota and a much larger hospital in Thunder Bay, Ontario.  The Minnesota hospital covers its ICU needs by using the telehealth services of Dr. Rogers, who has a teleICU office near his home about an hour north of Thunder Bay.  Dr. Rogers also sometimes covers ICU rounds at the Thunder Bay

hospital, both in person and by telehealth.  Ms. Jones suffers a heart attack and her husband calls 911.  If traffic is lighter on the route to Thunder Bay, such that the ambulance driver determines that trip is more likely to save Ms. Jones' life, Medicare will cover ICU care provided to Ms. Jones by Dr. Rogers at the Thunder Bay hospital, including if it is delivered via telehealth by Dr. Rogers from his teleICU office north of Thunder Bay.  *See* 42 U.S.C. §§ 1395f(f), 1395y(a)(4).  If traffic is lighter on the route to the Minnesota hospital, such that the ambulance driver determines that trip is more likely to save Ms. Jones' life, Medicare, pursuant to the Critical Care Ban, will not cover ICU care provided to Ms. Jones by Dr. Rogers at the Minnesota hospital.

Second, suppose Mr. Smith, a 75-year-old who has lived in rural Iowa his entire life and has never traveled outside the United States, contracts COVID-19 and becomes seriously ill with labored breathing.  He calls 911 and the ambulance rushes him to the only hospital within sixty miles, where he is admitted to the ICU and drifts in and out of consciousness as he struggles to breathe.  As is the case for many rural hospitals, there is no intensivist on staff to monitor Mr. Smith and direct his care, even though supervision from such an intensivist is the standard of care and would dramatically increase Mr. Smith's chances of survival.  Docs 3-19, 3-20.  Dr. Johnson—an American citizen and U.S.-trained and Iowa-licensed intensivist—lives in Australia and could perform this life-saving work via RICU's telehealth technology.  The struggling hospital cannot afford to contract with RICU without Medicare coverage.  Doc. 3-18.  Yet HHS (which deems intensivist care medically necessary) will not pay for Mr. Smith to receive this care because it says he would receive care in Australia—a place where Mr. Smith is not present, has never been, and has never dreamed of going (especially while lying unconscious in Iowa).  Only in a Kafkaesque nightmare could such a patient—an elderly Medicare patient dying in a rural Iowa hospital bed—be told by HHS that his beside medical services would actually be provided in Australia.

Regrettably, Mr. Smith's situation is tragically common.  Hospital ICUs are overwhelmed with critically ill COVID-19 patients and, as HHS admits, more care from intensivists would save lives.  Because HHS refuses to act on that knowledge and in accordance with the law, the Court should enter the preliminary injunction without delay.

## I.    THIS COURT HAS JURISDICTION.

Much of HHS's brief is dedicated to an argument that this Court does not have jurisdiction, and that any further consideration of whether the law requires Medicare to pay for RICU's critical-care telehealth services should await the five-year HHS internal review process.  This is the same jurisdictional argument HHS makes in every Medicare case, including unsuccessfully three times at the end of last year.[4]  Fortunately, for the lives that could be saved right now, HHS's well-worn briefing on the topic is again meritless, and there is no bar to this Court's jurisdiction and its issuance of a preliminary injunction.

### A.    LEGAL STANDARD.

In determining whether it has jurisdiction "on a Rule 12(b)(1) motion, a court looks first to the allegations in the complaint, construing them in the light most favorable to the plaintiff." *Student Loan Servicing All. v. D.C.*, 317 F. Supp. 3d 89, 92 (D.D.C. 2018) (citing *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)); *see also Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 341 (D.D.C. 2016) (in ruling on a Rule

---

[4] *Compare* Defs.' Opp. to Pls.' Mot. for T.R.O. and Prelim. Inj. at 7–13, *Ass'n of Cmty. Cancer Ctrs. v. Azar*, No. 1:20-CV-3531 (D. Md. Dec. 15, 2020) ("Plaintiffs' Claims are Barred from Judicial Review"), *with Ass'n of Cmty. Cancer Ctrs.*, 2020 WL 7640818, at *2–3 (D. Md. Dec. 23, 2020) (rejecting argument).  *Compare* Defs.' Opp. to Pls.' Mot. for T.R.O and Prelim. Injunctive Relief at 7–13, *Regeneron Pharm., Inc. v. U.S. Dep't of Health & Human Servs.*, No. 7:20-CV-10488 (S.D.N.Y. Dec. 16, 2020) ("Plaintiff's Claims are Barred from Judicial Review"), *with Regeneron Pharm.*, 2020 WL 7778037, at *6–9 (S.D.N.Y. Dec. 30, 2020) (rejecting argument); Defs' Opp. to Pls.' Mot. for Prelim. Inj. at 5–11, *Cal. Life Scis. Ass'n v. CMS*, No. 3:20-CV-08603 (N.D. Cal. Dec. 22, 2020) ("Plaintiffs' Claims are Barred from Judicial Review"), *with Cal. Life Scis. Ass'n*, 2020 WL 7696050, at *1 (N.D. Cal. Dec. 28, 2020) (rejecting argument).

12(b)(1) motion, "the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff").

### B.   RICU HAS SATISFIED THE PRESENTMENT REQUIREMENT AND HHS HAS PROVIDED A FINAL DECISION OR WAIVER THEREOF.

By incorporating 42 U.S.C. § 405(h), the Medicare Act directs that "[n]o findings of fact or decision of the [HHS Secretary] shall be reviewed by any person, tribunal, or governmental agency except as provided" in the Social Security Act.  42 U.S.C. § 1395ii.  Another section of the Medicare Act then incorporates the section of the Social Security Act that provides for judicial review, such that "[a]ny individual, after any final decision of the [HHS Secretary] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision [in a district court] by a civil action."  42 U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. § 405(g)).

As the Supreme Court has explained, this review scheme contains two requirements: (1) the plaintiff must present the claim to the Secretary (the "presentment requirement"), and (2) the Secretary must render a final decision (the "exhaustion requirement").  *See Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).  The Secretary cannot waive the presentment requirement, but can waive the exhaustion requirement "if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer."  *Id.* at 330.

The D.C. Circuit and a court in this District have held that the jurisdictional requirements of section 405(g) were met in circumstances remarkably similar to those presented here.  In *Action Alliance of Senior Citizens v. Sebelius,* 607 F.3d 860 (D.C. Cir. 2010), the plaintiffs claimed that HHS and the Social Security Administration had erred by failing to provide them with a waiver of the requirement to repay overpayments.  *Id.* at 862.  After plaintiffs filed their initial complaint,

6

the district court granted an injunction, but the D.C. Circuit reversed for lack of jurisdiction, finding that plaintiffs "failed to present a [waiver] claim to the Commissioner of Social Security before seeking [judicial] review." *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 856 (D.C. Cir. 2007). Following the D.C. Circuit's remand, "in an apparent effort to meet the jurisdictional requirements set forth in that decision[,] . . . Plaintiffs' counsel sent a separate letter from each of the plaintiffs to the Secretary and Commissioner asking them to notify the Medicare Participants of their right to request a waiver." *Action All. of Senior Citizens v. Johnson*, 607 F. Supp. 2d 33, 37–38 (D.D.C. 2009). The Chair of the SSA's Medicare Planning and Implementation Task Force responded, explaining the SSA's legal conclusion that the waiver provision at issue did not apply to plaintiffs. *Id.* at 38. The district court held that this process satisfied the jurisdictional requirements of section 405(g). *Id.* at 40 ("their letters to the Commissioner" satisfied the presentment requirement). Notably, the district court exercised jurisdiction over the case despite the fact that (1) a specific and complex administrative process existed for plaintiffs to pursue their claims, and (2) plaintiffs did not avail themselves of or exhaust that specific process.[5] On appeal, the D.C. Circuit likewise held that this process "cured the jurisdictional defect" the court had identified in its 2007 opinion. *Action All. of Senior Citizens,* 607 F.3d at 862 n.1.

This case is on all fours with *Action Alliance*. RICU's communications to HHS fulfilled the presentment requirement, and HHS's response constituted a final decision or waiver thereof (exhaustion). Although HHS now seeks to minimize this lengthy correspondence as a "mere[] respon[se]," a "rote letter," "informal correspondence," and a "one-page, three-paragraph letter," it has no choice but to admit that "officials at CMS undertook a careful and thorough review."

---

[5] *See* Mem. in Supp. of Defs.' Mot. to Dismiss Pls.' Suppl. and Second Am. Compl. at 6–7, 17–21; *Action All. of Senior Citizens v. Leavitt*, No. 06-1607-HHK, 2007 WL 4822376 (D.D.C. Dec. 3, 2007).

HHS Br. 21.  Indeed, RICU provided HHS with an in-depth legal analysis, upon HHS's request

for such, and HHS represented in responses that it had engaged in an "exhaustive" review.  RICU

wrote to HHS and CMS officials in April and May 2020 asserting that RICU's services should be

reimbursable by Medicare.  Docs 3-3, 3-4.  In a formal letter response, on June 1, 2020, CMS's

Acting Director of the Chronic Care Policy Group explained that RICU had raised an "important

matter" that prompted "an exhaustive review of the statute and regulations" and a "careful[]

review[]" of the Medicare Manual.  Doc. 3-5 at 2.  The letter provided an analysis of section

1395y(a)(4) that is longer than the discussion in HHS's brief in this Court, and conveyed CMS's

conclusion that it was *statutorily prohibited* from paying for RICU's services.  After RICU pressed

the issue further, CMS's Principal Deputy Administrator for Policy and Operations responded that

the agency's "senior Medicare team and General Counsel's office also reviewed [RICU's] legal

memo" and the agency stood by the June 1 letter.  Doc. 3-6 at 2.  After RICU pressed still further,

including through letters to the Secretary, the Principal Deputy Administrator and Director for the

Center for Medicare responded in a letter to RICU "on … behalf" of the Secretary.  Doc. 3-8 at 2.

