# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICU LLC, | |
| *Plaintiff*, | |
| *v.* | Civil Action No. 21-cv-452 |
| U.S. Dep't of Health and Human Services, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.     The Complaint Must Be Dismissed For Lack of Subject Matter Jurisdiction ................... 2

       A.    RICU has not presented its claims or exhausted its administrative remedies ........ 2

       B.    Judicial review remains available for RICU's claims ............................................. 9

II.    RICU Has Failed To State A Claim For Which Relief Can Be Granted ......................... 13

       A.    RICU continues to misread both the Telehealth Statute and Telehealth Rule ...... 13

       B.    The Telehealth Statute requires that Medicare pay physicians based on the
           location of the distant site. .................................................................................... 16

       C.    The Foreign Payment Bar precludes Medicare from making payment for RICU's
           overseas provision of services. ............................................................................. 20

       D.    Medicare's longstanding rules are not arbitrary and capricious. .......................... 24

CONCLUSION .................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Action All. of Senior Citizens v. Johnson*,
    607 F. Supp. 2d 33 (D.D.C. 2009) ................................................................. 4, 7

*Action All. of Senior Citizens v. Leavitt*,
    483 F.3d 852 (D.C. Cir. 2007) ...................................................................... 4, 7

*Action Alliance of Senior Citizens v. Sebelius*,
    607 F.3d 860 (D.C. Cir. 2010) ............................................................... 3, 4, 5, 6

*Am. Chiropractic Ass'n, Inc. v. Leavitt*,
    431 F.3d 812 (D.C. Cir. 2005) ........................................................ 9, 10, 11, 12

*Am. Hosp. Ass'n v. Azar*,
    895 F.3d 822 (D.C. Cir. 2018) ........................................................... 1, 3, 5, 9

*Am. Hosp. Ass'n v. Hargan*,
    289 F. Supp. 3d 45 (D.D.C. 2017) ...................................................................... 5

*Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*,
    62 F. Supp. 3d 114 (D.D.C. 2014) ............................................................... 5, 6, 7

*Arizona Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ............................................................................... 6, 10

*Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*,
    987 F.2d 821 (D.C. Cir. 1993) ...................................................................... 24

*Bowen v. Michigan Academy of Family Physicians*,
    476 U.S. 667 (1986) ...................................................................................... 9

*Bristol-Myers Squibb Co. v. Shalala*,
    91 F.3d 1493 (D.C. Cir. 1996) ...................................................................... 13

*Chapman v. United States*,
    500 U.S. 453 (1991) ...................................................................................... 15

*Colo. Heart Institute, LLC v. Johnson*,
    609 F. Supp. 2d 30 (D.D.C. 2009) .................................................................. 12

*Community Oncology All., Inc. v. OMB*,
    987 F.3d 1137 (D.C. Cir. 2021) ...................................................................... 8

*Council for Urological Interests v. Sebelius*,
    668 F.3d 704 (D.C. Cir. 2011) ........................................................ 9, 10, 11, 12

*Dep't of Revenue of Oregon v. ACF Indus., Inc.*,
  510 U.S. 332 (1994) ................................................................................ 25

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ........................................................................... 18

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................... 17

*Gersman v. Grp. Health Ass'n*,
  975 F.2d 886 (D.C. Cir. 1992) ................................................................ 7

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ........................................................................... 25

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ............................................................................... 18

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ...................................................................... 2, 3, 8, 9

*Henry v. Azar*,
  No. CV 20-1144 (CKK), 2021 WL 429967 (D.D.C. Feb. 8, 2021) ........ 12

*Henson v. Santander Consumer USA, Inc.*,
  137 S. Ct. 1718 (2017) ...................................................................... 21, 23

*Kondapally v. U.S. Citizenship & Immigr. Servs.*,
  No. CV 20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020) ........ 18

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) .......................................................................... 19, 20

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ................................................................................. 6

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ............................................................................... 19

*NLRB v. SW General, Inc.*,
  137 S. Ct. 929 (2017) ............................................................................. 15

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
  901 F. Supp. 2d 54 (D.D.C. 2012) ........................................................ 18

*Sensory Neurostimulation, Inc. v. Azar*,
  977 F.3d 969 (9th Cir. 2020) ................................................................... 8

*Shalala v. Ill. Council on Long Term Care*,
 529 U.S. 1 (2000) ..................................................................................................... *passim*

*Shands Jacksonville Med. Ctr., Inc. v. Cochran*,
 No. 14-263 (RDM), 2021 WL 431035 (D.D.C. Feb. 8, 2021) ................................... 9

*Silver v. Mohasco*,
 602 F.2d 1083 (2d. Cir. 1979)................................................................................... 15

*Three Lower Ctys. Cmty. Health Servs. Inc. v. HHS*,
 517 F. Supp. 2d 431 (D.D.C. 2007), *aff'd,* 317 F. App'x 1 (D.C. Cir. 2009).................... 3, 7, 8

*Turner v. U.S. Agency for Glob. Media*,
 No. CV 20-2885 (BAH), 2020 WL 6822780 (D.D.C. Nov. 20, 2020) ................................... 19

*United States v. Sheffield*,
 832 F.3d 296 (D.C. Cir. 2016) .................................................................................... 5

**Statutes**

42 U.S.C. § 405(g) .............................................................................................................. 2

42 U.S.C. § 1395 ........................................................................................................ *passim*

**Regulations**

42 C.F.R. § 410.20(b) ......................................................................................................... 14

42 C.F.R. § 410.78 ......................................................................................................... 16, 20

42 C.F.R. § 411.9(a).......................................................................................................... 13, 20

42 C.F.R. § 412.3 ............................................................................................................... 24

42 C.F.R. § 413.74(b) ......................................................................................................... 18

42 C.F.R. § 424.106 ........................................................................................................... 24

42 C.F.R. § 424.121(a)-(b).................................................................................................... 23

66 Fed. Reg. 55246 ............................................................................................................ 19

85 Fed. Reg. 84472 ............................................................................................................ 12

**Other Authorities**

22 J. Health Care Compliance 5 ......................................................................................... 14

H.R. Rep. No. 92-231 (1972).............................................................................................. 22

Pub. L. No. 89-97, Sec. 1862(a)(4) ................................................................................. 13

Remarks of Acting Assistant Attorney General Brian M. Boynton,
    *available at* https://www.justice.gov/opa/speech/acting-assistant-attorney-general-brian-m-
    boynton-delivers-remarks-federal-bar ...................................................................... 24

S. Rep. 92-1230 (1972) .................................................................................................. 23

*Venturing Out Beyond the Great Wall of Medicare: A Proposal to Provide Medicare Coverage
    Outside the United States*,
    8 Elder L.J. 181 (2000) ............................................................................................ 23

## INTRODUCTION

RICU seeks to preliminarily enjoin a longstanding Medicare payment regime for telehealth services.  Because, as RICU does not dispute, its claims arise under Medicare, RICU was required by statute to first present a concrete claim for payment to the agency and then exhaust its administrative remedies in pursuing that claim.  RICU has failed to present such a claim, or pursue any administrative remedies, instead launching a general attack on the Department of Health and Human Services' ("HHS") reading of the Medicare statute and rules outside of the context of a specific claim for payment.  But Congress has removed the jurisdiction of federal courts to hear challenges under Medicare that are not first properly channeled, and accordingly this Court lacks jurisdiction over RICU's complaint.

RICU relies on a single offhanded footnote in a case of no precedential value on the issue of presentment to contend its months-long letter writing campaign to HHS was an adequate substitute for presentment.  But as both the D.C. Circuit and several district courts have explained, the sole case relied upon by RICU does not hold *anything* with respect to presentment, much less that a series of grievance letters can stand in for presenting a specific claim for payment to the agency.  Courts within this Circuit have instead *repeatedly* rejected that argument, recognizing that proper presentment of a concrete claim for payment is critical in "the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts."  *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000).  This case proves the merits of that approach—RICU seeks to upend a two-decade old payment scheme for telehealth but cannot show that anyone has even yet sought payment for its services.  While RICU may wish to jump the gun to have its merits argument heard as soon as possible, it provides no reason why it should be excused from presenting "a specific administrative claim for payment."  *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 826 (D.C. Cir. 2018).