That letter reported that HHS "appreciate[d] the significance of this issue and ha[d] taken a fresh

look at the matter, including a complete reevaluation of all of the legal analysis that [RICU]

provided."  *Id.*  HHS's "careful review again confirmed the findings that were detailed in the June

1, 2020 letter … and affirmed in the July 9, 2020 email," both of which were attached to the letter.

*Id.* at 2–4.  In sum, HHS engaged in an "exhaustive review" and "complete reevaluation"

consisting of a "careful review."  Moreover, while HHS now attempts to downplay the agency's

review in response to RICU, RICU's raising of the issue prompted CMS to issue public guidance

on the topic, as HHS admits in its brief.  HHS Br. 7–8 (citing FAQ guidance on whether Medicare

can "pay for telehealth services furnished by physicians or practitioners who are physically located outside of the United States").

If anything, the administrative presentment and response here was far more robust than the one approved by the D.C. Circuit in *Action Alliance*. RICU repeatedly presented its claims of program eligibility to HHS, including to the Secretary, and it received a definitive response after the agency "conducted an exhaustive review" and "complete reevaluation" consisting of a "careful review." The claim was presented and—in HHS's own words—"exhaust[ed]." Doc. 3-2 at ¶¶ 26–31; Doc. 3-5. The Secretary's final rejection on October 28, 2020, Doc. 3-8, established his view that the relief sought by RICU is "inconsistent with the statutory prohibition," Doc. 3-8 at 2—or, put another way, "beyond his power to confer," *Eldridge*, 424 U.S. at 330.

Tellingly, HHS' position in this litigation is precisely the same as the one it provided RICU in its letters: namely, that RICU's claim of program eligibility is statutorily barred. *Compare* HHS Br. 25 ("Medicare's statutory bar on payments for physician services provided outside the United States therefore resolves this case."), *with* Doc. 3-8 at 7 (concluding that Medicare cannot pay for RICU's services because of "the statutory payment exclusion that prohibits Medicare payment for services that are not furnished within the United States"). Because RICU both presented its claim to HHS and received a final determination (or waiver thereof) from HHS, this Court has jurisdiction over RICU's case.

The decisions cited by HHS do not upset this analysis. In *American Hospital Association v. Azar*, 895 F.3d 822 (D.C. Cir. 2018), the plaintiffs filed their lawsuit before the regulation in question became effective, and the court rejected the argument that comments filed during the rulemaking process constituted presentment. *Id.* at 826. Likewise, in *American Hospital Association v. Azar*, 415 F. Supp. 3d 1 (D.D.C. 2019), the plaintiffs filed their lawsuit when the

regulation in question "ha[d] not yet gone into effect." *Id.* at 4. These cases are a far cry from the situation here, where there is detailed correspondence with a definitive outcome that the agency memorialized in a public guidance document. *Compare* Doc. 3-8 (letter of Oct. 28, 2020), *with* HHS Br. 8 (reproducing CMS COVID-19 FAQ No. 45, effective July 28, 2020).

The D.C. Circuit panel in *American Hospital* questioned the precedential value of *Action Alliance* because *Action Alliance* "did not explain what constituted the cure." 895 F.3d at 827. As support for this statement, the *American Hospital* panel cited *United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016), which stated in a footnote that "'questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'" *Id.* at 308 n.3 (quoting *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004)). But the court's subject matter jurisdiction in *Action Alliance* did not "merely lurk in the record." It was the entire basis of the D.C. Circuit's first opinion in the case, and the court could not have reached the merits in the second appeal without satisfying itself of its subject matter jurisdiction, *see Joyner v. Reno*, 466 F. Supp. 2d 31, 39 (D.D.C. 2006) ("before reaching the merits of a case, a federal court must first address whether it has jurisdiction"), which it explicitly discussed by stating the jurisdictional issue had been "cured," *Action Alliance*, 607 F.3d at 862 n.1. Accordingly, *Action Alliance* is not the kind of decision referenced by *Sheffield*. In any event, one panel of the D.C. Circuit cannot overrule a prior panel. *Brewster v. CIR*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) ("In its intra-circuit application, [s]tare decisis demands that we abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court [e]n banc has overruled it.").

For this same reason, the court in *American Orthotic & Prosthetic Association, Inc. v. Sebelius*, 62 F. Supp. 3d 114 (D.D.C. 2014), was not on solid ground in questioning whether it had

to follow binding D.C. Circuit precedent.  *Id.* at 123.  In any event, the court there held that "general complaints" did not satisfy the presentment requirement without any explanation of the contents of those complaints.  *Id.* at 122–23.  Here, the correspondence between RICU and HHS was detailed, and HHS repeatedly represented that it understood exactly the issue at hand.  *See* Doc. 3-8 at 2 ("we appreciate the significance of the issue and have taken a fresh look at the matter, including a complete reevaluation of all of the legal analysis that you provided"); Doc. 3-5 (CMS "appreciates your bringing this important matter to our attention" and "we have conducted an exhaustive review").

*Three Lower Counties Community Health Services, Inc. v. HHS*, 517 F. Supp. 2d 431 (D.D.C. 2007), predated the decisions of this Court and the D.C. Circuit in *Action Alliance*, such that its statements about "correspondence" do not reflect current law.  In any event, the issue the plaintiffs presented to HHS (a request for an advisory opinion on jurisdiction) was different from the issue the plaintiffs sought to adjudicate in court (the validity of cost limits).  *Id.* at 433.

As for *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969 (9th Cir. 2020), that out-of-circuit case did not rule upon presentment at all and analyzed whether *judicial* waiver of the *exhaustion* requirement was warranted.  *See id.* at 981.  RICU is not seeking judicial waiver of the exhaustion requirement, but rather contends that the agency provided a final determination or waiver thereof.  *See Mathews*, 424 U.S. at 330 (HHS Secretary may waive the exhaustion requirement "if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the

relief that is sought is beyond his power to confer").[6]  Thus, *Sensory Neurostimulation* is not applicable this case.[7]

Finally, HHS posits that "[c]hanneling … demands that a plaintiff present its claim to the Secretary in the context of a specific administrative claim for payment."  HHS Br. 19 (internal quotation marks and citation omitted).  But that is precisely the opposite of the law.  The Supreme Court in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)—adopting *HHS's position*—held it could *not* "accept a distinction that limits the scope of § 405(h) to claims for monetary benefits," and that it applies equally to "[c]laims for money, claims for other benefits, *claims of program eligibility*, and claims that contest a sanction or remedy," all which "may . . . involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions."  *Id.* at 14 (emphasis added).  RICU is not a beneficiary that can file a claim for benefits, but it presented HHS with a specific and detailed "claim[] for program eligibility," *id.*, and HHS engaged in an "exhaustive review" and "complete reevaluation" of that exhaustive review, which led the Secretary to conclude he was statutorily barred from granting the claim, Doc. 3-8.  Under *Eldridge* and *Action Alliance*, this is sufficient to establish jurisdiction in this Court.  Indeed, if the "exhaustive review" conducted by HHS is not sufficient to establish jurisdiction, then *Eldridge* and *Action Alliance* are dead letter because no process available to RICU could satisfy the channeling requirement as HHS conceives of it in its brief.  This "extreme position" would raise a

---

[6] HHS contends that RICU "gets it backwards" by claiming the agency must exhaust administrative remedies.  HHS Br. 21.  This, of course, is not RICU's position.  RICU contends the decisions transmitted from HHS to RICU constituted exhaustion or waiver of any such requirement.   In its brief, HHS fails to acknowledge the black letter law that the Secretary may waive the exhaustion requirement, but *Mathews* is clear and binding.

[7] *Community Oncology All., Inc. v. OMB*, 987 F.3d 1137 (D.C. Cir. 2021), is far afield from this case.  There, the court found that the plaintiff failed to fulfill the presentment requirement because it had presented no claims to the government and instead relied on unspecified and unverified claims supposedly presented by its members.  *Id.* at 1144.

"'serious constitutional question.'" *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 680 & 681 n.12 (1986) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975)).

### C.    RICU SATISFIES THE EXCEPTION TO ADMINISTRATIVE CHANNELING.

This leads to the alternative basis for this Court's jurisdiction.  Where the application of section 405(h) would in practice mean "no review at all of substantial statutory and constitutional challenges," judicial review under 28 U.S.C. §§ 1331 and 1346 is available.  *Michigan Academy*, 476 U.S. at 680; *see also Ill. Council*, 529 U.S. at 21–22 (channeling function of § 405(h) does not apply if it would result in the "practical equivalent of a total denial of judicial review").  In sum, "section 405(h)'s 'channeling requirement' is not absolute." *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 707 (D.C. Cir. 2011) (hereinafter "*Urological Interests*").

The D.C. Circuit explained the contours of this exception in *Urological Interests*, a case that HHS fails to discuss or even cite in its brief.  In that case, an association of doctor-owned equipment providers challenged HHS regulations, citing 28 U.S.C. § 1331 as the basis for jurisdiction.  *Id.* at 705.  HHS asserted that the court had no jurisdiction because (1) the plaintiff failed to exhaust the available administrative procedures and (2) even if those procedures were unavailable to the plaintiff, the hospitals with which the plaintiff's members contracted could have obtained administrative review.  *Id.* at 706–07.  Reversing the district court's dismissal of the case, the D.C. Circuit held that the court had jurisdiction.  The circuit court held that, in order to determine whether a potential proxy claimant is adequate, it is necessary to examine the "particular circumstances of th[e] case" and any "factors that speak to a potential proxy's willingness and ability to pursue the plaintiff's claim." *Id.* at 712–13.  The D.C. Circuit found three factors supported application of the exception under the circumstances at issue.  First, the potential proxies for the plaintiff's claim lacked incentives to challenge the HHS regulation at issue. *Id.* at 713.  Second, no potential proxy had actually brought a claim. *Id.*  Third, the plaintiff was unable to

13

become an assignee of the potential proxies.  *Id.*  Thus, contrary to HHS's assertion that the channeling exception applies "only where the channeling requirement results in **complete** preclusion of judicial review to **all possible claimants**," HHS Br. 22 (double emphasis in original), "[i]n cases where the only entities able to invoke Medicare Act review are highly unlikely to do so, their unwillingness to pursue a Medicare Act claim poses a serious 'practical roadblock' to judicial review" and the exception to the channeling requirement applies, 668 F.3d at 712.  In short, for purposes of applying the channeling exception, it does not matter whether potential claimants *could* engage in administrative review of a regulation but, rather, whether potential claimants *are likely* to engage, and *had engaged*, in administrative review.