RICU's merits claim is anyways meritless because it badly misreads the Medicare laws.  Medicare excludes payment for services, like RICU's, that are not provided within the United

States.  And the Telehealth Statute further makes clear that physicians are paid for telehealth services based on their physical location at the "distant site."  That makes paying RICU's overseas physicians both legally and practically impossible—Medicare's Physician Fee Schedule lacks any payment rates for doctors located outside of the United States, and Medicare cannot issue such rates in the absence of a Congressional command to do so.  RICU picks and chooses among words in the Telehealth Statute to force a reading that fits its business model but cannot provide a cogent reading of the statute as a whole.  Remarkably, RICU continues to refuse to explain *how* payment would actually work under its strained and erroneous interpretation of the law, undercutting the plausibility of its approach.  Because RICU's reading of the Telehealth Statute is directly belied by the plain statutory text, the complaint fails to state a claim for which relief can be granted.

## ARGUMENT

### I.      The Complaint Must Be Dismissed For Lack of Subject Matter Jurisdiction

This Court lacks subject matter jurisdiction over RICU's complaint because RICU's claims: (1) arise under Medicare; (2) were not properly channeled through the agency's administrative appeals process as required by Congress; and (3) judicial review remains available for RICU's claims.  *See* Mot. to Dismiss & Opp. to Mot. for Prelim. Inj. ("MTD"), ECF No. 20 at 14-24.  RICU does not dispute that its claims arise under Medicare,[1] but contends it has complied with Medicare's channeling provisions and, alternatively, that its claims fall within the narrow exception to such channeling requirements.  *See* Reply & Opp. to MTD ("Opp."), ECF No. 23 at 6-17.  Both arguments are wrong and RICU's complaint must be dismissed for lack of jurisdiction.

#### A.      RICU has not presented its claims or exhausted its administrative remedies.

"Judicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the claim . . . as is provided in 42 U.S.C. § 405(g)."  *Heckler v. Ringer*, 466 U.S. 602, 605 (1984).  "The Supreme Court has held that § 405(g) imposes two

---

[1] For this reason, RICU's continued reliance on *Regeneron Pharm. v. HHS*, *Ass'n of Cmty. Cancer Ctrs. v. Azar*, and *Cal. Life. Scis. Ass'n v. CMS* is puzzling.  *See* Opp. at 5 n.4.  Those decisions found that the plaintiffs' claims did not arise under Medicare, and thus did not need to be channeled.  *See* MTD at 17-19. But RICU does not dispute that its claims *do* arise under Medicare.

distinct preconditions for obtaining judicial review of covered Medicare claims." *Am. Hosp. Ass'n*, 895 F.3d at 825-826. "First, the plaintiff must have 'presented' the claim to the Secretary." *Id.* "Second, the plaintiff must fully exhaust all available administrative remedies[.]" *Id.* There is no dispute that RICU has failed to formally present a specific claim for payment to the agency or exhaust all available administrative remedies. *See* MTD at 19-22.

RICU nonetheless contends it has effectively satisfied these requirements through a months-long letter-writing campaign to sub-Secretary officials at HHS. *See* Opp. at 6-13. RICU's persistent demand that HHS reread decades-old Medicare rules to fit RICU's chosen business model resulted in a one-page letter from Chronic Care Policy Group Acting Director Jason E. Bennett, explaining that existing laws barred RICU's reading of the Telehealth Statute. *See* Compl., Ex. 4. When RICU, dissatisfied with this response, continued to seek a different answer from different Medicare officials, it was repeatedly pointed back to Mr. Bennett's letter. *See id.*, Exs. 5, 7. This informal correspondence is not a substitute for the channeling requirements set by Congress. And for good reason—permitting claimants to substitute fruitless lobbying efforts for presentment and channeling would allow them to "circumvent the Medicare appeals process by relying upon [their] correspondence." *Three Lower Ctys. Cmty. Health Servs. Inc. v. HHS*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (collecting cases), *aff'd*, 317 F. App'x 1 (D.C. Cir. 2009). But "Plaintiff may not choose its own path to federal court" and "must pursue its claim under [§ 405(g)] in the manner which Congress has provided." *Id.* (quoting *Ringer*, 466 U.S. at 622).[2]

RICU's argument that it has complied with § 405(g) relies on a single, offhanded footnote in a case of no precedential value on the issue of presentment. *See* Opp. at 6-9 (citing *Action Alliance of Senior Citizens v. Sebelius*, 607 F.3d 860, 862 n.1 (D.C. Cir. 2010)). In that litigation,

---

[2] RICU's repeated and unsupported complaints that Defendants "trot[] out this jurisdictional argument in *every* Medicare case," (Opp. at 2) and that the administrative review process "takes about five years to navigate" (Opp. at 2, 5, 14, 36) are therefore irrelevant, even if true. "Although [Plaintiff] would clearly prefer an immediate appeal to the District Court rather than the often lengthy administrative review process . . . they [] must adhere to the administrative procedure which Congress has established for adjudicating their Medicare claims." *Ringer*, 466 U.S. at 619. That is particularly true here, where RICU does not dispute that its claims arise under Medicare.

3

advocacy groups for Medicare beneficiaries sued the government to stop recoupment of payments to those beneficiaries that the government claimed were in error.  *See Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 858 (D.C. Cir. 2007).  The D.C. Circuit held the groups failed to present their claims to the agency, vacating the lower court's injunction and remanding the case.  *Id.*  To cure this jurisdictional defect, after the case was remanded, "Plaintiffs' counsel sent a separate letter from each of the plaintiffs to the Secretary and the Commissioner" and then filed an amended complaint.  *Action All. of Senior Citizens v. Johnson*, 607 F. Supp. 2d 33, 37-38 (D.D.C. 2009).  The government moved to dismiss the new complaint.  *See Action All. of Senior Citizens v. Leavitt*, Case No. 1:06-cv-1607, ECF No. 49 (D.D.C. Dec. 3, 2007).  It did ***not*** argue, as Defendants do here, that grievance letters are not a substitute for proper presentment under § 405(g), but instead "contend[ed] that the letters that [plaintiffs] sent to the Commissioner did not satisfy the presentment requirement because they were from the associations rather than their members." *Action All.*, 607 F. Supp. 2d at 38; *see also Action All.*, Case No. 1:06-cv-1607, ECF No. 49 at 22 (arguing § 405(g) requires that individual members, rather than advocacy groups, send letters).  The district court rejected that argument but dismissed the case on other grounds.  *See Action All.*, 607 F. Supp. 2d at 40.  The government, on appeal, did not press *any* jurisdictional challenge, including the presentment issue.  *See* Appellee Brief, *Action Alliance of Senior Citizens, et al. v. Sebelius, et al.*, Case No. 09-5191 (D.C. Cir. Nov. 18, 2009).[3]  In that context, the D.C. Circuit offhandedly observed in a footnote, without any discussion, that "Plaintiffs have since cured the jurisdictional defect" that previously resulted in remand.  *See* 607 F.3d at 862 n.1.