Under the "particular circumstances of this case," applying section 405(h) would "amount[] to the 'practical equivalent of a total denial of judicial review.'"  *Id.* at 712–13 (citing *Ill. Council*, 529 U.S. at 21–22).  First, as a practical matter, the hospitals with which RICU contracts have insufficient incentive or ability to challenge the Critical Care Ban.  Given the Telehealth Waiver and RICU's domestic competition, many of these hospitals now have a reimbursable option that is substantively similar to RICU's services and will choose—and already have chosen—that option rather than incurring the hassle and expense of HHS's administrative process.  *See* Doc. 3-2 at ¶¶ 37–38, 41; *Regeneron Pharm.*, 2020 WL 7778037, at *8 (channeling exception applied where potential proxies had incentive to switch to a competitor's product); *Urological Interests*, 668 F.3d at 713 (fact that hospitals had begun cancelling contracts with plaintiff's members was evidence that they did not share a similar interest in challenging the underlying regulation).  Moreover, given the uncertainty around the future of the Telehealth Waiver, hospitals currently lack a practical incentive to challenge the Critical Care Ban, especially given that HHS's five-year administrative process will far outlast the current sunset of the waiver.

*Compare* 85 Fed. Reg. 84,472, 84,517 (Dec. 28, 2020) (establishing end of 2021 sunset), *with,*
*Average Processing Time By Fiscal Year,* U.S. Dep't of Health & Human Servs. (Feb. 8, 2021)
(averaging 1,430.1 days for claims filed in fiscal year 2020).[8]  Finally, the circumstances caused
by the COVID-19 pandemic exacerbate the above-mentioned disincentives for hospitals to engage
in an administrative challenge to the Critical Care Ban.  Hospitals throughout the nation are in a
constant state of triage, determining the best methods for treating COVID-19 patients.[9]  It is highly
unlikely that, in the midst of trying to establish best practices in a novel medical crisis, hospitals
will make the strategic decision to develop a years-long challenge to a currently temporary HHS
waiver.

Second, the facts on the ground confirm that no proxy is likely to bring a challenge.  As
HHS itself notes, not a single one of the many supposed proxies it identifies has brought an
administrative challenge to the Critical Care Ban.  HHS Br. 17, 22 (pointing to lack of evidence
that "even a single claimant has yet sought Medicare payment for [RICU's] services" or that "a
single claimant … has pursued such review").

Third, as HHS concedes, RICU is not a Medicare biller and thus cannot access the
administrative process behalf of proxies to challenge the Critical Care Ban besides the rigorous
process it has already pursued.  *See* Doc. 3-2 at ¶ 22; HHS Br. 22 ("RICU itself may never be able
to seek administrative review").

As in *Urological Interests*, HHS has not countered any of RICU's evidence on this front,
and thus the Court must draw all inferences in RICU's favor.  *See* 668 F.3d at 713 (HHS "failed

---

[8] *Available at* https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html.
[9] Melanie Evans, *Record Covid-19 Hospitalizations Strain System Again*, WALL ST. J. (Nov. 11, 2020, 7:11 PM), https://www.wsj.com/articles/covid-19-surge-strains-hospitals-once-again-11605100312.

to counter the Council's allegations with, for instance, affidavits from hospitals attesting to their incentives or intent to pursue an administrative challenge").  Because RICU cannot access HHS's administrative review process beyond what it has already done, and the supposed proxies HHS identifies lack adequate incentive to do so, and have not done so, "invoking section 405(h) would result . . . in the 'complete preclusion of judicial review.'"  *Urological Interests*, 668 F.3d at 713 (citing *Ill. Council*, 529 U.S. at 22–23).  For these reasons, the exception to section 405(h) applies, and this Court has jurisdiction over RICU's case under 28 U.S.C. §§ 1331 and 1346.

While HHS ignores *Urological Interests*, the decisions it relies upon are in accord.  For example, HHS relies heavily on *American Chiropractic Association, Inc. v. Leavitt*, 431 F.3d 812 (D.C. Cir. 2005), for the proposition that the channeling exception does not apply where a third-party claimant could theoretically file a claim that challenges a regulation.  HHS Br. 22–23.  But HHS fails to note that the case, decided prior to *Urological Interests*, also holds that the channeling exception applies "when roadblocks *practically* cut off any avenue to federal court." *Am. Chiropractic*, 431 F.3d at 816 (emphasis added).  The other decisions HHS cites have similar holdings.  *See Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 505 (5th Cir. 2018) (proxy must have the capacity *and incentive* to seek administrative review); *Sensory Neurostimulation*, 977 F.3d at 983 ("if another party can bring the same claim through the existing administrative channel, *and is sufficiently incentivized to do so*, then some review is available") (emphasis added); *Cal. Clinical Lab'y Ass'n v. HHS*, 104 F. Supp. 3d 66, 82 (D.D.C. 2015) (distinguishing *Urological Interests* because plaintiff's own members had the ability to bring an administrative challenge to the regulation at issue); *Colo. Heart Inst., LLC v. Johnson*, 609 F. Supp. 2d 30, 37 (D.D.C. 2009) (third-party hospitals had "sufficient incentive" to challenge the regulation at issue); *Nat'l Hospice & Palliative Care Org., Inc. v. Weems*, 587 F. Supp. 2d 184, 195–202 (D.D.C. 2008) (plaintiffs'

own members had the ability to challenge the regulation at issue).  In short, HHS's position that the channeling exception does not apply to RICU's case is entirely dependent on a misstatement of the law of the D.C. Circuit, and the Court should decline HHS's invitation to depart from binding precedent.

## II.  RICU IS LIKELY TO PREVAIL ON THE MERITS AND HAS STATED A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

HHS offers two merits arguments in defense of the Critical Care Ban.  Its contends that 42 U.S.C. § 1395y(a)(4) precludes payment here.  It further contends that "[e]ven absent the foreign payment bar, the Telehealth Statute" precludes payment.  HHS Br. 25.  Both arguments fail for a host of reasons.

### A.  LEGAL STANDARD.

To obtain a preliminary injunction, one of the factors a plaintiff must show is a likelihood of success on the merits.  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019).  To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Franklin v. Capitol Hilton Hotel*, 325 F. Supp. 3d 25, 28 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).  "In evaluating a motion to dismiss under Rule 12(b)(6), a court must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 436 F. Supp. 3d 354, 357 (D.D.C. 2020) (quotation marks omitted).

### B.  The Telehealth Statute Requires Medicare to Pay for RICU's Services, and HHS Ignores and Misconstrues the Text of that Statute.

HHS's argument that the Telehealth Statute independently bars payment for RICU's

services[10] is based on a jumbled reading of just about every provision of the Telehealth Statute which HHS cites.  The Telehealth Statute, reflecting common sense, defines telehealth services as being furnished at the site of the patient—i.e., the object of Medicare.  HHS ignores these provisions to focus solely on the portion of the statute that establishes the *rate of*, rather than the *entitlement to*, reimbursement.  But even here HHS misconstrues the text and offers contradictory arguments.

1. ***HHS Ignores the Express Terms of the Telehealth Statute's Payment Mandate and Definitions.***

The most fundamental flaw in HHS's position is that it ignores the Telehealth Statute's clear text, which defines telehealth services as being delivered at the site of the Medicare beneficiary. Subsection (1) of the Telehealth Statute—entitled "In General"—establishes the mandate that "the Secretary shall pay for telehealth services that are ***furnished*** via a telecommunications system by a physician … to an eligible telehealth individual," and then subsection (4)—entitled "Definitions"—defines that eligibility as being for a person who "receives a telehealth service ***furnished at*** an originating site." 42 U.S.C. §§ 1395m(m)(1), (4)(B) (emphasis added).  With the defined term substituted in, the payment mandate reads as follows:

> the secretary shall pay for telehealth services that ***are furnished*** via a telecommunications system by a physician … to an [individual enrolled under this part who receives a telehealth service ***furnished at*** an originating site] notwithstanding that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary.

---

[10]  In its brief, HHS is inconsistent on whether it believes the Telehealth Statute independently bars payment for RICU's services.  It says as much on page 25, but then on page 28 it cites section 1395y(a)(4) as the sole reason why "Medicare routinely pays for telehealth services 'notwithstanding' the differing locations of the physician and patient" but is "barred from paying for [RICU's] … because CMS cannot pay for services not provided outside the United States."  HHS's inconsistency about precisely which stance it is taking on the meaning of the Telehealth Statute is a clue that the agency's (varying) positions are legally untenable.

"Furnished" telehealth services are what the Secretary must pay for, and the statute use this key word to define how they are furnished ("via a telecommunications system"), who furnishes them ("by a physician"), and where they are furnished ("at an originating site"). It is the fact that the beneficiary "receives" a telehealth service—"furnished at an originating site"—that triggers Medicare eligibility.

The "notwithstanding" clause of the payment mandate solidifies this reading. The only location mentioned in the main clause is the "originating site," and the superordinating clause says the Secretary shall pay notwithstanding that the physician is not there. *See* Antonin Scalia & Bryan A. Garner, READING LAW 127 (2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers.").