RICU rests its entire channeling argument on that footnote.  *See* Opp. at 6-9.  But as RICU admits, the D.C. Circuit has since "questioned the precedential value of *Action Alliance*." Opp. at 10.  In fact, courts have ***repeatedly*** concluded that *Action Alliance* did not hold anything with

---

[3] The government's brief noted in a footnote that it continued to believe the district court's ruling on its narrow presentment argument was "incorrect." *Id.* at 11 n.2.  But it acknowledged that there was "no dispute" that at least one non-organizational plaintiff had standing and there was "therefore no dispute that this Court has jurisdiction to address the issues presented in this appeal." *Id.*  In other words, the government conceded the existence of jurisdiction on appeal.

respect to presentment.  In *American Hospital Ass'n v. Azar*, the D.C. Circuit noted that in *Action Alliance* the "entire discussion of presentment was a statement that the plaintiffs had 'cured' their prior failure to present."  895 F.3d at 827 (citing *Action All.*, 607 F.3d at 862 n.1).  It concluded that "[b]ecause [the court] did not explain what constituted the cure, the decision **has no precedential value on that specific point**."  *Id.* (citing *United States v. Sheffield*, 832 F.3d 296, 308 n.3 (D.C. Cir. 2016)).[4]  It further distinguished *Action Alliance* on the facts, noting that (unlike here) the plaintiffs there "were embroiled with HHS in a **specific payment dispute**."  *Id.*

Judge Contreras's earlier decision in the same case further explained the matter.  *See Am. Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 54 (D.D.C. 2017).  He observed that in *Action Alliance* the government "did not cross-appeal on the jurisdictional issue and, in fact, conceded that the Circuit 'ha[d] jurisdiction to address the issues presented in th[e] appeal.'"  *Id.* (citing Appellee's Brief).  He further noted that—unlike in this case—the government did "not argue that the generalized nature of the letters in anyway made them deficient" for purposes of presentment.  *Id.* His decision pointed out that the D.C. Circuit's opinion "observed in a footnote" that the presentment deficiency had, apparently, been remedied but "like the district court, the Court of Appeals did not offer any explanation as to why generalized letters satisfy the presentment requirement."  *Id.*  Considering "the lack of any substantive discussion on the issue of whether generalized letters may suffice for purposes of presentment by either the defendant Secretary, the district court, or the Court of Appeals," Judge Contreras appropriately concluded "that *Action Alliance's* value on this underdeveloped issue is doubtful[.]"  *Id.*  He, too, distinguished the letters on the facts, noting that they "concerned specific claims that *had already accrued to individuals* and thus 'were closer to the concrete claim for reimbursement that the Supreme Court has held is required for proper presentment.'"  *Id.* (quoting *Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*, 62 F. Supp. 3d 114, 123 (D.D.C. 2014) (emphasis in original)).

Finally, Judge Lamberth offered similar observations in *American Orthotic & Prosthetic*

---

[4] All emphases are added unless otherwise noted.

*Association*.  *See* 62 F. Supp. 3d at 123.  He noted that the district court in *Action Alliance* "without explanation[] declared that an association's letters to the agency established presentment."  *Id.*  "In affirming the district court's decision, the Circuit summarily noted that a prior jurisdictional defect had been cured but offered no opinion on whether and why generalized letters were sufficient." *Id.* (citing *Action All.*, 607 F.3d at 862 n.1).  The lack of explanation in either decision was unremarkable "because the precise question presented here—whether generalized grievance letters rather than discrete claims are sufficient to satisfy presentment—was not raised by the parties in *Action Alliance*."  *Id.*  Judge Lamberth therefore "question[ed] the precedential value of those opinions."  *Id.* (citing *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011)).

As these careful decisions show, RICU is simply incorrect in claiming that either the district court or Court of Appeal decisions in *Action Alliance* "held" anything as to whether grievance letters can substitute for formal presentment.  Opp. at 6-7.  Because the issue here— "whether generalized grievance letters rather than discrete claims are sufficient to satisfy presentment," *Am. Orthotic & Prosthetic Ass'n*, 62 F. Supp. 3d at 123—was neither raised by the parties nor addressed in either decision, the decisions do not support RICU's claim that the offhanded footnote in *Action Alliance* is "binding D.C. Circuit precedent."  Opp. at 11.  "Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed."  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (citations omitted); *see also Winn*, 563 U.S. at 144 ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.").  Unsurprisingly, not a single subsequent decision has cited either *Action Alliance* opinion for the proposition urged by RICU.

Having placed all of its jurisdictional chips on *Action Alliance*, RICU briefly attempts to defend its precedential value.  *See* Opp. at 10-11.  It contends that the jurisdictional issue was before the court in the second *Action Alliance* appeal because it "was the entire basis of the D.C. circuit's first opinion in the case."  *Id.* at 10.  But that is simply not correct.  Nothing in the D.C. Circuit's first decision addressed the issue of whether generalized grievance letters suffice for

6

purposes of presentment.  *See generally Action All.*, 483 F.3d at 853; *see also Am. Orthotic &*
*Prosthetic Ass'n,* 62 F. Supp. 3d at 123 (noting this issue "was not raised by the parties in *Action*
*Alliance*").  Indeed, the letters in that case were not even sent until ***after*** the D.C. Circuit remanded
the case and the plaintiffs attempted to cure their failure to present.  *See Action All.*, 607 F. Supp.
2d at 37-38 ("Following the D.C. Circuit's decision and in an apparent effort to meet the
jurisdictional requirements set forth in that decision . . . Plaintiff's counsel sent a separate letter
from each of the plaintiffs to the Secretary and the Commissioner[.]").  The D.C. Circuit's earlier
decision merely noted plaintiffs' failure to present their claims ***at all*** and in no way shows that the
jurisdictional issue was still in contention during the second appeal.  *Id.* at 37.[5]

RICU vainly tries to distinguish the myriad cases within this Circuit rejecting generalized
grievance letters as a basis for jurisdiction.  *See* Opp. at 9-13.[6]  For example, it contends that in
*American Orthotic & Prosthetic Association* the plaintiff offered only "general complaints" and
not the detailed legal analysis supposedly offered by RICU in its letters.  Opp. at 10.  But the court
there found that the plaintiff's letters offered "detailed critiques" of the agency's position, and
nonetheless were "insufficient to establish presentment" because "they were not tied to any
concrete claims."  62 F. Supp. 3d at 123.  RICU's letter-writing campaign is similarly not tied to
any specific claims for payment.  *See* MTD at 19-22.  It further argues that *Three Lower Counties*
*Cmty. Health Servs., Inc.* is distinguishable because the issue the plaintiffs presented to HHS "was
different from the issue the plaintiffs sought to adjudicate in court."  Opp. at 11.  But that was not
the basis of the court's decision; instead it explained that jurisdiction "is permitted only upon the
completion of the administrative process outlined in [the Medicare Act] and its implementing
regulations."  517 F. Supp. 2d at 435.  The plaintiff there was not permitted to "circumvent" that

---

[5] RICU further argues, in one sentence, that "one panel of the D.C. Circuit cannot overrule a prior
panel."  Opp. at 10.  But because the earlier panel decision did not actually hold anything with
respect to presentment, the D.C. Circuit's later decision in *American Hospital Association* should
guide this Court's review.  *See Gersman v. Grp. Health Ass'n*, 975 F.2d 886, 897 (D.C. Cir. 1992)
("Binding circuit law comes only from the holdings of a prior panel, not from its dicta.").

[6] Plaintiff attacks several of these decisions on the basis that they conflict with *Action Alliance*
(Opp. at 10, 11), but that is wrong because *Action Alliance* offered only dicta on this issue.

process by "relying on its correspondence" with the agency. *Id.* Nothing in the court's decision suggests it was the *content* of the letters that rendered them deficient for purposes of presentment; "[r]ather, plaintiff 'must pursue [its] claim under [§ 405(g)] in the manner which Congress has provided." *Id.* (quoting *Ringer*, 466 U.S. at 622).