HHS repeatedly waives this straightforward language away as "slivers of isolated text," HHS Br. 1–2, 26–27, but these are the key terms in the core provision of the Telehealth Statute, and HHS's interpretation fails to give them any meaning whatsoever, despite the fact that HHS recognizes "'the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" HHS Br. 27 (quoting *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985)). Indeed, HHS's position is so unmoored from the statutory text that the agency cannot even offer a consistent recitation of what "furnished" means. On one page of its brief it says only that telehealth services "are made available and supplied from abroad," while two pages later it shifts positions and says telehealth services are "'furnished' simultaneously by two entities in two places—by the provider at the distant site and the facility at the originating

site." HHS Br. 25, 27.  In either case, the Telehealth Statute never says what HHS wants it to say: that telehealth services are "furnished at a distant site."[11]

HHS concedes that "a patient *receives* [RICU] services domestically" and "does not *receive* inpatient care at a hospital outside the United States," but contends that "as offered by RICU, those services are … *supplied* from abroad."  HHS Br. 25, 31 n.11 (emphasis added).  But the Telehealth Statute says the patient "*receives* a telehealth service *furnished at* an originating site," and "furnish" has the same meaning as "supply" according to the dictionary HHS favors. *See Furnish*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("supply, give").  HHS fails to explain how "receives … at" can point to the originating site, while the very same "at" in "furnished at" somehow points to the distant site.  *See Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) ("we cannot accept respondent's position without unreasonably giving" the same word "two different meanings in the same section of the statute").

### 2. *HHS Ignores Its Own Telehealth Rule.*

In the PI motion, RICU explained that HHS's Telehealth Rule, like the Telehealth Statute, clearly defines where telehealth services are furnished.  Doc. 3-1 at 25.  The regulation establishes a "General Rule" that states "Medicare Part B pays for covered telehealth services included on the

---

[11] In a footnote, HHS suggests that RICU's overseas providers "likely do not qualify as 'physicians' or 'practitioners' under the telehealth laws."  HHS Br. 26 n.8.  In support of this proposition, HHS bizarrely cites the statutory definitions for physician assistant, nurse practitioner, certified registered nurse anesthetist, and clinical social worker—none of which are the intensivists at issue here.  In any event, the statutory definition of "physician"—"a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function or action," 42 U.S.C. §1395x(r)—presents no bar here because the Telehealth Statute defines telehealth services as being furnished at the originating site, and RICU's physicians are all licensed in the states where they furnish services.  Moreover, HHS's footnote cannot withstand the test of its own 2001 rulemaking, in which HHS said: "We defer to State law regarding licensure issues.  When the State law for the originating site permits an out-of-State practitioner to provide a telehealth service, without being licensed in the State in which the originating site is located, Medicare would make payment for the telehealth service."  66 Fed. Reg. at 55,283–84.

telehealth list" if certain conditions are met, including that "[t]he services are ***furnished*** to a beneficiary ***at an originating site***." 42 C.F.R. § 410.78(b)(3) (emphasis added). HHS's only answer is to again waive all this away as an "isolated bit of text." HHS Br. 30. But ignoring binding text does not make it disappear, and HHS offers not one word of analysis about how the Telehealth Rule squares with the Critical Care Ban, most probably because there is nothing that can be said in HHS's favor. HHS's subregulatory Critical Care Ban is directly contrary to HHS's duly promulgated Telehealth Rule.

### 3. *HHS Misconstrues the "Payment Amount" Provision.*

Instead of confronting the meaning of "furnished" in the Telehealth Statute's payment mandate, HHS tries to divert attention away from this text by citing a different subsection, which governs "payment amount." 42 U.S.C. 1395m(m)(2)(A). That subsection states:

> the Secretary shall pay to a physician or practitioner located at a distant site that furnishes a telehealth service to an eligible telehealth individual an amount equal to the amount that such physician or practitioner would have been paid under this subchapter had such a service been furnished without the use of a telecommunications system.

*Id.* HHS posits that this provision reflects "Congress's decision to peg fee schedule payments to the location of the provider at the distant site" and makes clear that, "[e]ven absent the foreign payment bar," "Medicare has no discretion to pay for services provided abroad" because "no such fee schedule exists." HHS Br. 25. HHS deems it "remarkabl[e]" that RICU did not discuss this provision in its compliant or PI motion, but that is because the provision does not alter the analysis.

<u>First</u> and foremost, HHS is relying on a statutory provision it has invented, not the one that is found in the U.S. Code. HHS insists that subsection (m)(2)(A) "expressly commands PFS payment based on the distant site." HHS Br. 32 n.12. Yet nowhere does subsection (m)(2)(A) "expressly command" that physician payment amounts be pegged to the location of the physician at the distant site. It says a physician must be paid what he or she "would have been paid … had

such service been furnished without the use of a telecommunications system." 42 U.S.C. § 1395m(m)(2)(A). HHS leaps to the conclusion that this means the physician should be paid as if the patient came to the physician's location, rather than vice versa. But this assumption is questionable—and certainly not required—given that (1) an originating site generally has to be a medical facility equipped to receive patients, while a distant site can be anywhere and may not be able to receive patients,[12] and (2) the Telehealth Statute states that payment shall be made "notwithstanding that the individual physician … is not at the same location as the beneficiary," not the other way around. Accordingly, "RICU offers no explanation for how the Telehealth Statute could simultaneously compensate providers based on their geographic location, but also consider their services as being 'furnished' solely at the originating site," HHS Br. 27, because that is not what the Telehealth Statute does.[13]

Second, nothing in subsection (m)(2)(A) is inconsistent with RICU's position. Subsection (m)(2)(A) again uses the phrase "furnishes … a telehealth service to an eligible telehealth individual." As already explained, that phrase is given meaning in the "definitions" section of the statute, which states that eligibility occurs when a "telehealth service" is "furnished at an originating site." 42 U.S.C. § 1395m(m)(4)(B). Thus, using the full definition of "eligible telehealth individual," subsection (m)(2)(A) reads:

> the Secretary shall pay to a physician or practitioner located at a distant site that furnishes a telehealth service to an [an individual enrolled under this part who receives a telehealth service furnished at an originating site] an amount equal to the amount that such physician or practitioner would have been paid under this

---

[12] *Compare* 42 U.S.C. § 1395m(m)(4)(C)(ii) (originating site must be a provider's office, critical access hospital, rural health clinic, federally qualified health center, hospital, renal dialysis center, skilled nursing facility, community mental health center, or, in limited circumstances, a patient's home), *with id.* § 1395m(m)(4)(A) (placing no limitations on a distant site).

[13] The legality of HHS's interpretation of subsection (m)(2)(A) for reimbursement *rate* purposes, as pointing to the distant site, need not be decided to resolve this case.

subchapter had such a service been furnished without the use of a telecommunications system.[14]

There is only one part of this sentence that defines where the telehealth service is "furnished at," and it is followed by the words "an originating site."  Again, if HHS were correct that the telehealth service is furnished at the distant site (or both sites), then one would expect this subsection (or any part of the Telehealth Statute) to contain the phrase "furnished at a distant site."  But that is not the statute Congress enacted, and HHS is not free to amend it.

Third, even if HHS's erroneous assertion were correct and the statute required provider payment rates based on the distant site's location, that still would not mean this section defines where services are *actually* furnished.  This section merely provides an "as if" or hypothetical scenario: pay based on what "would have been" happening, not "what is" happening.  Put differently, subsection (m)(2)(A) only addresses payment *amount*, not the underlying mandate to pay for telehealth services or the associated definitions, which are found in subsections (m)(1) and (m)(4)(B).  Left unexplained by HHS is why, in this Court, it conflates a payment mandate with a separate provision about payment rate, when just two months ago, in the Supreme Court, it took a very different position.  *See* Letter from Deputy Solicitor General Edwin S. Kneedler to Hon. Scott S. Harris, Clerk, Supreme Court of the United States, *California, et al. v. Texas, et al.*, No. 19-840, and *Texas, et al. v. California, et al.*, No. 19-1019 (Feb. 10, 2021) (explaining that "[i]n the view

---

[14] The term "that furnishes" appears adjacent to "distant site," but it cannot reasonably be read to refer back to "distant site" because a distant site (which is a place not an entity, unlike an originating site) is not an entity that is paid.  The practitioner or physician is paid, and thus the phrase "that furnishes" can only reasonably refer back to the person, not the place.  HHS admits as much in its brief.  *See* HHS Br. 4 ("Under the statute, *a physician* provides services from a 'distant site'…."); *id.* at 27 (stating that telehealth services are "'furnished' … *by the provider*") (emphasis added).  *See also Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*, 926 F.3d 819, 824 (D.C. Cir. 2019) (court must look to "nearest *reasonable* referent").

of the United States, Congress's decision to reduce the payment amount to zero" has no effect on the *separate* mandate to make a shared responsibility payment under the Affordable Care Act).[15]

Fourth, even if HHS's erroneous assertion were correct and the statute required provider payment rates based on the distant site's location, HHS would still be wrong in suggesting (in double emphasized text) that it is utterly incapable of devising payment schedules for physicians located abroad. HHS Br. 26. The claim is rather incredible because HHS has already done so. As discussed more fully below, 42 U.S.C. §§ 1395f(f) and 1395y(a)(4) authorize payments for certain inpatient hospital and physician services provided at foreign hospitals. HHS has promulgated regulations governing the "amount of payment" for such services. *See* 42 C.F.R. § 413.74(b) (amount of payment for inpatient hospital services is "equal to 100 percent of the hospital's customary charges"); *id.* § 424.126(b) (amount of payment is "on the basis of 100 percent of the hospital's customary charges"); *id.* § 424.127(c) (specifying amount of payment for physician services); *see also* CMS, Pub. No. 100-04, *Medicare Claims Processing Manual* ch. 32, § 350.6 (2020) ("Payment is made for necessary physician and ambulance services that meet the other coverage requirements of the Medicare program, and are furnished in connection with a covered foreign hospitalization."); *id.* § 350.11.3 (Medicare Approved Charges for Services Rendered in Canada or Mexico); *id.* § 360.1 (Payment for Services from Foreign Hospitals). Medicare has had no problem devising a rate to pay physicians located overseas when required to do so, it has done so for years, and it could easily do so here if that is how it chose to set the reimbursement rate for the services at issue.[16]

---

[15] *Available at* https://www.supremecourt.gov/DocketPDF/19/19-840/168649/20210210151147983_19-840%2019-1019%20CA%20v%20TX.pdf.