RICU buries in a footnote its effort to distinguish the D.C. Circuit's recent holding in *Community Oncology All., Inc. v. OMB*, 987 F.3d 1137 (D.C. Cir. 2021). *See* Opp. at 12 n.7. It contends *Community Oncology* is irrelevant because the court found that the plaintiff failed to fulfill the presentment requirement by relying upon claims from its members. *Id.* But that, again, ignores the actual basis for the court's decision. The D.C. Circuit held that because the appellant's claims "plainly" arose under the Medicare laws, § 405(g) removed the district court's jurisdiction to hear the case unless the appellant obtained a "final decision" from the Secretary. *See Community Oncology*, 987 F.3d at 1143. Appellant argued that "some members of Community Oncology have presented concrete reimbursement claims to HHS," but the D.C. Circuit found the Appellant "identifie[d] no such claims" and "provide[d] no claim numbers, claim accounts, agency dockets, agency findings, agency records, or agency decisions of any kind." *Id.* at 1144. The flaw was not that the claims allegedly came from the Appellant's members, but rather that "Community Oncology did not identify ***any concrete claim*** that its members presented to the agency" and thus "section 405(g) d[id] not confer subject-matter jurisdiction." *Id.*; *see also id.* at 1143 (further concluding "Community Oncology does not seek review of any 'final decision' ***on a claim that it—or any of its members—presented to HHS***"). RICU, too, has not identified "any concrete claim" for payment that has been presented to the agency. *See* MTD at 19-20.[7]

Finally, RICU says that it does not need to present a specific administrative claim for

---

[7] RICU also argues that *Sensory Neurostimulation, Inc. v. Azar* is "not applicable to this case" because it is an out-of-circuit decision and did not squarely address presentment. Opp. at 11-12. But Defendants cited that case to highlight that Mr. Kouzoukas, the Principal Deputy Administrator of CMS and Director of the Center for Medicare, sent a letter to the plaintiff there that was materially the same as the one he sent to RICU. *See* MTD at 21. The Ninth Circuit expressed no doubt that, despite Mr. Kouzoukas's letter, the plaintiff "ha[d] not obtained a 'final decision' [from the Secretary] within the meaning of § 405(g)." 977 F.3d 969, 982 (9th Cir. 2020).

payment.  *See* Opp. at 12.  It relies upon the Supreme Court's observation in *Illinois Council* that § 405(h)'s jurisdiction-stripping provisions are not limited solely to "claims for monetary benefits" but rather extend to "[c]laims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy."  529 U.S. 1, 14 (2000).  But this language from *Illinois Council* addressed the broad scope of Medicare's channeling requirement, not the manner in which challengers must present claims.  *Id.*  Contrary to RICU's suggestion, "Congress . . . has [] expressly set up a scheme that requires the presentation of a concrete claim to the Secretary." *Ringer*, 466 U.S. at 625; *Am. Hosp. Ass'n*, 895 F.3d at 826 (requiring a "specific administrative claim for payment" to supply the "'final decision' required under § 405(g)").  RICU has failed to present any such concrete claim for payment and this Court therefore lacks jurisdiction.

## B.    Judicial review remains available for RICU's claims.

Because RICU has failed to channel its claims, it alternatively contends that it falls within the narrow exception to the channeling requirement established by the Supreme Court in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680 (1986), which held that general federal-question jurisdiction may exist where channeling would result in "no review at all of substantial statutory and constitutional challenges."  The Supreme Court has since clarified that this exception applies only where the "channeling requirement" results in "*complete* preclusion of judicial review."  *Ill. Council*, 529 U.S. at 23 (emphasis in original).  The exception does not apply merely due to "hardship likely found in many cases" or "postponement [that] would mean added inconvenience or cost in an isolated, particular case."  *Id.* at 22, 23.  The D.C. Circuit has further explained that while this exception may apply "when roadblocks practically cut off any avenue to federal court," such "difficulties must be severe enough to render judicial review unavailable as a practical matter."  *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).  It is therefore a "narrow exception" that applies only in "rare cases."  *Shands Jacksonville Med. Ctr., Inc. v. Cochran*, No. 14-263 (RDM), 2021 WL 431035, at *12, *15 (D.D.C. Feb. 8, 2021).

Relying again on a single case, RICU contends it fits within this exception based on the D.C. Circuit's decision in *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 707 (D.C.

Cir. 2011).  *See* Opp. at 13-17.  There, an association of doctor-owned equipment providers challenged regulations that barred physicians from referring patients to entities in which they had a financial interest.  *Urological Interests*, 668 F.3d at 705.  The panel began its analysis by explaining that the "exception is not intended to allow section 1331 federal question jurisdiction in every case where section 405(g) would prevent a particular individual or entity from seeking judicial review."  *Id.* at 711 (citing *Ill. Council*, 529 U.S. at 23-24; *Am. Chiropractic*, 431 F.3d at 817-818).  Rather, "the exception is primarily concerned with whether a particular *claim* can be heard through Medicare Act channels," and not whether a specific party can pursue the claim.  *Id.* at 712 (emphasis in original).  Courts may consider "a potential proxy's willingness and ability to pursue the plaintiff's claim," *id.*, consistent with *Am. Chiropractic's* instruction that the exception may apply "when roadblocks practically cut off any avenue to federal court," 431 F.3d at 816.

Under "the specific facts of th[e] case," the panel found that the exception applied. *Urological Interests,* 668 F.3d at 714.  While the government argued that hospitals that contracted with the physicians plausibly could raise the association's claims, the court found that "several unique characteristics of the hospital's relationship to the Council and to the challenged regulations" suggested that was not a practical path to a claim.  *Id.* at 713.  Significantly, the plaintiff specifically "alleged in its complaint that the hospitals had no incentive to challenge" the regulations and that the hospitals broadly supported the challenged rule because it gave them greater control over the purchase of medical equipment.  *Id.*  The complaint also alleged "the regulations [] allowed hospitals to purchase expensive laser equipment from urologist joint ventures at 'fire-sale prices[.]'"  *Id.*  "Taking the Council's allegations as true and drawing all reasonable inferences in its favor," the court found "that the complaint demonstrates, at the very least, that hospitals have little incentive to pursue the Council's challenge to the regulations."  *Id.*

RICU's complaint and supporting affidavit could not be more different from the facts of *Urological Interests*.  There, the plaintiff specifically pled "in its complaint that the hospitals had no incentive to challenge" the regulations and, further, actually ***supported*** the regulations because of the power it gave them over medical equipment purchasing.  668 F.3d at 713.  But according to

RICU's complaint, hospitals have "indicate[d] their concern that HHS may eventually approve tele-ICU services permanently but that RICU's services will continue to be excluded from payment." Compl. ¶ 84. According to RICU's sole declarant, Mr. Rabinowitz, RICU's hospital-clients have inquired "whether RICU's services are eligible for Medicare reimbursement," Rabinowitz Decl. ¶ 37, and "continue to inquire about whether there is any hope that HHS" will permit Medicare to pay for RICU's services, *id.* These hospitals have "always been extremely satisfied with RICU's services and the quality of RICU physicians," and therefore desire to continue doing business with RICU but are "perplexed" over Medicare's inability to pay for RICU's services. *Id.* One particularly large and well-known hospital-client of RICU's has described "increased needs during the pandemic" for RICU's telemedicine services, but has told RICU "it must now factor in the ability to bill Medicare for tele-ICU services[.]" *Id.* ¶ 38.[8] According to Mr. Rabinowitz, even prospective clients would still like to engage RICU's services but are concerned about "whether the hospital will be able to bill [Medicare] for RICU's services." *Id.* ¶ 39. Echoing the complaint, Mr. Rabinowitz attests that "[h]ospital representatives have indicated to RICU their concern that HHS will eventually approve tele-ICU services permanently but that RICU's services will continue to be excluded from payment." *Id.* ¶ 40. Far from showing that "hospitals have little incentive to pursue [RICU's] challenge to the regulations," *Urological Interests*, 668 F.3d at 713, RICU's complaint and declaration show that RICU's existing and potential clients have a strong interest in vindicating RICU's claims so that they may obtain Medicare dollars for RICU's highly-sought after services.