[16] For example, Medicare could use the national rate unadjusted for geography, the rate for physicians who do not participate in Medicare, or a discounted charge approach.

### 4.    *The Facility Fee Does Not Alter Where Services Are Furnished.*

HHS argues that telehealth services must be deemed furnished at the distant site because the Telehealth Statute provides for a flat "facility fee" for the originating site.  HHS Br. 27.  This is a red herring.  Subsection 1395m(m)(2)(B) does not contain a single word about where telehealth services are furnished.  In providing a facility fee, Congress simply recognized that telehealth requires the originating site to use technology to enable the furnishing of services, and the facility fee accounts for that.  *See, e.g.*, CMS, *COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-for-Service (FFS) Billing* 47 (Mar. 31, 2021) (describing facility fee as meant "to support such telehealth services").

Moreover, HHS's reasoning about the facility fee cannot withstand close scrutiny.  <u>First</u>, HHS posits that this unit of the "twin payment scheme" accounts for the part of the telehealth service that is furnished at the domestic site.  HHS Br. 27.   But if that is true, then HHS should have come to the conclusion that RICU's domestic client hospitals can charge the facility fee, even if RICU's physicians cannot charge separately for physician services.  But HHS told RICU: "*both sites* are subject to the statutory payment exclusion that prohibits Medicare payment for services that are not furnished within the United States."  Doc. 3-5 (emphasis added).  Thus, based on this concession from HHS, if the Court ultimately decides HHS legally can bar payment for RICU's physician services, RICU nonetheless requests an order declaring the Critical Care Ban invalid as to the facility fee payment and enjoining HHS from enforcing that portion of the Critical Care Ban.

<u>Second</u>, HHS buries in a footnote an admission that undermines its position: the "Telehealth Statute states that '[n]o facility fee shall be paid' when the originating site is a person's home."  HHS Br. 5 n.2 (quoting 42 U.S.C. § 1395m(m)(2)(B)(ii)).  If the facility fee is the lynchpin for determining the meaning of where telehealth services are furnished—and this is what HHS says at page 27 of its brief—does the meaning of "furnished" suddenly change when the telehealth

patient is at home?  Is the place of service the distant site when the originating site is a hospital, but not the distant site when the originating site is a home?  HHS offers no answers, and that is because its interpretation of the Telehealth Statute is unmoored from the statutory text.

Third, in its 2001 rulemaking HHS took this position: "We defer to State law regarding licensure issues.  When the State law for the originating site permits an out-of-State practitioner to provide a telehealth service, without being licensed in the State in which the originating site is located, Medicare would make the payment for the telehealth service.  However, when State law precludes an out-of-State practitioner from delivering a telehealth service, Medicare would not pay for that service."  66 Fed. Reg. 55,246, 55,283–84 (Nov. 1, 2001).  But if the Telehealth Statute actually establishes a "twin payment scheme" that reflects services being furnished "by two entities in two places—by the provider at the distant site and the facility at the originating site," HHS Br. 27, then HHS should have been concerned only with the State law for the home locality of each entity.  HHS's recognition that State law of the originating site matters as to whether the *provider* is authorized to perform telehealth is a recognition that the provider is, in fact, furnishing services at the originating site.

### 5.    *HHS Misrepresents RICU's Arguments Regarding the Payment Mandate's Notwithstanding Clause.*

As noted above, the straightforward meaning of the Telehealth Statute—that telehealth reimbursement is based on the patient's location and is furnished at the originating site—is reinforced by the last clause of the general payment command: "the Secretary shall pay for telehealth services that are furnished … by a physician … to [an individual … who receives a telehealth service furnished at an originating site] … notwithstanding that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary."  42 U.S.C. § 1395m(m)(1).  The location at issue is the originating site, and the payment mandate

prevails notwithstanding that the physician is located elsewhere because it is the beneficiary "receiv[ing]" the service "at the originating site" that triggers eligibility.

HHS spends the majority of the merits section of its brief attempting to explain away this provision, but its argument is mostly misdirection.   RICU does not contend that the notwithstanding clause impliedly repealed the Foreign Payment Ban, 42 U.S.C. § 1395y(a)(4). HHS Br. 29.  If a Medicare beneficiary is sited abroad and is furnished telehealth services there, those services would not be eligible for Medicare reimbursement because of the Foreign Payment Ban (unless one of the statutory exceptions applied).  What the notwithstanding clause reinforces is that the site of the patient, not the site of the doctor, matters for telehealth reimbursement.  That is why the notwithstanding clause is phrased in the way that it is, with a focus on the doctor not being in the same location as the beneficiary rather than vice versa.

Again, it helps to read the sentence with the definitions substituted in: "the Secretary shall pay for telehealth services that are furnished via a telecommunications system by a physician or practitioner … to [an individual enrolled under this part who receives a telehealth service furnished at an originating site] notwithstanding that the individual physician or practitioner providing the telehealth service is not at the same location as the beneficiary."  The service is "furnished at" and "receive[d]" at the patient site and that is the trigger for payment; the physician's "not [being] at the same location" does not matter (notwithstanding).  That all the focus is on the patient site is confirmed by the fact that there are *no* limitations on what can constitute a distant site.[17]

---

[17] HHS makes much of "foundational" and "long-standing" rules of Medicare, HHS Br. 28–29, but it completely ignores the fact that Medicare has long had strict requirements for facilities where reimbursable services can be delivered, and that these requirements promote patient safety. *See, e.g.*, 42 U.S.C. 1395x(e); 42 C.F.R. § 482.21.  That telehealth distant sites have no requirements at all reflects the fact that medical services are furnished to patients at the patient location and nowhere else.

HHS's reading also renders the notwithstanding clause superfluous. HHS contends the notwithstanding clause "merely clarifies that … Medicare could pay for traditional services when furnished as telehealth rather than in person." HHS Br. 28. In other words, HHS argues the Telehealth Statute says this: "the Secretary shall pay for telehealth services that are furnished via a telecommunications system … notwithstanding that it is telehealth." *See What is Telehealth?*, HHS (Feb. 25, 2021), https://telehealth.hhs.gov/patients/understanding-telehealth/ ("Telehealth— sometimes called telemedicine—is the use of electronic information and telecommunication technologies to provide care when you and the doctor are not in the same place at the same time.") (last visited April 12, 2021). As HHS admits, it is an "'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" HHS Br. 27 (quoting *Mountain States*, 472 U.S. at 249). But that is exactly what HHS's reading of the notwithstanding clause does.

### C.   SECTION 1395Y(A)(4) DOES NOT BAR PAYMENT FOR RICU'S SERVICES.

After its "exhaustive review" and "complete reevaluation" consisting of a "careful review," HHS came to the conclusion that 42 U.S.C. § 1395y(a)(4) was the sole basis for the Critical Care Ban. Doc. 3-5. That statute states: "no payment may be made … for any expenses incurred for items or services … which are not provided within the United States." Oddly, in its brief, HHS only offers a few lines of defense for this position. It recites the statute, offers a dictionary definition of "provide" as "supply or make available," and then reasons that the services here "are made available and supplied from abroad" even if "a patient *receives* such services domestically." HHS Br. 25. This argument fails.

**1. *Section 1395y(a)(4) Is Not Implicated Because RICU's Services Are Provided Domestically.***

<u>First</u>, HHS's reading of section 1395y(a)(4) badly misconstrues how the statute applies to telehealth.  As explained above, the Telehealth Statute defines telehealth services as being "furnished at an originating site."  Section 1395y(a)(4) is not implicated.  HHS pins its entire argument on the Merriam-Webster definition of "provide," but it fails to read a little further in that dictionary.  "Provide" means "supply," and supply, as a verb, means "to make available *for use*," "to *satisfy* the needs or wishes of," "to ***furnish*** … with a vital element."  *See Supply*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphasis added).[18]  Merely offering or making available services from abroad—just showing up in front of a telehealth monitor—does not "satisfy the needs" of a Medicare beneficiary, make the physician's services available "for use," or *furnish* those services.  All of that happens in the hospital at the critically ill patient's bedside in the United States—"furnished at an originating site."  42 U.S.C. § 1395m(m)(4)(B).  Moreover, HHS ignores that the word section 1395y(a)(4) uses is "provid***ed***"—the past participle, which "typically expresses *completed* action."  *Past Participle*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphasis added).  The provision of services is completed in the United States.

Indeed, if HHS's reading of section 1395y(a)(4) is correct, and merely supplying or making available "items or services" from abroad triggers the ban, then the Foreign Payment Ban bars Medicare from paying for a whole host of medicines and prosthetics that are manufactured abroad, imported, and then used in the United States.  These items are "supplied from abroad," HHS Br. 25, but they are not *used* by a beneficiary (or, in terms of the Telehealth Statute, "receive[d]") until

---

[18] HHS's reliance on "provide" is particularly misplaced because the Telehealth Statute's payment mandate, subsection (m)(1), also speaks of the "physician or practitioner *providing* the telehealth service," and, as explained, that section deems such services as being furnished at the originating site.

they reach the United States.  So, too, with the telehealth services at issue.  The physician is located abroad—no one disputes that—but the services are not received and used, and thus furnished for Telehealth Statute purposes, until they reach the patient in the United States.