Citing nothing in its complaint, RICU contends these hospitals "lack a practical incentive to challenge" Defendants "given the uncertainty around the future of the Telehealth Waiver." Opp. at 14. This, too, is directly belied by RICU's own complaint, which alleges that "HHS telehealth services approved under the Telehealth Waiver are likely to become permanently reimbursable

---

[8] Indeed, Mr. Rabinowitz's declaration repeatedly stresses the alleged shortage of intensivist services in the United States, suggesting many hospitals would eagerly desire to have Medicare pay for RICU's services. *See* Rabinowitz Decl. ¶¶ 6, 15, 32.

under Medicare even after the pandemic subsides." Compl. ¶ 69; *see also* Rabinowitz Decl. ¶ 45 (declaring HHS is likely to "permanently expand the list of reimbursement telehealth services" after the pandemic); *id.* ¶ 46 (describing the "likelihood that the list of telehealth service will be expanded"); *accord* 85 Fed. Reg. 84472, 84507 (Dec. 28, 2020) (indicating HHS plans to entertain "requests for permanent changes to the Medicare telehealth services list"). RICU also argues that many hospitals will migrate to competitors to avoid "the hassle and expense of HHS's administrative process." Opp. at 14. But Mr. Rabinowitz's declaration says otherwise, indicating that even potential clients still inquire whether Medicare's position might change so that they can obtain RICU's services, and that existing clients maintaining business with RICU are "concerned" about Medicare's position and would like to see it changed. *See* Rabinowitz Decl. ¶¶ 36-40.

RICU contends the fact that no hospital has (apparently) yet filed a claim indicates that hospitals lack incentive to do so. Opp. at 15. The court in *Urological Interests* pointed to a similar fact to "confirm[] the Council's contentions" that "hospitals have little incentive to pursue" a claim. 668 F.3d at 713. But RICU makes no similar "contentions" in its complaint to confirm. As described by RICU and Mr. Rabinowitz, hospitals have ample incentive to pursue a claim, *see* Compl. ¶ 84; Rabinowitz Decl. ¶¶ 36-40, and the lack of a claim to date does not establish that such a claim is foreclosed "as a practical matter." *Am. Chiropractic Ass'n*, 431 F.3d at 816.

Other courts have found that similarly incentivized claimants sufficed to foreclose the *Bowen* exception. *See* MTD at 23-24. In *Colo. Heart Institute, LLC v. Johnson*, Judge Collyer found that "hospitals ha[d] the necessary incentive to file an administrative claim" where it could have resulted in lower-cost cardiac catheterization services. 609 F. Supp. 2d 30, 38 (D.D.C. 2009). Here, RICU's clients could obtain its purportedly well-regarded services at lower costs if Medicare was compelled to pay for such services. *See* Rabinowitz Decl. ¶¶ 36-40. By contrast, in *Urological Interests* the hospitals stood to gain financially by maintaining the challenged rule. *See* 668 F.3d at 713. This is therefore not the rare case where RICU and its client hospitals are "structurally adverse, as was the unique relationship . . . in *Council for Urological Interests*." *Henry v. Azar*, No. CV 20-1144 (CKK), 2021 WL 429967, at *8 (D.D.C. Feb. 8, 2021) (finding exception did not

apply where beneficiary could plausibly raise claim).  Because RICU cannot show a "*complete preclusion of judicial review*" of its claims as a practical matter, *Ill. Council*, 529 U.S. at 23, the Court should not relieve it from the statutory channeling requirements set by Congress.

## II.     RICU Has Failed To State A Claim For Which Relief Can Be Granted

Medicare has barred payment for services "which are not provided within the United States" since it was enacted in 1965.  Pub. L. No. 89-97, Sec. 1862(a)(4) (codified at 42 U.S.C. § 1395y(a)(4)); *see also* 42 C.F.R. § 411.9(a) ("Basic rule. . . . Medicare does not pay for services furnished outside the United States.").  Nothing in the Telehealth Statute or any other federal law has repealed this prohibition or otherwise suggests that, somehow, a physician performing services outside of the United States actually provides them domestically when using a telecommunications system.  The Telehealth Statute also makes clear that physician payment for telehealth services is based on the location of the physician—consistent with the fee schedule designed by Congress— and therefore has never contemplated foreign provision of services.  *See* 42 U.S.C. § 1395m(m)(2).  Though RICU strains to parse the statute in a manner favorable to its chosen business model, the plain statutory text bars its preferred reading.  Because its claims "come[] up short as a matter of law," the Court must "dismiss the complaint pursuant to Rule 12(b)(6)."  *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1501 (D.C. Cir. 1996); *see also* MTD at 25-33.

### A.     RICU continues to misread both the Telehealth Statute and Telehealth Rule.

RICU justifies its self-serving interpretation of the statute by repeatedly claiming that the Telehealth Statute "defines telehealth services as being furnished at the site of the patient."  Opp. at 18; *see also id.* at 20, 22, 23, 29; PI Mot., ECF No. 3-1 at 4, 24-25.  This is not correct.  The statute nowhere categorically defines where telehealth services are "furnished."  Instead, RICU relies upon a subsection defining an "eligible telehealth individual," which is a beneficiary "who receives a telehealth service furnished at an originating site."  42 U.S.C. § 1395m(m)(4)(B).  This subsection does not purport to define where telehealth services are "furnished," but instead simply explains that an eligible Medicare beneficiary must receive telehealth services at a qualifying originating site, as defined in the statute.  *See* 42 U.S.C. § 1395m(m)(4)(B), (C).  That is consistent

with the telehealth laws' historical focus on serving patients in rural areas. *See* H. Rep. 106-645, at 36-37 (explaining "[t]elehealth has the potential for improving the delivery of quality health care to rural underserved areas"); *see also* Faget, *Telehealth in the Wake of COVID-19*, 22 J. Health Care Compliance 5, 6 (2020) (recognizing that "pre-emergency requirements . . . conditioned coverage of telehealth services upon a beneficiary being located in a qualifying rural area and being located at a qualifying 'originating site'").

Rather than define a single location where telehealth is "furnished," the Telehealth Statute uses the verb "furnishes" in varying contexts.  For example, the subsection establishing the payment mechanism for telehealth—which RICU ignored in its motion—refers to "a physician or practitioner located at *a distant site that furnishes a telehealth service* to an eligible telehealth individual." *Id.* § 1395m(m)(2)(A).  The statute later states that "the term '*distant site*' includes a Federally qualified health center or rural health clinic *that furnishes a telehealth service* to an eligible telehealth individual." *Id.* § 1395m(m)(8)(A)(iii)(I); *see also id.* § 1395m(m)(8)(B)(i) (describing a "Federally qualified health center or rural health clinic that serves *as a distant site that furnishes a telehealth service*").  The Telehealth Statute therefore expressly contemplates "a distant site that furnishes a telehealth service" and that physicians "furnish[] a telehealth service" while "located at a distant site."  The statute nowhere purports to define a single location where services are "furnished" or suggests that a service is only provided at the originating site.[9]

RICU argues the term "notwithstanding" in § 1395m(m)(1) bolsters its piecemeal reading. Opp. at 19.  But this language merely clarified that, contrary to the then-prevailing rule, Medicare could pay for services "notwithstanding" that the physician is not in the same location as the

_____

[9] The Telehealth Statute gives other indications that physicians "furnish" their services from their physical location.  It adopted the existing regulatory definition of a "physician" as a person "legally authorized to practice by the State in which he or she performs the functions or actions."  42 C.F.R. § 410.20(b); *see also* 42 U.S.C. § 1395m(m)(1).  RICU's intensivists plainly "perform" their functions where they are located, which by RICU's own admission is not within a "State."  Thus, RICU must further stretch its argument to contend that the Telehealth Statute, again *sub silentio*, amended the existing definition of a "physician" to include extraterritorial intensivists.  Opp. at 20 n.11.  To the contrary, the Telehealth Statute expressly adopted the existing definition that contemplated performance of services in a "State."  *See* 42 U.S.C. § 1395m(m)(1).

patient—but the "notwithstanding" language did not implicitly expand Medicare worldwide.  *See* MTD at 27-28.  RICU returns to the meaning of this "notwithstanding" term later in its opposition.  *See* Opp. at 26-28.   In that section RICU contends it never actually argued that the "notwithstanding" term repeals the foreign payment bar as to telehealth.  *Id.* at 27.  That is not accurate.  *See* PI Mot. at 23 (describing the "notwithstanding" language as a "clear command in a later-enacted statute that 'shows which provision prevails in the event of a clash'" (quoting *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 939 (2017))).  RICU otherwise uses this section to reiterate its position that the "notwithstanding" language broadens the Telehealth Statute to cover services provided anywhere in the world provided the originating site is in the United States.  *See* Opp. at 26-28.  But it is not plausible that Congress expanded Medicare globally, against the longstanding backdrop of the foreign payment bar, solely by implication.  *See* MTD at 27-30.