Second, HHS ignores the word "incurred."  The statute bars payments for "expenses *incurred* … for services … not provided in the United States."  *See Incur*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to become liable or subject to," as in "incur expenses"). Medicare expenses are "incurred" when a patient receives a service, not when a doctor offers it. Again, the patients at issue here do not receive services—and thus do not incur expenses—outside of the United States.  They receive services and incur expenses only from their ICU beds within the United States.  *See* HHS Br. 25, 31 n.11 ("a patient *receives* such services domestically," and "the patient does not receive inpatient care outside the United States").  HHS's reading of section 1395y(a)(4) thus ignores the basic structure of Medicare and defies common sense.  *See Sierra Club v. Costle*, 657 F.2d 298, 398 (D.C. Cir. 1981) ("Common sense, after all, must play a part in our interpretation of these statutory procedures.").  Medicare does not pay for services that are simply "made available" or offered by a physician; it pays for services that are delivered to and obtained by a beneficiary.  Patients, not providers, are the object of Medicare—and the care patients receive is what Medicare reimburses.  *See* 42 U.S.C. § 1395a(a) ("Any individual entitled to insurance benefits under this subchapter may *obtain* health services….") (emphasis added); *id.* § 1395a(b)(6) ("'Medicare beneficiary' means an individual who is entitled to benefits under part A or enrolled under part B."); *id* §§ 1395d(a), 1395x(b) ("The benefits provided *to an individual* by the insurance program … shall consist of entitlement to have payment made on his behalf … for inpatient hospital services," which are "services *furnished to an inpatient*") (emphasis added); CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual* ch. 6, § 10 (2020) ("Payment may be

made under Part B for physician services and for the nonphysician medical and other health services as provided in this section *when furnished by a participating hospital (either directly or under arrangements) to an inpatient of the hospital*") (emphasis added).  HHS's argument turns this on its head, completely ignoring a Medicare patient's choice to receive care at a U.S. hospital.

        **2.**    ***HHS Has No Response for RICU's Argument that Even Under HHS's "Simultaneous Provision" Interpretation, Section 1395y(a)(4) Is Inapplicable.***

Although, for purposes of discussing section 1395y(a)(4), HHS claims that RICU's "services are made available and supplied from abroad," HHS Br. 25, it cannot maintain that fiction and quickly reverts to the position it took in its letters to RICU—namely that "a telehealth service is furnished at the originating site and also at the distant site," Doc. 3-5, and is "'furnished' simultaneously by two entities in two places," HHS Br. 27.  In its complaint and PI brief, RICU explained that even under this (erroneous) reading of the Telehealth Statute, section 1395y(a)(4) is inapplicable because nothing in section 1395y(a)(4) bars reimbursement of services that are simultaneously domestic and foreign.  Doc. 1 at ¶ 94; Doc. 3-1 at 28.  HHS has admitted that the services are provided domestically, even if they are (according to HHS) simultaneously repeated in a foreign location.  And, as HHS admits, Medicare must pay for delivery of otherwise qualifying domestic telehealth services.  HHS Br. 29.  Accordingly, even if the Court adopts HHS's interpretation of the Telehealth Statute, RICU is still entitled to its requested relief.

        **3.**    ***HHS Has No Response for RICU's Argument that Its Services Qualify for Reimbursement Under the Exception to 42 U.S.C. § 1395y(a)(4).***

In the Complaint and PI Motion, RICU asserted that if HHS's argument is accepted—i.e., if RICU's telehealth services are deemed simultaneously furnished domestically and abroad—then the services qualify for reimbursement under the exception to the Foreign Payment Ban.  That exception states that the ban does not apply to "inpatient hospital services furnished outside the

31

United States under the conditions described in section 1395f(f) of this title and[,] … physicians'
services … furnished an individual in conjunction with such inpatient hospital services."  42
U.S.C. § 1395y(a)(4).  Section 1395f(f), in turn, states:

> (1) Payment shall be made for inpatient hospital services furnished to an individual
> entitled to hospital insurance benefits … by a hospital located outside the
> United States … if—(A) such individual is a resident of the United States, and
> (B) such hospital was closer to, or substantially more accessible than the nearest
> hospital within the United States which was adequately equipped to deal with,
> and was available for the treatment of, such individual's illness or injury.
>
> (2) Payment may also be made for emergency inpatient hospital services furnished
> to an individual entitled to hospital insurance benefits … by a hospital located
> outside the United States if—(A) such individual was physically present … in
> a place within the United States … at the time the emergency which necessitated
> such inpatient hospital services occurred, and (B) such hospital was closer to,
> or substantially more accessible from, such place than the nearest hospital
> within the United States which was adequately equipped to deal with, and was
> available for the treatment of, such individual's illness or injury.

HHS  has  promulgated  regulations  implementing  this  statutory  requirement.    Those
regulations "set[] forth the conditions for payment for services furnished in a foreign country," and
specify that "Medicare Part A pays … for emergency and nonemergency inpatient hospital services
furnished by a foreign hospital," and "Medicare Part B pays for certain physicians' services …
furnished in connection with covered inpatient care in a foreign hospital."  42 C.F.R. §§ 424.120,
424.121(a)–(b).  For emergency inpatient hospital services, "Medicare Part A pays" if, "[a]t the
time of the emergency that required the inpatient hospital services, the beneficiary was … [i]n the
United States" and the "foreign hospital was closer to, or more accessible from, the site of the
emergency than the nearest United States hospital equipped to deal with, and available to treat, the
individual's illness."  *Id.* § 424.122(a)–(b).  For nonemergency inpatient hospital services,
"Medicare Part A pays" if the "beneficiary is a resident of the United States" and the "foreign
hospital is closer or more accessible to the beneficiary's residence than the nearest United States

hospital equipped to deal with, and available to treat, the individual's illness or injury." *Id.* § 424.123(a)–(b).   In either case (emergency or nonemergency), "Medicare Part B pays" for "physician … services" otherwise covered under Part B and "furnished … [i]n the hospital, during a period of covered inpatient services" if the "physician is legally authorized to practice in the country where he or she furnishes the services." *Id.* § 424.124(a)–(b).

All RICU intensivists "serve as full-time, permanent staff members of the U.S. hospitals at which they care for patients."  Doc. 3-2 ¶ 14.  Under HHS's view, these physicians' services are simultaneously "furnished at the originating site and also at the distant site."  Doc. 3-5; *see also* HHS Br. 5–6, 27.  If that is so, then the conditions necessary for foreign hospital payments are met.  First, the beneficiaries are all residents of the United States (nonemergency services, 42 C.F.R. § 424.122(a)(1)) and in the United States (emergency services, *id.* § 424.123(a)).  Second, the distant site of the foreign hospital is "more accessible from" the site of the emergency (*id.* § 424.122(b)) or the beneficiary's residence (*id.* § 424.123(b)) than the nearest United States hospital equipped to deal with, and available to treat, the individual's injury, which in the case of ICU means having critical care doctors treating patients.  For a critically ill patient in a rural America— where the nearest critical care hospital with an in-person intensivist on staff is often hundreds of miles away[19]—the hospital furnishing telehealth from abroad (in HHS's view) will be "closer or more accessible" than another United States hospital.

HHS addresses this issue only in a footnote and offers two arguments.  First, HHS makes the absurd claim that a House Report somehow restricts this statutory payment command to "border residents."  HHS Br. 31 n.11.  But the actual law—the text Congress enacted and HHS's

---

[19] *See* Will Stone, *Getting Health Care Was Already Tough in Rural Areas. The Pandemic Has Made It Worse*, NPR (Oct. 7, 2020, 5:00 AM), https://tinyurl.com/put55hah.

promulgated rules implementing that law—is not restricted to border cases.  And HHS well knows this because it has said as much: "Services that fall under these exceptions typically are furnished in Canada or Mexico.  However, … it is permissible for Medicare to pay for services furnished in foreign countries other than Canada and Mexico."  71 Fed. Reg. 47,870, 48,124 (Aug. 18, 2006).  Second, HHS argues that section 1395f(f) covers "inpatient hospital services" and "RICU offers no explanation at all as to how this section could cover care where the patient does not receive inpatient care at a hospital outside the United States."  HHS Br. 31 n.11.  This is a curious argument because it is *HHS's contention* that RICU's inpatient telehealth services are furnished outside the United States, not RICU's.  RICU agrees—as HHS appears to concede in this footnote—that its telehealth services are furnished domestically.  But if HHS persists in its refusal to recognize that position, then it has no sound argument as to why the exception to 42 U.S.C. § 1395y(a)(4) is inapplicable.  HHS cannot have it both ways, defining the location of telehealth services one way for purposes of section 1395m(m) and another way for purposes of section1395f(f) and section 1395y(a)(4)'s exception.

### D.    HHS'S ADOPTION OF THE CRITICAL CARE BAN WAS ARBITRARY AND CAPRICIOUS.

HHS suggests that because it offers the "one true reading" of the Telehealth Statute, the Critical Care Ban is not arbitrary and capricious.  HHS Br. 31.  For the reasons already explained, HHS's statutory interpretation is neither correct nor the "one true reading" of the Telehealth Statute, so this argument fails.  Beyond that, HHS offers precious little to rebut RICU's arguments that the Critical Care Ban is arbitrary and capricious.  Doc. 3-1 at 30–34.  For example, HHS fails to rebut that its June 1, 2020 letter announcing the Critical Care Ban makes only conclusory assertions and is unsupported by any authority.  Doc. 3-1 at 31; Doc. 3-5.  As RICU explained in its opening brief, although that letter cites 66 Fed. Reg. 55,246, it fails to examine or explain the

substance of that document, quote any language from it, or even point to a section or page that might apply to the problem at hand.

HHS does not attempt to justify the inconsistencies in its letter.  Doc. 3-1 at 31.  Although the letter states in one part that the services at issue are "furnished at the originating site" (in the United States), it states in the following sentence that those services cannot be paid because they "are not furnished within the United States."  Doc. 3-5.

Nor does HHS attempt to explain inconsistencies with prior positons.  HHS's Telehealth Rule states that telehealth "services are furnished to a beneficiary at an originating site," which is "the location of an eligible Medicare beneficiary," 42 C.F.R. §§ 410.78(a)(4), (b), (b)(3).  This contradicts the Critical Care Ban, which relies on the notion that services are provided at the physician's location (and therefore cannot be paid).  HHS offers no rejoinder.