RICU claims that Defendants offer an inconsistent definition of "furnishes."  Opp. at 19-20.  Not so.  The Telehealth Statute does not supply any special meaning to "furnishes," which, "therefore, must be given [its] ordinary meaning." *Chapman v. United States*, 500 U.S. 453, 462 (1991).  To "furnish" is to "supply" or "give."  *See Furnish*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).  That the statute sometimes uses "furnishes" in different contexts does not change the word's meaning; rather the statute recognizes that services can be "supplied" or "given" from both a distant site and at an originating site.  *See* MTD at 25; *compare* 42 U.S.C. § 1395m(m)(4)(B) *with id.* § 1395m(m)(8)(B)(i).[10]  The ordinary meaning of the word "furnishes" says nothing about from **where** something is "supplied" or "given," and RICU's insistence that the statute can only use the term in one specific context ignores the statutory text.

Turning to the Telehealth Rule, RICU repeats its argument that the rule "clearly defines where telehealth services are furnished."  Opp. at 20.  But like the Telehealth Statute, the Telehealth Rule nowhere defines, as a categorical matter, where services are "furnished" or limits

---

[10] This case is therefore nothing like *Mohasco Corp. v. Silver*, where the Second Circuit initially held that the term "filed" in Title VII meant two different things within the same statute.  *See* 447 U.S. 807, 813 (1980) (citing *Silver v. Mohasco*, 602 F.2d 1083, 1087 (2d. Cir. 1979)).  Defendants nowhere suggest that "furnishes" means different things in different sections of the statute.

the definition of "furnished" to the originating site alone.  *See generally* 42 C.F.R. § 410.78.
Indeed, the rule defines the distant site as "the site at which the physician or practitioner delivering
the service is located at the time the service is furnished via a telecommunications system."  *Id.* §
410.78(a)(2).  In other words, services are 'delivered' from the distant site and 'furnished,' via a
telecommunications system, to the originating site.  The rule also requires that "services are
furnished to a beneficiary at an originating site, which is one of" a dozen kinds of originating site
facilities.  *Id.* § 410.78(b)(3).  This provision, like § 1395m(m)(4)(B), merely requires that services
are supplied to a beneficiary located at a qualifying originating site and nowhere purports to
pinpoint the sole location where services are "furnished."

### B.   The Telehealth Statute requires that Medicare pay physicians based on the location of the distant site.

The Telehealth Statute requires that Medicare pay physicians "an amount equal to the
amount that such physician or practitioner would have been paid under this title had such service
been furnished without the use of a telecommunications system." 42 U.S.C. § 1395m(m)(2)(A).
Medicare therefore must pay physicians the PFS rate they would have received for performing the
same services in person at the distant site, accounting for the geographic costs of practicing in that
location.  *Id.*; *see also* MTD. at 8-10; 25-26.  Because the PFS has no extraterritorial rates, and
HHS cannot promulgate such rates, the statute does not contemplate or permit making payment
for physicians providing services outside of the United States.

Finally acknowledging the statutory language most relevant to its challenge, RICU
suggests there are four reasons why § 1395m(m)(2)(A) does not contradict its claims.  *See* Opp. at
21-24.  *First*, RICU contends that this subsection does not expressly state that rates should be paid
based on the physician's, rather than the patient's, location.  *Id.* at 21-22.  But that fails to account
for the Telehealth Statute's command that physicians be paid as if they provided the same service
"without the use of a telecommunications system."  42 U.S.C. § 1395m(m)(2)(A); *see also* 66 F.3d
Reg. 55246, 55284 (explaining that because "payment to the physician . . . at the distant site must
be equal to the amount that would have been paid without the use of telehealth" the "site of service

for telehealth service is the location of the physician . . . at the distant site"). That is consistent with how Medicare pays **all** physicians, including outside the telehealth context. Congress required that HHS develop a fee schedule that "reflect[s] geographic variations in costs associated with performing services." Weresh, *Geographic Inequity in Medicare Rates*, 5 Rutgers J.L. & Pub. Pol'y 361, 365 (2008); *see also* 42 U.S.C. § 1395w-4(b)-(e) (establishing the geographic practice cost index (GPCI)). For two decades, as required by the Telehealth Statute, Medicare has paid telehealth providers according to the PFS, accounting for their local costs. RICU fails to explain why, for its international telehealth services alone, Medicare must throw out the PFS, ignore the GPCI, and pay physicians (without any statutory basis) based on the location of their patients. That view is both contrary to the plain text of the Telehealth Statute and the broader fee schedule regime created by Congress for all payments made to physicians through Medicare.

*Second*, RICU argues that nothing in subsection (m)(2)(A) is inconsistent with its view that the telehealth laws define the services as occurring solely at the originating site. *See* Opp. at 22-23. This amounts to nothing more than saying that subsection (m)(2)(A) does not amend the meaning of an "eligible telehealth individual," which RICU incorrectly claims defines the site of service. *Id.* As explained, that subsection merely defines where a beneficiary must be located to qualify for telehealth services and nowhere defines where those services are "furnished." RICU is also wrong that the plain text of subsection (m)(2)(A) is consistent with its position. It contends that "reflecting common sense," the Telehealth Statute "defines telehealth services as being furnished at the site of the patient." Opp. at 18. But it makes no effort to reconcile that "common sense" position with Congress's decision to pay telehealth physicians based on the distant site location. RICU notably fails to ever explain *how* payment would actually work under its reading of subsection (m)(2)(A), suggesting that is a question for another day. *See* Opp. at 22 n.13.

*Third*, RICU relatedly suggests that even if subsection (m)(2)(A) does require payment based on the distant site, that provision "only addresses payment *amount*, not the underlying mandate to pay for telehealth services." Opp. at 23. But statutes must be read "as a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133

(2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)).  RICU's failure to explain how its reading of the statute can be reconciled with the plain text of the statute's payment mechanism severely undercuts its interpretation.  RICU's argument sets the statute's provisions "at war with one another," but "[i]t is this Court's duty to interpret Congress's statutes as a harmonious whole." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).  RICU even suggests that the rate provided by the statute could be ***zero dollars*** for all of its services.  Opp. at 23-24.  But that is not a reasonable reading of the statute as a whole, and, if accepted, would call into question RICU's standing (and further undermine RICU's claims of irreparable harm).

*Fourth*, RICU contends that even if payment is based on the distant site, that is no impediment because Medicare can simply promulgate a payment rate for every single location where RICU has physicians.  *See* Opp. at 23.[11]  RICU points to other instances where Medicare has promulgated rules for foreign payments, but as it admits, these rules were issued under express statutory authorization from Congress.  *Id.*  ("42 U.S.C. §§ 1395f(f) and 1395y(a)(4) authorize payments for certain inpatient hospital and physician services provided at foreign hospital"); *see also* 42 C.F.R. § 413.74(b) (noting "Section 1814(f) of the [Medicare] Act authorizes certain payments for inpatient hospital services in foreign countries").  These statutes unambiguously require Medicare to make certain foreign payments.  *E.g.*, 42 U.S.C. § 1395f(f) ("Payment for certain inpatient hospital services furnished outside United States"); *id.* § 1395y(a)(4) (incorporating the exceptions in § 1395f(f)).  But no similar Congressional command exists here.  Nothing in the Telehealth Statute or Rule speaks to foreign payments.  It would be extraordinary for this Court to compel the Defendants to issue new regulations without such a statutory mandate, particularly given the "longstanding principle of American law that legislation of Congress, unless

---

[11] This argument directly undercuts RICU's claim that it is merely seeking a prohibitory injunction. *See* Opp. at 39 n.23.  Requiring HHS to promulgate Medicare payment rules specifically for RICU's physicians would upset the status quo and "courts 'exercise extreme caution in assessing' such motions."  *Kondapally v. U.S. Citizenship & Immigr. Servs.*, No. CV 20-00920 (BAH), 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (quoting *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56-57 (D.D.C. 2012)).

a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *see also* MTD at 29-30.