HHS even makes no attempt to justify the lack of common sense behind the Critical Care Ban.  Doc. 3-1 at 33–34.  Although Congress wanted Medicare beneficiaries located in the United States to receive life-saving care at the nearest available hospital, *see* 42 U.S.C. § 1395f(f), under the Critical Care Ban, a Medicare beneficiary residing in the middle of the United States, taken to a local hospital for life-saving care, would be charged the full amount for his medical bill on the theory that his care was "not provided within the United States."  Neither HHS's correspondence with RICU nor its brief in this Court address this glaring issue.

## III.   THE EQUITIES WEIGH DECIDEDLY IN RICU'S FAVOR.

### A.   RICU HAS ESTABLISHED IT IS SUFFERING IRREPARABLE HARM.

HHS contends that RICU has failed to establish it has suffered and will continue to suffer irreparable harm absent a preliminary injunction.  HHS. Br. 33–42.  But the Critical Care Ban undermines RICU's business model, has caused RICU to lose existing business, and continues to impede RICU's ability to attract new business.

### 1.      *RICU Timely Sought Its Requested Preliminary Injunction.*

HHS contends that RICU had an "unjustified delay" in seeking relief from the Critical Care Ban.  HHS Br. 34–35.  HHS has trouble picking which date it believes started the clock.  It alternatively points to the date RICU established its business (some eleven years ago), the publication date of the IFR, the date of HHS's first formal letter to RICU, and the date of HHS's publication of agency guidance.  HHS Br. 34.  One thing is certain, however.  Had RICU filed its motion on *any* of these dates, HHS would have said it was *too soon* and that its five-year administrative claims process is the appropriate timeline for resolving RICU's claims.  HHS Br. 28, 33–36.  Thus, on the one hand, HHS contends RICU is in Court too soon, and on the other hand it says RICU has come to Court too late.  The first proposition undermines the second—and, in any event, the second is flat wrong.

The Critical Care Ban is a sub-regulatory policy announced by HHS in the wake of the Telehealth Waiver—an extraordinary regulatory action promulgated in the midst of a global pandemic that has affected the speed of business and litigation across the United States.  RICU— a healthcare company that works with client hospitals overwhelmed by COVID-19 patient volumes—doggedly pursued a resolution short of litigation, and HHS engaged in a "complete reevaluation of all of the legal analysis" in the late fall of 2020, providing its final decision from the Secretary on October 28, 2020.  Just a few days later, President Biden won the presidential election, promising a very different approach to meeting the COVID crisis, including reversing many policies of the prior administration.  Candidate Biden explained that he "understands that [President] Trump's failed response has made older Americans and others at high-risk even more vulnerable" and that he would "listen to science"  and "[e]nsure public health decisions are

informed by public health professionals."[20]   One such professional is HHS's Chief Medical Officer, who told RICU in late December that "it would be a reasonable course of action to exhaust all possible avenues in the pursuit of decreasing morbidity and mortality."  Doc. 3-9.  Candidate Biden also promised to "make sure every single person in this country gets free testing and treatment for the coronavirus."[21]   Upon taking office, President Biden promised to "evaluate Medicare … and take any available steps to promote insurance coverage for safe and effective COVID-19 treatments and clinical care," and directed "the Secretary of HHS" to "promptly . . . provide targeted surge assistance to critical care . . . facilities."  Exec. Order 13,997, 86 Fed. Reg. 7,201, 7,201 (Jan. 26, 2021).  From RICU's perspective—and for the critically ill patients they could serve—these promises proved hollow.  So RICU timely sued.

Moreover, the harm to RICU's business was not evident all at once, because the healthcare marketplace took time to adapt—and is still adapting—to HHS's fast-moving regulatory changes during an unprecedented pandemic.  Doc. 3-2 ¶¶ 33-40.  Indeed, on an almost weekly basis, HHS changes the CMS COVID-19 FAQs that it now cites as an appropriate trigger date.  HHS published the original version of the document on or before April 9, 2020, and updated it at least twenty-six times in 2020, and at least six times so far in 2021—most recently on March 31, 2021, after HHS filed its brief in this case.

A preliminary injunction motion is not unjustifiably delayed if brought "in the context of ongoing, worsening injuries" because "the magnitude of the potential harm becomes apparent gradually."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014).  RICU could not

---

[20]   *Joe and Kamala's Plan to Beat COVID-19*, BIDEN-HARRIS, https://joebiden.com/covid19/ (last visited April 13, 2021).

[21] *Fact Sheet: How Joe Biden Would Help You Get Health Insurance Coverage During the Coronavirus Crisis*, BIDEN-HARRIS, https://joebiden.com/fact-sheet-how-joe-biden-would-help-you-get-health-insurance-coverage-during-the-coronavirus-crisis/ (last visited April 13, 2021).

appreciate the full scope of the harm that has and will continue to befall it until hospital decisionmakers became aware of the Critical Care Ban. Doc. 3-2 at ¶ 34. Indeed, only after those decisionmakers learned of the Critical Care Ban did RICU begin to both lose existing business and see a collapse in the acquisition of new business. Doc. 3-2 at ¶¶ 34–40. Moreover, telehealth is recently and increasingly common, and thus RICU's competitive disadvantage from the Critical Care Ban is recently, and increasingly, pronounced. In circumstances like these, the timeframe in which RICU filed its lawsuit can hardly be seen to undermine its entitlement to a preliminary injunction. *See Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 232–35, 244–45 (D.D.C. 2014) (rejecting HHS's argument that a delay of several *years* in filing for preliminary injunction in response to an FAQ guidance document foreclosed a preliminary injunction because, based on "the nontraditional nature" of a policy announced via FAQ, "plaintiffs reasonably pursued non-litigation avenues first"); *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehabilitation Servs.,* 31 F.3d 1536, 1544 (10th Cir. 1994) ("Within three months of having failed to reach such a settlement [regarding Medicaid payments] plaintiffs commenced this action. Under those circumstances, we are reluctant to hold that plaintiffs' delay should be fatal to their claim of irreparable injury.").[22]

## 2. A Preliminary Injunction Would Not Upset a "Longstanding" Status Quo.

HHS contends that this Court should reject RICU's requested preliminary injunction because it would upset "a longstanding status quo." HHS Br. 35–36. But the Telehealth Waiver

---

[22] HHS's absurd argument that RICU should have brought suit eleven years ago is divorced from the facts of this case. Before the Telehealth Waiver, no tele-ICU services were eligible for Medicare reimbursement and RICU operated on a level playing field with its competitors. Doc. 3-2 at ¶ 23. The Critical Care Ban has now given RICU's competitors an advantage. Doc. 3-2 at ¶ 41. HHS's illegal action has upset the competitive status quo in a way that substantially disfavors RICU, a wrong that RICU seeks to remedy.

and Critical Care Ban are less than a year old, and the category of telehealth RICU provides only

became eligible for Medicare under the Telehealth Waiver (and then prohibited by the Critical

Care Ban).  For an agency that has managed its telehealth policy by constantly updating a website

FAQ, the claim to a status quo of "two decades" is questionable at best. [23]

### 3. *The Damages HHS Caused and Continues to Cause RICU are Neither Speculative nor Vague.*

The continuing operation of the Critical Care Ban has caused and will continue to cause

substantial harm to RICU.  Rather than address that harm, HHS deflects by falsely asserting that

those harms are "speculative" and "vague."  HHS Br. 36–42.  HHS is wrong.

#### a. *Monetary Damages*

Under the Critical Care Ban, RICU competitors' services (using domestically located

telehealth intensivists) are eligible for Medicare reimbursement while RICU's services are not,

and thus RICU now faces a substantial competitive disadvantage.  Doc. 3-2 at ¶¶ 36–41.  This

situation has cost RICU existing business and new business.  Doc. 3-2 at ¶¶ 36–40.  Indeed, the

Critical Care Ban has eliminated RICU's ability to attract new business, which went from a thirty-

five percent annual growth rate before the Critical Care Ban to non-existent.  Doc. 3-2 at ¶ 34.

HHS has failed to put forward any evidence to rebut these facts.  As for HHS's rejoinders, they

are without merit.

---

[23] To the extent HHS suggests that a "mandatory injunction" is judged with a more exacting standard than a "prohibitory injunction," it misstates D.C. Circuit law.  *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("[T]his court has rejected any distinction between a mandatory and prohibitory injunction, observing that the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms."); *United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995) ("Yet there is no reason why one form of injunctive relief should be treated differently than any other....  Experience has shown that the dichotomy is an illusion and cannot be maintained.").  In any event, RICU seeks a prohibitory injunction: "enjoining the Defendants from denying Medicare reimbursement for telehealth services on the basis of a physician's or practitioner's physical location outside of the United States at the time of service."  Doc. 3 at 2.

HHS posits that RICU's losses are speculative because RICU has not identified a Medicare claimant that has sought reimbursement for RICU's services.  HHS Br. 36.  But this odd rejoinder is backwards: RICU is harmed because its services *cannot* be reimbursed.   Doc. 3-2 at ¶¶ 36–40.[24]

HHS next trots out one of its standard responses to preliminary injunction motions—namely, that RICU's monetary damages are too vague to justify a preliminary injunction.  HHS Br. 37–40.[25]  But  RICU has specifically identified the economic losses the Critical Care Ban is causing and the consequences of those losses.  Mr. Rabinowitz's declaration establishes that existing customers have withdrawn business from RICU as a result of the Critical Care Ban.  Doc. 3-2 at ¶¶ 36–38.  Moreover, prospective customers have withheld business from RICU as a result of the Critical Care Ban.  Doc. 3-2 at ¶¶ 39–40.  Indeed, although HHS suggests that RICU has not specifically quantified its losses, HHS Br. 40, RICU has shown that its rate of business growth went from more than thirty-five percent per year before the COVID-19 pandemic to zero since the Critical Care Ban became known to hospital decisionmakers.  Doc. 3-2 at ¶ 34.  *See* HHS Br. 39 (conceding that irreparable harm is shown by establishing percentage of business at stake).  And while HHS argues that RICU has failed to show the significance of this revenue loss, HHS Br. 37–38, as RICU has explained, the consequences of these economic losses are dire.  It is not an exaggeration to state that the continued operation of the Critical Care Ban risks "the very foundation of RICU's business model."  Doc. 3-2 at ¶¶ 42–44.