Relatedly, RICU argues that the Telehealth Statute's payment of a facility fee to the originating site does not alter the conclusion that services are furnished solely at the originating site. *See* Opp. 25-26. The facility fee is relevant here because it reinforces what is already clear from the text of the statute—that telehealth services can be, and are, furnished both at the distant site and the originating site. *See* MTD at 25-26, 27, 29. This twin provisioning of services therefore typically results in two payments from Medicare—a facility fee for the services furnished at the originating site and a PFS rate payment for the services furnished by the physician at the distant site. *See* 66 Fed. Reg. 55246, 55282 (Nov. 1, 2001) (Telehealth Statute "provides for a professional fee for the physician or practitioner at the distant site (equal to the applicable Part B fee schedule amount) and a $20 facility fee for the originating site"). RICU makes hay of the fact that, when the originating site is a person's home, no facility fee is paid. *See* Opp. at 25-26. But nothing in that brief subsection speaks to where care is "furnished"—it merely reflects Congress's judgment that no fee be paid where the originating site is not a professional facility. *See* 42 U.S.C. § 1395m(m)(2)(B)(ii). RICU next conflates state licensure rules governing where physicians may practice with Congress's use of the term "furnishes" in the Telehealth Statute. *See* Opp. at 26. But a state, naturally, has the prerogative to regulate the licensure of a doctor treating patients located within its jurisdiction. *See* 66 Fed. Reg. at 55283–55284. That says nothing about Congress's separate decision to determine the scope of what Medicare will pay for as telehealth, or the location for determining the rate of payment.[12] Instead, the Telehealth Statute reflects Congress's judgment

---

[12] Plaintiff also insists that "if the Court ultimately decides HHS legally can bar payment for RICU's physician services, RICU nonetheless requests an order declaring the [so-called] Critical Care Ban invalid as to the facility fee payment and enjoining HHS" from refusing to issue the facility fee. Opp. at 25. This request for relief appears nowhere in RICU's complaint. RICU further lacks standing to seek declaratory relief for third-party originating site facilities that have thus far elected not to bring a claim. *See Turner v. U.S. Agency for Glob. Media*, No. CV 20-2885 (BAH), 2020 WL 6822780, at *15 (D.D.C. Nov. 20, 2020) (setting out standards for establishing third-party standing (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004))).

that telehealth physicians (like all other physicians under Medicare) be paid based on their geographic location, with a separate fee to qualifying originating site facilities.[13]

### C. The Foreign Payment Bar precludes Medicare from making payment for RICU's overseas provision of services.

Medicare has barred payment for services "which are not provided within the United States" for over half a century, subject only to limited exceptions mandated by Congress. *See* 42 U.S.C. § 1395y(a)(4). Even though its business model is based upon supplying intensivist services from abroad, RICU contends its services are actually provided domestically for purposes of the foreign payment bar, and otherwise fall within an exception to the bar. *See* Opp. at 29-34. The proper way for RICU to test this theory, of course, is to have the appropriate patient, physician, or hospital submit a claim to Medicare, as would happen in the ordinary course for domestic provision of services—which is what RICU claims its services are. *See supra* 2-9. But RICU is wrong regardless—its overseas physicians do not provide services within the United States.

As described above, the Telehealth Statute recognizes that physicians furnish telehealth services from the distant site. *See* 42 U.S.C. § 1395m(m)(2), (4)(A), (8)(A)(iii)(I), (8)(B)(i). The Telehealth Rule similarly recognizes that physicians "deliver[] the service" at the distant site where they are "located at the time the service is furnished." 42 C.F.R. § 410.78(a)(2). That accords with common sense—a physician located abroad, performing their services abroad, naturally "suppl[ies] or make[s] available" their services from abroad, *see Provide*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003), and "suppl[ies]" and "give[s]" their services from abroad, *id.*, *Furnish*. Medicare cannot pay for services that are not "provided" or "furnished" within the United States. *See* 42 U.S.C. § 1395y(a)(4); *see also* 42 C.F.R. § 411.9(a) ("Basic rule. . . . Medicare does not pay for services furnished outside the United States.").

RICU points to a different word—"supply"—that does not appear in the statutory or

---

[13] RICU claims, baselessly, that this subsection is the "lynchpin" for determining where services are furnished under Defendants' view. *See* Opp. at 25. That is not the case. Even removing the facility fee provisions from the statute altogether, Medicare's foreign payment bar and Congress's decision to peg telehealth physician payments to the distant site doom RICU's claims.

regulatory text to suggest its physicians "make available" their services "for use" within the United States.  *See* Opp. at 29.  But that improperly shifts the focus to where the patient ultimately makes use of the services, rather than the statute's focus on where "services . . . are [] provided."  42 U.S.C. § 1395y(a)(4).  RICU's physicians "make available" their services "for use" from abroad.  The fact that the statutory text uses the past participle—provid***ed***—does not change the statute's focus on the site where the services are being ***provided*** from.  RICU's overseas physicians begin and complete their provision of services from outside of the United States.  Moreover, past participles "are routinely used as adjectives to describe the present state of a thing," *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1722 (2017), and thus the appropriate focus under § 1395y(a)(4) is where the services are being provided from at the time of service, not where a third-party receives those services.[14]

RICU next focuses on the foreign payment bar's use of the term "incurred" in its preamble.  *See* Opp. at 30.  The full sentence, in context, reads: "[N]o payment may be made under part A or part B for any expenses <u>incurred</u> for items or services— . . . (4) which are not ***provided*** within the United States."  42 U.S.C. § 1395y(a)(4).  The statute's focus is not on where the expenses for items or services were incurred but rather from where they are *provided*.  *Id.*  That is consistent with the fact that the various other exclusions in § 1395y(a)—to which the "incurred" language also applies—have nothing to do with location.  *E.g.*, *id.* § 1395y(a)(2) (excluding coverage for expenses incurred "for which the individual furnishing such items or services has no legal obligation to pay"); *id.* § 1395y(a)(3) (excluding coverage for incurred expenses "which are paid for directly or indirectly by a governmental entity").  RICU suggests expenses are not "incurred" until a patient receives them (Opp. at 30), but the timing is not relevant.  Regardless of when or

---

[14] RICU, without citation or serious explanation, warns that Defendants' common sense reading of the foreign payment bar would somehow disrupt "Medicare from paying for a whole host of medicines and prosthetics that are manufactured abroad, imported, and then used in the United States."  Opp. at 29.  But again, the foreign payment bar focuses on the location of provision of service at the time of service.  RICU offers no meaningful support for its outlandish parade of horribles.

where the patient "incurs" the expense, such incurred expenses cannot be paid if the "items or services . . . are not provided within the United States."  42 U.S.C. § 1395y(a)(4).[15]

Shifting tack, RICU argues that its services are "simultaneously domestic and foreign" and that the foreign payment bar does not apply to such services.  Opp. at 31.  But nothing in the foreign payment bar indicates that Medicare can pay for services *partially* provided outside of the United States—the statute is unequivocal.  Moreover, as Defendants explained, the Telehealth Statute's "payment scheme reflects that telehealth services may be 'furnished' simultaneously by two entities in two places—by the provider at the distant site *and* the facility at the originating site."  MTD at 27.  There is no ambiguity that, as to RICU's intensivists, their services are provided at the distant site, regardless of any separate and parallel services at a domestic originating site.