---

[24] For the same reason, HHS's argument that RICU's lost revenue may be retrievable makes no sense.  HHS Br. 37 n.15.

[25] *See* Defs.' Opp. to Pls.' Mot. for T.R.O. and Prelim. Inj. at 34–36, *Regeneron Pharm., Inc. v. U.S. Dep't of Health and Human Servs.*, No. 20-CV-10488 (S.D.N.Y. Dec. 16, 2020); Defs.' Opp. to Pls.' Mot. for T.R.O. and Prelim. Inj. at 40–42, *Ass'n of Comm. Cancer Ctrs. v. Azar*, No. 1:20-cv-3531 (D. Md. Dec. 15, 2020).

Recognizing the dire circumstances facing RICU, HHS responds by misstating RICU's position on its irreparable injuries.  HHS argues that RICU relies solely on sovereign immunity to establish that its economic losses justify a preliminary injunction.  *See* HHS Br. 36–37, 40 n.19. This is not RICU's position.  Rather, both the character of RICU's losses *and* sovereign immunity justify RICU's requested preliminary injunction, a proposition supported by the law.  *See* Doc. 3-1 at 36 (RICU describing its economic injuries as "severe ***and*** irreparable") (emphasis added). The Critical Care Ban has upset "the very foundation of RICU's business model" and represents a threat to RICU's continued operation.  Doc. 3-2 at ¶¶ 42–44.  RICU's growth went from more than thirty-five percent per year before the COVID-19 pandemic to nil since the Critical Care Ban became known to hospital decisionmakers.  Doc. 3-2 at ¶ 34.  Indeed, since the Critical Care Ban became known to hospital decisionmakers, RICU has seen a contraction in existing business.  Doc. 3-2 at ¶¶ 36–40.  Despite these substantial economic harms, RICU may not recover damages from Defendants.  *See* 5 U.S.C. § 702.

These facts amount to the sort of irreparable harm that justifies a preliminary injunction, and the caselaw is in accord.  The court in *Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008), for example, found irreparable harm justifying a preliminary injunction where the plaintiff (1) asserted that, without the preliminary injunction, his business "may be severely damaged" because "[l]ong-standing clients ... [may be] unwilling, or unable, to do business with" him and it would "be difficult for him to attract new customers" and (2) established that he could not "recover damages from the defendant due to the defendant's sovereign immunity." *Id.* at 50–51; *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (granting a preliminary injunction and rejecting the notion that economic damages must "threaten[] the very existence of the movant's business" where a defendant enjoys sovereign immunity).  And although HHS relies

heavily on *National Mining Association v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011), it fails to mention that the court there explained the standard for establishing irreparable harm as follows: "[i]f a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary." *Id.* at 53. Under that holding, RICU has assuredly met the standard for establishing economic losses that justify a preliminary injunction.

b.      *Competitive and Reputational Harm*

With respect to competitive and reputational injuries the Critical Care Ban has caused and continues to cause RICU, HHS ignores the actual evidence, describing Mr. Rabinowitz's testimony as "predictions." HHS Br. 40–42. But Mr. Rabinowitz establishes—and HHS has proffered no evidence to dispute—that RICU has *already lost* existing and prospective customers due to the Critical Care Ban, Doc. 3-2 at ¶¶ 36–40, marking a decline in market share in contrast with annual gains of thirty-five percent before the Critical Care Ban. Doc. 3-2 at ¶ 34. Far from speculative, the Critical Care Ban risks "the very foundation of RICU's business model." Doc. 3-2 at ¶¶ 42–44. As a result of the Critical Care Ban, RICU is now labeled by its existing and potential customers as less economically desirable than its competitors, whose services are eligible for Medicare reimbursement. Doc. 3-2 at ¶¶ 36–40. The competitive injury will compound as prospective clients form long-term relationships with RICU's competitors. Doc. 3-2 at ¶ 44.

The decisions cited by HHS do not undermine RICU's entitlement to relief. In *Woodstream Corp. v. Jackson*, No. CIV.A. 11-867 JEB, 2011 WL 8883395, at *9 (D.D.C. June 3, 2011), the plaintiff conceded that the asserted harm underlying its requested preliminary injunction would "have no significant effect on its business." *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 150 (D.D.C. 2013), involved "speculative allegations of loss of revenue and

other market advantages," as opposed to *actual* lost revenue and market share in this case. *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220–21 (D.D.C. 1996), involved a single drug sold by a major pharmaceutical company, whereas this matter involves RICU's entire business model. And while the plaintiff in *Toxco, Inc. v. Chu*, 724 F. Supp. 2d 16, 30 (D.D.C. 2010), relied on an affidavit that made predictions about how an industry would react to an agency action, it could not show how any industry players had actually responded, unlike Mr. Rabinowitz, who has averred as to what has already happened. *See also Mallinckrodt Ard LLC v. Verma*, No. 19-CV-1471, 2020 WL 7265325, at *13 (D.D.C. May 29, 2020) (plaintiff failed to show "concrete" reputational harm); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (same).

## B. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST BOTH SUPPORT A PRELIMINARY INJUNCTION.

In the midst of the worst pandemic to have faced the United States in over a century, HHS cannot and does not dispute that providing patients with expanded access to critical care will save lives and serves the public interest. HHS's CMO told RICU as much. Doc. 3-9. And one of the highest-ranking officials at HHS, the CDC director, recently said: "I know what it's like when you're the … healthcare provider and you're worried that you don't have the resources to take care of a patient in front of you…. I'm calling on our … civic leaders … to sound the alarm.… We do not have the luxury of inaction."[26] And HHS's own data shows the pandemic is still raging across the country. *See supra* note 3. People are dying for lack of critical care, and HHS concedes, as it must, that "broadening access to quality and reliable health care services is in the public interest." HHS Br. 28.

So what public-interest factor does HHS say could possibly cut the other way? Its lead argument is, incredibly, that a preliminary injunction would force it to devise a rate at which to

---

[26] *CDC Director Gives Emotional Warning of "Impending Doom," supra* note 1.

reimburse RICU doctors.  As explained above, however, HHS already has such rates, and could easily devise them.  *See supra* pp. 24, 31-34.  Indeed, the argument is hard to take seriously given that HHS is regulating the pandemic healthcare system by guidance documents updated on an almost weekly basis.

HHS's second argument is a parade of horribles about regulating doctors located overseas. But, again, Medicare *already pays* for some healthcare provided overseas, and it has not spelled doom for HHS, the sanctity of the American healthcare system, or the American justice system. HHS's claims that it will be unable to combat fraud or recoup overpayments ignores that RICU's intensivists serve as full-time, permanent staff members of the American hospitals at which they care for patients, Doc. 3-2 at ¶ 14, hospitals that would be within the domestic reach of HHS (not to mention RICU, a Delaware LLC).  And, of course, the Justice Department's reach is global.[27]

In addition, HHS raises concerns regarding state licensing rules, suggesting without explanation that enjoining the Critical Care Ban will somehow undermine those licensure regimes. HHS Br. 43.  But RICU's intensivists are all licensed to practice medicine in the states in which their patients are located.  Doc. 3-2 at ¶ 8.  Indeed, states have already promulgated rules concerning licensure of doctors delivering services to patients in their state using telehealth technology.  *See, e.g.*, D.C. Mun. Regs. tit. 17, § 4618; Fla. Stat. § 456.47(4)(a).  HHS is aware of these rules, as it defers to the states on such licensure issues.  *See* 66 Fed. Reg. at 55,283–84 ("We defer to State law regarding licensure issues.").

---

[27] *See* DOJ Press Release, *U.S. Citizen Extradited from Brazil to Face Wire Fraud Charges* (May 31, 2019), *available at* https://www.justice.gov/usao-ma/pr/us-citizen-extradited-brazil-face-wire-fraud-charges; DOJ Press Release, *U.S. Citizen Extradited from Costa Rica in Connection with International-Based Business Opportunity Fraud Ventures* (Feb. 12, 2015), *available at* https://www.justice.gov/opa/pr/us-citizen-extradited-costa-rica-connection-international-based-business-opportunity-fraud.

Granting the preliminary injunction will cause none of the harms HHS dreams up or raise any of the "thorny questions" HHS posits.  But it will save lives.  That ought to be HHS's top priority during this pandemic.  Both the equities and the public interest weigh in favor of granting RICU's requested preliminary injunction, and the balance is not close.

## <u>CONCLUSION</u>

RICU respectfully requests that this Court deny Defendant's Motion to Dismiss and grant a preliminary injunction enjoining the Defendants from denying Medicare reimbursement for telehealth services on the basis of a physician's or practitioner's physical location outside of the United States at the time of service.[28]

Dated: April 13, 2021                                 Respectfully submitted,

                                                   */s/ Jesse Panuccio*
                                                   Jesse Panuccio (DC Bar No. 981634)
                                                   Scott E. Gant (DC Bar No. 455392)
                                                   William Bloom (*pro hac vice*)

                                                   BOIES SCHILLER FLEXNER LLP
                                                   1401 New York Avenue, NW
                                                   Washington, D.C. 20005
                                                   Phone: (202) 237-2727
                                                   Fax: (202) 237-6131
                                                   Email: jpanuccio@bsfllp.com

                                                   *Counsel for RICU LLC*

---

[28] In the alternative, the Court should grant an injunction enjoining Defendants from denying Medicare facility fee reimbursement related to telehealth services provided by RICU.  *See supra* p. 25.

45

## <u>CERTIFICATE OF SERVICE</u>

I, Jesse Panuccio, hereby certify that on April 13, 2021, a true and correct copy of this

Reply in Support of Motion for Preliminary Injunction and Opposition to Motion to Dismiss has

been served upon Defendants by filing the same through this Court's electronic filing system.


                     */s/ Jesse Panuccio*
                       Jesse Panuccio