Finally, RICU claims its services fall within the statutory exceptions to the foreign payment bar.  *See* Opp. at 31-34.  These exceptions were enacted by Congress to address the "special problems of border residents," H.R. Rep. No. 92-231, at 77 (1972), who might live in isolated exclaves of the United States or not have ready access to domestic hospitals.  RICU points to two such exceptions: 42 U.S.C. § 1395f(f)(1) & (2).  Both exceptions contain common predicates— they grant payment under certain conditions for "*inpatient hospital services* furnished to an individual . . . *by a hospital located outside of the United States*" when "such hospital was closer to, or substantially more accessible from, . . . *the nearest hospital within the United States*" adequately equipped to address the patient's need.  *Id.* § 1395f(f)(1)-(2).

RICU hypothesizes that for an ill patient in "rural America" a domestic hospital providing telehealth services with a physician overseas is "more accessible" than another United States hospital.  *See* Opp. at 33.  But RICU fails altogether to explain how a patient located in a United States-based facility receives "*inpatient* hospital services . . . by a *hospital located outside of the*

---

[15] RICU cites to a mishmash of different statutory provisions showing, it claims, that "[p]atients, not providers, are the object of Medicare—and the care patients receive is what Medicare reimburses."  Opp. at 30.  Regardless of what this means, § 1395y(a)(4) plainly focuses on where "items or services" are "provided," and makes payment contingent on the items or services being provided within the United States.

***United States***."  42 U.S.C. § 1395f(f)(1).  The statute makes clear that the physical location of the patient is key because it contrasts the "hospital located outside of the United States" providing inpatient care with "the nearest hospital within the United States."  *Id.*  That is consistent with the exceptions' concern for border residents.  *See* S. Rep. 92-1230 at 47 (1972) (characterizing these exceptions as addressing "Medicare Benefits for Border Residents"); *id.* (discussing the "difficulty in securing necessary non-emergency care by border residents who ordinarily do and would use the hospital suited to their medical needs, which may be a foreign hospital"); *see also* Whitman, *Venturing Out Beyond the Great Wall of Medicare: A Proposal to Provide Medicare Coverage Outside the United States*, 8 Elder L.J. 181, 189-190 (2000) (describing history of these exceptions and their concern for "beneficiaries living in remote areas near United States' borders").

Further, RICU admits that its argument hinges on the idea that the patient actually receives inpatient hospital care *at the distant site*, and thus is actually located at a hospital outside of the United States.  *See* Opp. at 34 (contending "RICU's inpatient telehealth services are furnished outside of the United States" under Defendants' argument).  But plainly any "***inpatient*** hospital services" received by the patient are received *at the originating site* where the patient is admitted. *See* 42 C.F.R. § 412.3 (explaining a person "is considered an inpatient of a hospital . . . if formally admitted as an inpatient" under a physician's order and patient care "crosses two midnights"); *cf. Inpatient*, The American Heritage Medical Dictionary (2004) ("A patient who is admitted to a hospital or clinic that requires at least one overnight stay.").  That RICU's physicians furnish care from outside of the country does not render their patients "admitted" to the foreign distant site facility, which as RICU admits is not in all likelihood even a hospital, as required by the statute.[16]

---

[16] As RICU notes elsewhere, "an originating site facility generally has to be a medical facility equipped to receive patients, while a distant site can be anywhere and may not be able to receive patients."  Opp. at 22 (citing 42 U.S.C. § 1395m(m)(4)(C)(ii); *id.* § 1395m(m)(4)(A)).  This requirement renders RICU's theory that its patients are actually admitted for inpatient hospital services at the distant site even more implausible.  Indeed, the implementing regulations for the exceptions relied upon by RICU address "inpatient hospital service furnished by a ***foreign hospital***."  42 C.F.R. § 424.121(a)-(b).  But as RICU admits, distant sites "can be anywhere" and usually are not hospitals.  Defendants agree with RICU that its distant sites are not likely to fall within this narrowly tailored exception permitting payment for services by a foreign hospital.  *Id.*

RICU's argument is further flawed because the implementing regulations for these exceptions make clear that "closer to, or substantially more accessible from" refers to *physical* accessibility, and not the more abstract conception relied upon by RICU. These regulations supply "[c]riteria for determining whether the hospital was the most accessible." *See* 42 C.F.R. § 424.106; *see also id.* § 424.122(e) (adopting § 424.106 factors for determining whether a "foreign hospital" was "more accessible . . . than the nearest United States hospital"). Specifically, CMS considers: "(1) The relative distances of . . . hospitals in the area;" "(2) The transportation facilities available to these hospitals;" "(3) The quality of the roads to each hospital;" "(4) The availability of beds at each hospital;" and "(5) Any other factors that bear on whether or not the services could be provided sooner." *Id.* § 424.106(b). Each of the factors, save the final catchall, are occupied with the physical accessibility of the foreign hospital and its ability to physically admit the patient.

### D.    Medicare's longstanding rules are not arbitrary and capricious.

HHS's view that Medicare cannot pay for any hypothetical future claim for RICU's services is not arbitrary and capricious because it is commanded by statute. *See* MTD 31-33; *see also Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 832 (D.C. Cir. 1993). RICU offers little additional argumentation in support of its arbitrary and capricious claim, but does accuse Defendants of a "lack of common sense." Opp. at 35. Briefly considering the consequences of RICU's urged reading of the statute shows why Defendants' reading is not only consistent with the statutory text, but also administratively sensible.

*First*, permitting overseas physicians to obtain Medicare payments would severely curtail Medicare's ability to combat fraud and to recoup overpayments. *See* MTD at 42-43. Telehealth fraud is presently a priority of both the Department of Justice and Defendants. *See* Remarks of Acting    Assistant    Attorney    General    Brian    M.    Boynton,    *available    at* https://www.justice.gov/opa/speech/acting-assistant-attorney-general-brian-m-boynton-delivers-remarks-federal-bar. "[G]iven the expansion of telehealth during the pandemic," federal agencies have increasingly "seen the abuse of telehealth benefits." *Id.* Medicare's laws and rules therefore sensibly limit payment—save where expressly exempted—to domestic services.

24

*Second*, RICU's suggestion that physician payment be based on the originating site, if accepted universally,[17] would potentially disrupt the payment regime for thousands of domestic telehealth physicians and practitioners who for decades have been paid based on the distant site. Consider physicians located in Metropolitan Boston, Suburban Chicago, and Galveston, Texas, as those localities are defined in the PFS.  If each physician provides telehealth care to the same rural hospital in North Dakota, they are still each paid at their respective local rates, accounting for their local costs.  *See* MTD at 8-10.  But under RICU's reading of the statute, these physicians should all actually be paid North Dakota rates based on the originating site, and Medicare has been improperly paying them their local rates for two decades.  RICU fails to grapple with what its reading of the statute would mean for other telehealth providers, further showing its reading "is untenable in light of [the Telehealth Statute] as a whole."  *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 343 (1994).  RICU's view of the statute would *harm* the provision of telehealth services by compensating many other telehealth physicians at lower originating site PFS rates.  The Court should reject an interpretation of the Telehealth Statute that would favor RICU's chosen business model to the detriment of other extant telehealth providers.[18]

## CONCLUSION

For these reasons, and the reasons in Defendants' motion to dismiss and opposition to Plaintiff's motion for a preliminary injunction, the Court should dismiss the case and otherwise deny RICU's motion for a preliminary injunction.

---

[17] To be sure, any relief in this case should be limited to RICU alone.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933-34 (2018) (noting that any remedy "must be tailored to address the plaintiff's particular injury").  But considering how RICU's reading of the statute would apply generally further demonstrates the impracticality of its interpretation.

[18] RICU's relentless description of the "suffering," "death," and "disease" caused by Defendants is sorely misguided for this reason.  Opp. at 1-2.  RICU employs approximately 60 intensivists. *See* Compl. ¶ 27.  It points to no other telehealth provider that employs overseas physicians and Defendants are aware of no claim seeking payment for such physicians.  By contrast, all other telehealth providers paid under Medicare are, by definition, domestic providers.  RICU seeks to disrupt a two-decade old system for paying these thousands of other telehealth providers all to fit the statute to its own unique model.  Its grisly accusations therefore ring hollow.

Dated April 27, 2021

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Director*

/s/ *Christopher D. Dodge*
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendant*