```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    RICU LLC,
                                      CA No:  1:21-cv-00452-CRC
 4                 Plaintiff,
                                      Washington, D.C.
 5    vs.                             Monday, May 17, 2021
                                      10:03 a.m.
 6
      UNITED STATES DEPARTMENT OF
 7    HEALTH AND HUMAN SERVICES,
      et al.,
 8
                   Defendants.
 9    - - - - - - - - - - - - - - - x

10    _____

11                  TRANSCRIPT OF MOTION HEARING
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
12                  UNITED STATES DISTRICT JUDGE
      _____
13    APPEARANCES:

14    For the Plaintiff:        JESSE PANUCCIO, ESQ.
                                BOIES SCHILLER FLEXNER LLP
15                              1401 New York Ave. NW, Suite 1100
                                Washington, DC 20005
16                              202-237-2727
                                jpanuccio@bsfllp.com
17

18    For the Defendants:       CHRISTOPHER D. DODGE, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
19                              1100 L Street NW
                                Washington, DC 20005
20                              202-598-5571
                                christopher.d.dodge@usdoj.gov
21

22    Court Reporter:              Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   202-354-3187
25
```

```
1                    P R O C E E D I N G S
2            THE COURTROOM DEPUTY:  Good morning, Your Honor.
3   We're on the record for Civil Case 21-452, RICU LLC vs. The
4   United States Department of Health and Human Services, et
5   al.
6            Counsel, please identify yourselves for the
7   record.
8            MR. PANUCCIO:  Good morning; this is Jesse
9   Panuccio, for plaintiff RICU, from Boies Schiller Flexner.
10           THE COURT:  Good morning, Mr. Panuccio; good to
11  see you.
12           MR. PANUCCIO:  Good morning, Your Honor.  Thank
13  you.  You, as well.
14           MR. DODGE:  Good morning, Your Honor.  You also
15  have Christopher D. Dodge on behalf of Health and Human
16  Services and the other federal defendants.
17           THE COURT:  Okay.  Good morning, Mr. Dodge.
18           Let me just get situated here.
19           All right.  I know we're here both on the
20  plaintiff's motion for preliminary injunction as well as the
21  government's motion to dismiss.  I think the most efficient
22  way to proceed would be to deal with the jurisdictional
23  issues first and, since those issues were raised in the
24  government's motion to dismiss, to have the government lead
25  us off on that issue; and then have RICU respond both to the
```

1       government's jurisdictional arguments as well as on the

2       merits and any other PI factors that it would like to

3       address; and then have the government, in turn, respond to

4       the merits and the PI issues.  And then we'll just figure

5       out on the fly whether rebuttal would be necessary after

6       that.

7               I've allotted about an hour for this.  We may be

8       able to go over a bit, but I would ask for you to be brisk.

9       I've obviously read all of the materials, and I'm generally

10      familiar with the statutory and regulatory framework; and so

11      you can dispense with the sort of introductory setting a

12      stage, if you'd like, okay?

13              So, Mr. Dodge, why don't you lead us off on the

14      jurisdictional issues.

15              MR. DODGE:  Great.  Thank you, Your Honor.  As

16      you've asked, I'll begin with the jurisdictional issue.

17              RICU does not dispute here that its claims, quote,

18      arise under Medicare and, as a result, Section 405(h) of the

19      Medicare laws remove general federal question jurisdiction

20      over its claims.  Because its claims, quote, arise under

21      Medicare, the only method for judicial review here is for it

22      to comply with the requirements of Section 405(g).

23              Both the Supreme Court and the D.C. Circuit have,

24      in many cases, specified that there are two distinct

25      prerequisites for obtaining judicial review under Section

```
 1     405(g).
 2              First, the plaintiff must have presented a
 3     concrete claim for payment to the agency.  The D.C. Circuit
 4     has repeatedly characterized this as an absolute
 5     prerequisite to judicial review, for example, American
 6     Hospital Association v. Azar, National Kidney Patients
 7     Association; and then the second prerequisite, Your Honor,
 8     is the plaintiff must also administratively exhaust their
 9     claim.  There is no dispute here at all that RICU has not
10     presented a concrete claim to the agency.  In fact, RICU
11     cannot point to a single claimant -- not a hospital, not a
12     beneficiary, not a physician -- who has ever made a claim to
13     Medicare for RICU's services.
14              So, in other words, at this stage of the
15     litigation, the agencies have not had the benefit of being
16     able to consider a claim for payment from RICU against a
17     concrete factual backdrop that would allow the agency to
18     apply its specialized expertise against the full breadth of
19     its regulations to make a concrete ruling on its claim for
20     payment.
21              THE COURT:  So discuss the relationship between
22     American Hospital and Action Alliance.  Obviously RICU
23     relies on Action Alliance for the proposition that at least
24     under certain circumstances a specific claim for payment
25     need not be presented in order to establish jurisdiction.
```

1   Did *American Hospital* overrule *Action Alliance*, in your

2   view?

3          MR. DODGE:  Your Honor, *American Hospital*

4   *Association* had no need of overruling *Action Alliance*

5   because *Action Alliance*, as the D.C. Circuit itself has

6   observed, made no holding with respect to presentment.

7          And I'm glad to sort of go through the litigation

8   history --

9          THE COURT:  Okay.

10          MR. DODGE:  -- but the ruling relied upon by RICU,

11   all it is is an offhanded footnote observing, without any

12   discussion at all, that a jurisdictional issue the D.C.

13   Circuit had ruled upon years earlier had apparently been

14   remedied.  And as numerous courts -- including the D.C.

15   Circuit and Judges Lamberth and Contreras -- have noted, the

16   issue of whether or not generalized grievance letters or any

17   kind of correspondence sent to the agency can suffice for

18   purposes of presentment was not before either the district

19   court or the D.C. Circuit in *Action Alliance*.

20          THE COURT:  But is it to say that *Action Alliance*

21   did not involve a specific claim for payment?

22          MR. DODGE:  It is not, Your Honor.  In fact,

23   Judges Lamberth and Contreras both specifically noted in

24   discussing *Action Alliance* that *Action Alliance* not only

25   failed to make any holding on presentment, but, in fact, it

1    was distinguishable from the letter-writing campaigns in

2    their cases because *Action Alliance* did involve specific

3    claims for payment.  Both judges noted that.

4         So *Action Alliance* both made no firm holding with

5    respect to presentment, it also involved a factual scenario

6    different from the one here because there's no dispute that

7    there is no concrete claim for payment.  And in addition to

8    *American Hospital Association* making clear that a concrete

9    claim for payment is a prerequisite for judicial review, the

10   Supreme Court has further made that clear in cases like

11   *Ringer*.

12        And even moving beyond *American Hospital*

13   *Association*, just a few months ago the D.C. Circuit

14   reaffirmed in *Community Oncology Alliance v. OMB* that a

15   plaintiff does not comply with Section 405(g)'s presentment

16   requirements where, quote, it did not identify any concrete

17   reimbursement claim presented to the agency.  That's 987 F.

18   3d at 1444.  And so the *Community Alliance* panel affirmed

19   the district court's ruling that there was no jurisdiction,

20   and under the reasoning of *Community Oncology*, *American*

21   *Hospital Association*, but also Supreme Court cases like

22   *Ringer*, *Illinois Council*, and the *Salfi* case, the exact same

23   thing should happen here.  The lack of a concrete claim is

24   fatal to RICU's claim or argument that it's presented

25   anything.

1            As you've noted, you know, RICU's only

2     counterargument to this is the *Action Alliance* footnote.  It

3     cannot cite to a single other case, in this circuit or

4     elsewhere, that has found that a letter-writing campaign or

5     correspondence lacking a discrete claim for payment is

6     sufficient for presentment, and that's because courts within

7     the circuit have, in effect, uniformly rejected that

8     argument.  You know, we cited cases in our brief.  I can

9     briefly recount them here.

10            In *American Orthotic & Prosthetic Association*,

11     Judge Lamberth said that, quote, generalized grievance

12     letters offering detailed critiques are insufficient to

13     establish presentment.

14            In *Three Lower Counties Community Health Services*,

15     the Court found that claimants cannot, quote, circumvent the

16     Medicare appeals process by relying upon correspondence.

17            And finally, in Judge Contreras's decision in the

18     *American Hospital Association* case, which was later

19     affirmed, he explained that every single court to have

20     considered this issue, quote, found the submission of

21     letters that are divorced from discrete claims for

22     reimbursement are insufficient for purposes of 405(g).

23            THE COURT:  Okay.  Let's assume that I agree with

24     you on that point.  Does that still mean that I could not

25     consider this letter-writing campaign and the responses that

1    RICU got from CMS in assessing whether the *Illinois Council*

2    exception applies; namely that -- you know, assessing

3    whether there would be any judicial review available at all,

4    right?

5             RICU makes the argument that, you know, the

6    presentment of a claim by a hospital is highly unlikely, A,

7    because there are other alternative reimbursable sources of

8    the services at issue and, B, because CMS has already made

9    up its mind, and so it would be a fool's errand, in effect,

10   for a hospital to present a claim.

11            Why can't I consider, you know, CMS's analysis of

12   the issue in connection with the *Illinois Council* exception?

13            MR. DODGE:  Sure.  Several things, Your Honor.

14            First, the letter might be relevant if it were the

15   case that RICU had, in fact, presented a claim.  That

16   letter-writing campaign and the agency position might be

17   relevant, theoretically, to the question of futility under

18   the second prerequisite of administrative exhaustion, which

19   is conceivably waivable, but we have not reached that stage

20   here because RICU has not even presented its claim and

21   identified a concrete claim for payment, which is a judicial

22   prerequisite.

23            With respect to the *Bowen* exception, the no review

24   exception, Your Honor, the letter is not particularly

25   relevant because what the Supreme Court has said in *Illinois*

1    *Council* and what the D.C. Circuit said in *American*

2    *Chiropractic* and what numerous other appeals courts in the

3    Ninth, Fifth, and First circuits have all said is that the

4    no review exception does not apply merely because a

5    particular party, such as RICU, cannot bring a claim.

6    Courts are uniform on this.  It does not matter if a

7    particular entity never has the opportunity to pursue a

8    claim so long as the claim itself still might some day be

9    able to obtain judicial review.  That's *American*

10   *Chiropractic*.

11            THE COURT:  And the only alternative claimant here

12   are hospital groups, correct?  That's really what we're

13   focusing on.

14            MR. DODGE:  Well, I think actually there are

15   more than hospital groups, but those are the ones most

16   discussed in the briefings, Your Honor.  Theoretically a

17   Medicare beneficiary or a physician of RICU's who was

18   assigned a claim could also pursue, you know, a claim with

19   the agency --

20            THE COURT:  But if a beneficiary shows up in an

21   emergency room and needs critical care, that person is not

22   going to say, "Well, I want a RICU doctor in India to treat

23   me in the next two hours," right?  I mean, that's not

24   practical in this circumstance, is it?

25            MR. DODGE:  Well, Your Honor, based on RICU's

1    complaint and based on its affidavit, RICU continues to

2    supply critical care telehealth services across the United

3    States.  You know, it claims to have 250 hospital clients,

4    60 physicians.  Presumably some of the individuals that they

5    are presently treating are also people who are eligible for

6    Medicare payments.

7              THE COURT:  Okay.

8              MR. DODGE:  And so those people, if they were, in

9    fact, to still have access to their claims -- oftentimes a

10   beneficiary assigns the claim to the hospital or the

11   physician; but if that beneficiary were to retain the claim,

12   they absolutely would be able to file with the agency and

13   see it through.

14             But turning back to what Your Honor said about

15   whether or not the hospital clients in particular lack

16   incentive to bring a claim, RICU again relies on a single

17   case, which is the *Urological Interests* case, and as we

18   discussed in our brief, the Court there found that under

19   very, very specific facts the plaintiff and the hospital

20   clients were structurally adverse.

21             The plaintiffs there were an association of

22   physicians who also owned medical equipment companies.  They

23   challenged, through their association, a rule that limited

24   the ability of physicians to make referrals to entities in

25   which they had an interest.  They themselves could not

1   directly bring a claim.

2            The government argued that jurisdiction was

3   lacking because their hospital clients could nonetheless

4   bring a claim.

5            What Judge Tatel cited to in that decision were

6   very elaborate pleadings from the plaintiff who specifically

7   alleged in the complaint that the hospital clients lacked

8   any incentive to challenge the rule because they actually

9   financially benefited from the rule.  They gave them greater

10  leverage in negotiating medical equipment prices with the

11  physician-owned medical equipment providers --

12            THE COURT:  Right.

13            MR. DODGE:  -- and there were elaborate pleadings

14  in that case.

15            RICU does not make any allegations in its

16  complaint like that.  None at all.  In fact, what RICU's

17  complaint and its declarations say is that its hospital

18  clients are very, very eager for Medicare to pay for its

19  services.  So there's no structural adversity here.

20            THE COURT:  Well, Judge Tatel certainly said that

21  the adversity or the apparent adversity on the part of the

22  hospital was a factor in deciding that the exception

23  applied, but I did not read him to say that that adversity

24  was required.

25            I mean, you know, he pitched it as a practical

1    inquiry and that, you know, at least in this particular case

2    the adversity of the hospitals warranted application of the

3    exception.  But do you read the case as requiring hospital

4    adversity?  Are there other fact -- you know, practical

5    considerations that the Court could take apart from, you

6    know, clear adversity in applying the exception in a case

7    like this?

8            MR. DODGE:  What I understand the D.C. Circuit to

9    have said in both *American Chiropractic* and *Urological*

10   *Interests*, Your Honor, is that these practical impediments

11   only allow the no review exception to apply when they rise

12   to the level that the claim, practically speaking, will

13   never be heard and may never obtain judicial review.

14   That's -- *Urological Interests* and *American Chiropractic* are

15   consistent on that standard.  They merely involve different

16   facts.

17           And here I think it's very important to note that

18   the complaint and Mr. Rabinowitz's declaration suggest that

19   these hospital clients, you know, regardless of whether or

20   not you characterize it as structural adversity, they are

21   aligned with RICU's interests as far as its claims on

22   Medicare.  According to RICU -- and I point you in

23   particular towards Mr. Rabinowitz's declaration at

24   Paragraphs 38 to 40 and in the complaint at Paragraph 84 --

25   its hospital clients are very, very eager for Medicare to

1    make these payments so that RICU services -- which RICU

2    alleges are highly sought after, but there's a shortage of

3    such services and so that there's high demand for it.  These

4    hospital clients have an incentive to essentially file a

5    claim.  And so that's what distinguishes it from *Urological*

6    *Interests*, Your Honor.

7              And I'll also add, you know, the practical road

8    blocks.  It's important that they rise to the level of

9    precluding judicial review all together because what the

10   Supreme Court said in both -- in *Illinois Council*

11   specifically what Justice Breyer said was that mere

12   inconvenience, added cost, delay, those kinds of practical

13   considerations are not enough for the in review exception to

14   apply.  Justice Breyer said that very clearly.

15             So it's not enough that it be an inconvenience or

16   costly or add some time for RICU's hospital clients to have

17   to file a claim.  They have to essentially be precluded from

18   bringing a claim all together because it would make no sense

19   for them to even do so as it was in *Urological Interests*

20   based on the specific pleadings.

21             There are no such specific pleadings here.  All

22   the facts we have suggest that the hospitals are in fact

23   amply attended to bring claims.  They would accrue to their

24   financial benefit.  They would allow them to obtain RICU's

25   highly sought after services for dollar amounts through

1     Medicare subsidization.  And so this case is very factually

2     distinguishable from *Urological Interests*.

3                    THE COURT:  Okay.  Let's end there.

4                    Mr. Panuccio, why don't you address the

5     jurisdictional issues and then move on to the merits, and

6     then we'll give the government an opportunity to come back.

7                    MR. PANUCCIO:  Thank you, Your Honor, and good

8     morning again.

9                    THE COURT:  Good morning.

10                    MR. PANUCCIO:  Thank you.  I will jump right into

11    jurisdiction and dispense with any introduction since Your

12    Honor is familiar with the pleadings.

13                    HHS argues that the Court does not have subject

14    matter jurisdiction because RICU failed to channel its claim

15    for program eligibility through the agency's monetary claims

16    process.  There are, as just discussed, two paths to

17    jurisdiction in a Medicare case like this, and RICU

18    satisfies both of them.

19                    Let me begin with channeling, and then I'll turn

20    to the exception to channeling.

21                    THE COURT:  So just so I'm clear, do you agree

22    with the government that these are two independent

23    requirements?  Do you have to channel, meaning do you have

24    to present a claim for payment; and then once that claim for

25    payment has been submitted, then exhaust?

1          MR. PANUCCIO:  We agree that the channeling

2    requirement, as discussed in *Mathews vs. Eldridge*, has two

3    requirements:  presentment and exhaustion.  We do not

4    agree -- and *Illinois Council*, the Supreme Court case, does

5    not agree -- that the only type of claim that can be sent

6    through channeling is a claim for monetary benefits.  The

7    Supreme Court in *Illinois Council* said very specifically,

8    because this was the big fight whether channeling was going

9    to apply to other types of claims, and what Justice Breyer

10   said in that case is that the channeling requirement is,

11   quote, not limited to claims for monetary benefits but

12   includes claims for -- claims of program eligibility, claims

13   of a general legal nature rather than fact-specific claims,

14   and requests for declaratory and injunctive relief.  That's

15   at Page 14 of the *Illinois Council* opinion.

16          THE COURT:  Right, but do those requests have to

17   come in the context of a claim for reimbursement --

18          MR. PANUCCIO:  No, they have to be --

19          THE COURT:  -- or --

20          MR. PANUCCIO:  I'm sorry.

21          THE COURT:  Go ahead.

22          MR. PANUCCIO:  What RICU has here is a claim of

23   program eligibility, and it needs to be channeled through

24   the agency through whatever process exists for that.  The

25   government has not pointed to any process for that kind of

1   claim, and especially given that this came -- you know, what

2   we're dealing with here is a temporary waiver that was

3   created very quickly that the government changes the

4   contours of on an almost weekly basis through guidance

5   documents, and what they created here was an ad hoc

6   channeling process for this.

7            Am I permitted to share a demonstrative, Your

8   Honor?

9            THE COURT:  Sure.

10           MR. PANUCCIO:  Okay.  Let me just -- all right.

11  Can you see that, Your Honor?

12           THE COURT:  Yes.

13           MR. PANUCCIO:  Okay.  And this is just a

14  demonstrative exhibit, a summary exhibit of the attachments

15  to the complaint to show the process that was gone through

16  here.  And as you can see, just looking through this, these

17  are the things that the government, which they now try to

18  run away from and say, "Well, this was all just meaningless,

19  you know, form letters that we sent you."

20           The process -- if you actually look at these

21  exhibits, the process was quite detailed, was channeled

22  through the agency and went through multiple levels of

23  review and re-review, and RICU was told repeatedly that this

24  process was meaningful, that they were coming to an answer,

25  that it was being well considered, and at the end of it they

1   would get a binding answer.

2          On April 29th RICU was told, "We're giving this

3   every priority."

4          On May 11th RICU was told that HHS would, quote,

5   review carefully RICU's analysis.

6          On June 1, of course, we received the letter from

7   the acting director of the chronic care policy group at the

8   center for Medicare stating that HHS had conducted, quote,

9   an exhaustive review.  I mean, they use the terms of

10  "presentment" and "exhaustive."  They've said, "We've

11  conducted an exhaustive review and concluded that RICU's

12  services are ineligible."

13         Then on 7/9, after RICU pressed for further review

14  at higher levels, the CMS principal deputy administrator for

15  policy and operations states, quote, The senior Medicare

16  team and general counsel's office also reviewed the issue,

17  and we stand by the letter of June 1st.

18         After spending the summer and fall asking for

19  further higher levels of review all the way up to the

20  secretary, RICU gets a letter on October 28th from the

21  principal deputy administrator and director for Medicare --

22  one of the highest levels in CMS -- saying he's responding

23  on behalf of the secretary, and he stated that they did a,

24  quote, complete re-evaluation of what had already been an

25  exhaustive review, and they appreciated the significance of

1    the issue, and that the secretary's conclusion was that

2    RICU's claim of program eligibility was inconsistent with

3    the statutory prohibition.

4            This detailed process satisfied the presentment

5    and exhaustion requirements, and the whole point of

6    channeling, as spelled out in multiple cases, is to give the

7    agency a chance to carefully consider a claim and to

8    reconsider the issue, and that would --

9            THE COURT:  But how is that any different, that

10   back-and-forth any different than the -- what happens in a

11   notice-and-comment setting, which has been held not to have

12   satisfied the presentment requirement?

13           MR. PANUCCIO:  Well, a notice-and-comment setting

14   occurs before a rule is finalized.  So criticisms you might

15   have about a rule beforehand, the agency may have taken that

16   all into account in promulgating the final rule and then

17   should have an opportunity to respond after the rule is

18   actually promulgated.

19           But here we have the telehealth waiver.  It came

20   out.  The question here was are we eligible?  We have a

21   claim of program eligibility.  Are we eligible or not?

22           Now, if HHS felt that it was inappropriate for

23   RICU to bring the claim like this, at any point during this

24   process where they are promising you will get an answer --

25   you know, up here they say -- let me find it.

1       On 5/20 they say, "We have a detailed clearance

2    process before we can provide answers."  I mean, that's what

3    the agency told RICU it would be getting, that it was going

4    through a detailed process and would be getting an answer to

5    its claim of program eligibility.

6       And let me address, Your Honor --

7       THE COURT:  So your position is that -- or you

8    would have CMS simply stiff-arm potential claimants by

9    saying, "Look, we can't comment.  You know, good question.

10   File a claim and see what happens."  I mean, is that a

11   better system?

12      MR. PANUCCIO:  Well, certainly if they're going to

13   take a claimant through what here was a multimonth process

14   with multiple layers of review and say we're responding to

15   you on behalf of the secretary, but actually everything

16   we're saying is meaningless and what you should do then is

17   go find a rural hospital that doesn't have -- hasn't

18   invested in telehealth yet and doesn't have the money to do

19   so without Medicare reimbursement -- because there's a huge

20   upfront cost in putting this technology in.  If you can

21   convince one of them to come up with a claim, then we'll

22   redo this analysis over the next five years as you go

23   through our process.

24      They should at least say at the outset,

25   "Everything we're saying to you we're later going to

1    disclaim and say it's meaningless," and they haven't done

2    that here.  The agency made repeated promises that this

3    answer was binding; that it was going all the way up the

4    chain.

5           And if I may, Your Honor, I want to address the

6    *Action Alliance* case because I think this is very important,

7    to go through what happened there and what is and is not

8    binding law.

9           THE COURT:  Okay.

10          MR. PANUCCIO:  *Action Alliance* -- I'm sorry, Your

11   Honor.

12          THE COURT:  No, that's fine.  Go ahead.

13          MR. PANUCCIO:  Oh, thank you.  Thank you.

14          *Action Alliance* held that nonmonetary claims can

15   be presented outside the monetary claims process and through

16   other means.  What was at issue in *Action Alliance* was a

17   claim by Social Security beneficiaries that they should have

18   received notice of the right to seek a waiver.

19          So they weren't actually adjudicating the waiver;

20   they were adjudicating whether they had the right to a

21   notice.  So it was not a monetary claim that was at issue

22   there.  It was a process claim.

23          And in 2007, when the D.C. Circuit's first

24   opinion in this specifically addressed jurisdiction, that

25   was what -- subject matter jurisdiction on channel, and what

1     they said -- they address -- they said, you know, "The

2     plaintiffs have argued that an email they had sent to the

3     administrator of CMS was sufficient for channeling," and

4     D.C. Circuit wrote it need not decide that issue because the

5     email didn't actually discuss the waiver notice that was in

6     question.

7              So factually it just wasn't there.  They didn't,

8     even in the email, present to the agency the claim they were

9     bringing to the Court.

10             So the Court said in the first 2007 D.C. Circuit

11    opinion, no jurisdiction.  On remand it goes back to Judge

12    Kennedy.  And during that remand period plaintiff's counsel

13    sent a letter to CMS explaining what their claim was and

14    what they thought the law required, and Judge Kennedy said,

15    "The issue is whether they have satisfied the presentment

16    requirement," and the Court held that the post remand letter

17    from plaintiff's counsel to the agency satisfied

18    presentment.

19             Now, notably this letter was not sent as part of

20    the process the agency had established for seeking actual

21    waiver.  There was a process for the actual waiver, but they

22    weren't going through that process because their claim was

23    you need to provide us notice, and they presented that

24    through a letter, not through the actual process.

25             THE COURT:  The issue of the notice -- correct me

1    if I'm wrong -- arose in the context of CMS seeking a

2    clawback of funds that it had overpaid to the beneficiaries,

3    and that was a discrete amount of money that was at issue in

4    that litigation.  Is that fair?

5            MR. PANUCCIO:  I think that's fair, Your Honor.

6    Certainly the agency was seeking a clawback or a pay

7    reimbursement from beneficiaries, but the claim of the class

8    there or of the group of plaintiffs was outside of the

9    amounts we have in dispute with each other.

10           We have a process right.  You have not validated

11   or vindicated that process right.  We have a claim to it,

12   and we're raising that claim outside of this process.  We're

13   doing it through a letter campaign.  We're not going through

14   the multilevel review that the agency discusses in its

15   brief, how that works, in its brief in the lower court, and

16   it's clear the plaintiffs didn't go through it.

17           Now, when this goes up to the D.C. Circuit --

18   remember, this is the D.C. Circuit that in 2007 rejected

19   this case on subject matter jurisdiction.  It goes back up

20   to the D.C. Circuit on the merits, and, of course, the Court

21   needs to satisfy itself every time of subject matter

22   jurisdiction, and the Court was well aware of it in this

23   case, and in a footnote, the Court explained it had subject

24   matter jurisdiction.  It had previously rejected subject

25   matter jurisdiction, but here, quote, Plaintiffs have since

 1    secured the jurisdictional defect, and that's at Note 1.

 2              And so it is not true, as the government says in

 3    its brief here, that jurisdiction went unremarked upon.  It

 4    went remarked upon.  It's included in a footnote, and it's

 5    the whole basis of the first opinion.

 6              THE COURT:  Okay.  Well, be that as it may, we

 7    have a subsequent D.C. Circuit opinion from the chief judge

 8    and two active D.C. Circuit judges saying that that earlier

 9    case has no precedential value.  All right.  So your

10    position is that is wrong, and this is a case of a

11    subsequent circuit overturning a prior circuit panel's

12    decision.

13              Now, I've dealt with this issue before, and

14    usually when it comes up it's not clear that the subsequent

15    panel actually considered or even was aware of the earlier

16    panel decision.  Here obviously Judge Katsas and Judge

17    Srinivasan and Judge Millett were aware of *Action Alliance*,

18    and they said it has no precedential value because it didn't

19    squarely address the issue at hand.

20              What am I to do, sitting as a district judge, with

21    those two decisions?  Say that the subsequent panel was

22    simply wrong; that it improperly overturned *Action Alliance*?

23    Is that -- that's your position?

24              MR. PANUCCIO:  I'd say a few things about that,

25    Your Honor.

1              First of all, you know, what they said in *American*

2    *Hospital* is they said, "Well, we're going to view the *Action*

3    *Alliance* footnote as not addressed or dicta," but of course

4    in *American Hospital* it wasn't necessary because *American*

5    *Hospital* wasn't about a letter like the one that was written

6    in *Action Alliance*.  It was about comments filed during

7    rule-making.  So that holding itself or that statement

8    itself in *American Hospital* was dicta.

9              So its statement about dicta was itself dicta, but

10   it is also true that one panel cannot overrule another, and

11   the citation that the *American Hospital* panel provided for

12   saying why *Action Alliance* shouldn't be considered

13   precedential is a case that says, well, we don't consider

14   questions that lurk in the record.

15             But that's not what happened in *Action Alliance*.

16   There is a footnote explicitly addressing jurisdiction.

17             But in all events, Your Honor, even if you took

18   *American Hospital* as saying, "Well, it's nonprecedential,"

19   the reasoning is still persuasive, and you still have a

20   district court -- a fellow district court that was not

21   overturned on that ground, and the reasoning can be

22   persuasive, and the reasoning of *Action Alliance* stands.

23             If you go back to *Illinois Council*, it's not just

24   monetary claims.  There are other types of claims, and the

25   government has not addressed the process outside of monetary

1    claims that RICU failed to satisfy.  The government came up

2    with its own process for RICU, and RICU went through it to

3    the point of the government saying we have engaged in an

4    exhaustive review.

5              And I should add, it's instructive, I think,

6    to look at *Mathews vs. Eldridge*, because in *Mathews vs.*

7    *Eldridge* the Court said -- and let me just find the quote --

8    the secretary can, quote, satisfy himself at any stage of

9    the administrative process that no further review is

10   necessary because the internal needs of the agency are

11   fulfilled or because the relief that is sought is beyond the

12   power to confer.  That's at 424 US 330.

13             And that is exactly what happened here.  If you

14   look at the final letter, the October 28th letter, the last

15   thing they say is, "It is beyond the power for the secretary

16   to confer.  It would be against the law for us to confer the

17   program eligibility you are indicating here."

18             Now, Your Honor, separate and apart from the

19   channeling, there is another path to jurisdiction through

20   Section 1331, and this does flow from the D.C. Circuit

21   decision in *Council for Urological Interests*.

22             Now, the government has criticized us both for

23   this argument in the brief that we're only relying on one

24   case.  It just happens to be a precedential binding case

25   from the D.C. Circuit so we think it's pretty good authority

1    for our case.  And there, in that case, the plaintiff had no

2    direct means -- this is a quote -- had no direct means of

3    channeling its claims through the agency.  So it was thought

4    that, as was the case here, RICU itself cannot submit a

5    monetary claim.  That's not disputed.

6           So in that case, in *Urological Interests*, they

7    sought direct review under 1331, and the question by the

8    D.C. Circuit was posed as this:  What happens when the

9    Medicare Act provides an avenue for administrative and

10   judicial review of a --

11          THE COURT REPORTER:  I'm sorry.

12          THE COURT:  Mr. Panuccio, you're breaking up.

13   Maybe your documents are on top of the microphone.  If you

14   could rewind about 30 seconds, that would be great.

15          MR. PANUCCIO:  Let me just go back.  And I

16   apologize for that, if I was interfering with the

17   microphone.

18          THE COURT:  No problem.

19          MR. PANUCCIO:  So I was discussing *Council for*

20   *Urological Interests*, and I was pointing Your Honor to

21   what -- how the D.C. Circuit framed the question there.  And

22   the issue there was the plaintiff had no direct means of

23   challenging its claims through the agency, and that's the

24   same thing here.  Nobody disputes that RICU itself cannot

25   submit a monetary claim.

1          And so the D.C. Circuit framed the question this

2     way that it needed to answer:  What happens when the

3     Medicare Act provides an avenue for administrative and

4     judicial review of a particular claim but not by the

5     category of effective parties who wish to bring it?  And

6     that's at Page 708 of the opinion.

7          And the D.C. Circuit said, "In cases like this, we

8     need to examine a potential proxy's willingness and ability

9     to pursue plaintiffs' claim," and it said it's a practical

10    inquiry.

11         It did not list exhaustive factors, but it did

12    employ three factors in that case, and the D.C. Circuit

13    looked at incentives, history, and the party/proxy

14    relationship.

15         Now, on two of these, I think there's no dispute

16    between us and the government.

17         On history, we both agree, and the government has

18    highlighted it multiple times.  Nobody's bringing this

19    claim.  That in and of itself is a pretty strong indicator

20    that without -- that RICU has no proxy for this claim that

21    it's likely to bring it.

22         THE COURT:  So what is the relevant time period

23    for judging the lack of any claims being presented?

24         In that case, the time period was something like

25    three or four years, if I recall.  Here the interim final

1    rule has not been in effect for nearly that long.  What am I

2    to make of the fact that simply no claims have been

3    presented since the interim final rule has passed?

4         MR. PANUCCIO:  I think at this point, given that

5    we're going on, you know, over a year now or about a year, I

6    think you can draw the same conclusion, that it is unlikely

7    that a proxy is going to bring the claim.

8         And yes, it was three years there, but the D.C.

9    Circuit didn't draw a line around a certain time period, and

10   here I think it's also relevant that we're dealing with a

11   temporary waiver program.  This program is not going to last

12   forever, and so the fact that many months have gone by I

13   think is quite significant, especially given that there is

14   such a need for ICU-telehealth out there.  So if the parties

15   were going to bring a claim, I think they would have brought

16   it already.  So, you know, I would say the history factor is

17   undisputed, Your Honor.

18        And the relationship factor as well.  RICU cannot

19   be reassigning these claims.  There is no relationship

20   between the hospitals and the RICU that are going to create

21   the incentive for the hospital to assign the claims.  So the

22   last one --

23        THE COURT:  Why don't you move to the pleading

24   issues that the government has raised and the evidentiary

25   issues.  I mean, we are here on a 12(b)(1) motion.  The

1   Court has to take your -- the allegations pled as true but

2   can also consider other evidence in the record.

3           The government's position is that you've not pled

4   any allegations that the hospitals have a disincentive.  In

5   fact, just the opposite; that they want these services, that

6   they want to be able to, you know, utilize RICU doctors, and

7   the same with the Rabinowitz's declaration that you filed in

8   support of your motion for preliminary injunction.

9           MR. PANUCCIO:  Thank you, Your Honor, I will turn

10  to that.  And I would say, first of all, of course, the

11  standard is the Court needs to draw every reasonable

12  inference in RICU's favor, and I think both the complaint

13  and the Rabinowitz declaration identify everything necessary

14  to draw the conclusion that this is not an appropriate

15  incentive.

16          One of the things discussed in the complaint is

17  that there's really two categories of hospitals out there.

18  The first category is the hospitals that RICU was already

19  working with.  These were the hospitals that could afford

20  ICU-telehealth and were purchasing it prior to the waiver.

21  That category is turning to RICU's competitors.  And this is

22  discussed at Complaint Paragraph 84 and in the Rabinowitz

23  declaration at Paragraphs 38 and 41 through 42.  And the

24  *Regeneron* case that we cite from SDNY from December 30th

25  acknowledged the point that when your customers are moving

1    to competitors, that is an example that would fulfill the

2    *Urological Interests* test of a proxy not being available.

3            Then we have the other category of hospitals, and

4    these are the hospitals often in rural places.  These are

5    hospitals that are right on the edge financially.  They

6    simply cannot afford ICU-telehealth without the Medicare

7    reimbursement.  And hospitals that don't yet have it -- the

8    complaint discusses at Paragraphs 23 and 24 and 31 and 32

9    the advanced technological needs for telehealth, including

10   the massive upfront cost.  These hospitals are not going to

11   invest in telehealth technology and all of that cost and all

12   of those cameras and all of those monitors if they don't

13   know in advance that they're going to get Medicare

14   reimbursement.

15           So for both categories, there is ample evidence in

16   the declaration and allegations in the complaint that the

17   incentives are not properly there, and I would urge the

18   Court to look at the two separate categories of hospitals

19   because they are differently situated.

20           THE COURT:  Okay.  Why don't you move to the

21   merits.

22           MR. PANUCCIO:  Okay.  On the merits, Your Honor,

23   HHS originally provided only one reason why RICU's services

24   did not qualify for payment under the --

25           THE COURT:  And, Mr. Panuccio, if you can remove

1      the document so that I can see you all on a full screen.

2                     MR. PANUCCIO:  Oh, I'm sorry, yes.  Is that

3      better, Your Honor?  I forgot it was up there.  I'm sorry.

4                     THE COURT:  Yes.  That's fine.

5                     MR. PANUCCIO:  The original reason that HHS-

6      provided RICU services did not qualify under the telehealth

7      waiver was pointing to 42 USC 1394y(a)(4) [sic], which is

8      the foreign payment bar, and it says no payment may be made

9      for any expenses incurred for items or services which are

10     not provided within the United States.

11                    But the plain language of the telehealth statute

12     defines telehealth services as being furnished at the site

13     of the patient such that the foreign payment bar is of no

14     moment here.  We all agree that the patients are located

15     solely within the United States.

16                    THE COURT:  Well, Counsel, I mean, you cite

17     several provisions of the statute which you say indicate

18     that the location of the services is at the originating

19     site.  The government cites other provisions in the statute

20     indicating it would seem that the location of the provision

21     of services is at the distant site.  Why isn't this a

22     *Chevron* issue, and what deference is owed to the agency's

23     determination that the services can be furnished at two

24     different sites?

25                    MR. PANUCCIO:  Well, first of all, Your Honor,

1    this is not an interpretation that was promulgated through

2    notice-and-comment rule-making, so *Chevron* would not be

3    applicable to their interpretation here.  But moreover, even

4    if we were in that world, what we're going -- the statutory

5    analysis that's both in our opening brief and our reply

6    brief is a very close plain-text reading of the statute.

7    They don't really respond to that plain text, which is in

8    1395m(m)(1), which says furnished at the originating site.

9    That is where services are furnished.

10          The only thing they point to, the only statutory

11   language they point to is Provision (m)(2)(A), and that

12   provision -- you can search it, Your Honor -- does not say

13   anywhere where services are provided.  It's a provision

14   about rate, and they've made a choice to say, "Well, we're

15   going to deem the rate as where the physician is, not where

16   the patient is," but nothing in that section says -- and I

17   can put this up on the screen as well, if it would be

18   helpful, Your Honor.

19          THE COURT:  Sure.  Well, (m)(2)(A) says that the

20   secretary shall pay to a physician located at a distant site

21   that furnishes a telehealth service, so certainly that would

22   contemplate that the service can be furnished from a distant

23   site, correct?

24          MR. PANUCCIO:  Well, our argument, Your Honor, is

25   that that furnishes a telehealth service.  The referent

1    there is "physician," not "distant site," and that is the

2    reasonable referent here because the entire statute is about

3    physicians furnishing services.

4            The sites -- there is no requirement for the

5    sites.  They can be anywhere.  It can be the doctor's

6    basement, if he or she wants.

7            So the site does not furnish a telehealth service;

8    only the physician furnishes a telehealth service.

9            THE COURT:  Right.  You're calling in from New

10   York this morning?

11           MR. PANUCCIO:  Me?  Washington, D.C.

12           THE COURT:  You're in Washington, okay.  Well, you

13   are providing your argument from your office, but you're

14   also providing it here in court, correct?  Why is that an

15   illogical construction of the words "furnish" or provide"

16   based on common parlance and understanding?

17           MR. PANUCCIO:  Well, for one thing, Your Honor,

18   it's not what the statute says.  The statute here says, if

19   you look at provision (m)(1), the secretary shall pay for

20   telehealth services that are furnished via

21   telecommunications -- a telecommunications system by a

22   physician to an eligible telehealth individual.  And then

23   that is a defined term, and it is defined as an individual

24   who receives the telehealth service furnished at an

25   originating site.  That is the only direct statutory

1    language that says where a telehealth service is furnished

2    at.

3              But it also accords with common sense, Your Honor.

4    No --

5              THE COURT:  But just because an eligible

6    telehealth individual receives a service at an originating

7    site does not eliminate a conclusion that it is also

8    furnished by the physician at a distant site, correct?

9              MR. PANUCCIO:  Well, if there was something in the

10    statute that said that.  But the only time the statute uses

11    "furnished at" is with -- if you look at (m)(4)(B), it says

12    "furnished at an originating site."  It says "both received

13    at and furnished at an originating site."

14              And, of course, if you take this from the patient

15    position -- and Medicare is about the patients and whether

16    their services will get reimbursed -- no patient sitting in

17    a hospital bed in rural Iowa who is receiving, you know,

18    half unconscious, ICU care is going to think reasonably that

19    their services are being furnished in Canada or in

20    Australia.  The reasonable expectation and the reasonable

21    reading of the language here is that those services are

22    being furnished at the hospital.

23              THE COURT:  Okay.  Just out of curiosity, I mean,

24    we're obviously here because the rule at issue expanded

25    services on that telehealth list to include critical care

1    services, but the provision that you've just cited has been

2    on the books for 20 years.  Has any other provider of remote

3    telehealth services challenged the application of the

4    foreign payments ban to their services or --

5              MR. PANUCCIO:  I'm not aware of --

6              THE COURT:  -- or is this the first time this

7    issue is coming up just because RICU was smart enough to

8    raise it?

9              MR. PANUCCIO:  Well, I'm not aware of a reported

10   case, Your Honor.  And if there is one, I apologize, but we

11   have not found one where this issue has been litigated.

12             THE COURT:  Okay.  But it could have been

13   litigated.  There's nothing about the interim final rule

14   that teed this particular issue up as to whether services

15   provided by licensed doctors in foreign countries can be

16   reimbursable under the telehealth statute.

17             MR. PANUCCIO:  It may depend on what kind of care;

18   but yes, I think that's probably right, Your Honor.  And, of

19   course, it became an emergent situation because once you add

20   critical care services to the telehealth list, now you're

21   talking life and death on an, you know, often instantaneous

22   basis.  I mean, this is the kind of care, especially salient

23   in the COVID-19 crisis, that patients need.  They need --

24             THE COURT:  Right.  I understand rhetorically and

25   public interest and all of that.  But as a legal matter, I

1    mean, you've referred to CMS's position as the critical care

2    ban when, in fact, it's a ban on all or the reimbursement of

3    all telehealth services provided abroad.

4              MR. PANUCCIO:  Well, as far as --

5              THE COURT:  And that so-called ban has been in

6    effect for the last 21 years notwithstanding the fact that

7    critical care has been recently added to the list.

8              I just want to make sure I'm understanding the

9    problem right.

10             MR. PANUCCIO:  Well, as far as we can tell, CMS

11   has never made a pronouncement before, which they have now

12   made both in their letters to RICU and in their agency FAQ

13   or subregulatory guidance, applying the foreign payment bar

14   this way.  So it's not clear that the agency had ever made

15   previously any kind of pronouncement on this, and that may

16   be because no company had a business model like this for

17   other -- I mean, other telehealth services.

18             You know, these are specialists, and there's the

19   shortage of that --

20             THE COURT:  Right.  I understand.  But the flip

21   side of my point is that if I were to, you know, adopt your

22   position, then, you know, a dermatologist located abroad

23   would be equally entitled to reimbursement notwithstanding

24   the foreign payments ban.

25             MR. PANUCCIO:  Well, you know, our position is --

1    and, of course, the agency can decide what they want to open

2    the telehealth list up to taking all that into account, but

3    our position is the plain language of the telehealth

4    statute, including the "notwithstanding" clause, says what

5    matters is the location of the patient, not the location of

6    the doctor.

7            THE COURT:  Okay.

8            MR. PANUCCIO:  Now, there are lots of other

9    governors or regulators on doctors and who can provide

10   services, including the state licensure requirements.  I

11   mean, recall that all of RICU's doctors are permanent staff

12   members of the hospitals at which they provide services, the

13   American hospitals.  They are all licensed in the states in

14   which they provide these services.  They're all board-

15   certified in critical care.

16           So it's not as if anyone can provide telehealth.

17   There are still state licensing regimes and other

18   requirements that need to be met.

19           THE COURT:  And I singled out dermatology.  I

20   don't know if dermatology is on the telehealth list or not,

21   but my point is that any service on the list, if I adopt

22   your position, would be eligible for reimbursement if the

23   doctor provides a service from abroad and meets all the

24   other registration requirements.

25           MR. PANUCCIO:  Oh, I think that's right, Your

1    Honor, but let's put some specifics around it.

2                THE COURT:  Okay.

3                MR. PANUCCIO:  So suppose during the early days of

4    COVID-19, when, you know, the first closures and quarantines

5    were in place, someone's dermatologist that had been

6    treating them for months watching a potentially cancerous

7    growth was on vacation in, say, Cancun or in France when the

8    lock-downs first came in place and couldn't travel.

9                And the patient said, the Medicare patient said,

10   "I'm really worried.  I'd like you to look at this growth.

11   It's changing shape.  It's changing color."

12               And the doctor says, "Okay.  We'll do it via

13   telehealth."

14               To that patient, that patient is being treated at

15   home.  They don't know whether the doctor's in Cancun or

16   back in her office.  So from the patient perspective, that's

17   the whole point of telehealth.  The whole point is we're

18   providing these services to the patient, quoting the

19   statute, notwithstanding that the doctor is not in the same

20   location as the patient.

21               THE COURT:  Got it, okay.  We're on the same page.

22               MR. PANUCCIO:  Okay.  Thank you.

23               And if I may, I'll just -- it sounds like we've

24   exhausted that.  Let me just turn to two brief alternative

25   arguments.

1          One is that let's suppose that HHS is right about

2     its reading and what Your Honor questioned earlier, that the

3     service could be furnished simultaneously both abroad and at

4     home.  HHS has given no explanation for why the at-home

5     portion of that, which they concede happens -- they concede

6     that a service is delivered and also furnished

7     domestically -- why that portion is not reimbursable either

8     through the facility fee -- and there's no argument that the

9     hospitals are domestic and that the facility fee is meant to

10    reimburse the hospital's technology costs and some of the

11    upfront costs.  So HHS has not explained why the foreign

12    payment bar would cut out whatever they define as the

13    domestic portion of this service.

14          And then beyond that, if they really want to say

15    what's happening is this permanent staff member is

16    delivering services from abroad, then we get into the

17    question of whether 1395y(a)(4) is an exception, which then

18    incorporated 1395ff, which provides payments for U.S.-

19    resident Medicare recipients when a hospital is

20    substantially more accessible than the nearest hospital

21    adequately equipped.  And in many of these cases, if what

22    you need is an intensivist, the only hospital -- the only

23    situation that is adequately equipped within hundreds of

24    miles may be an intensivist who is telehealthing into a

25    hospital from abroad.  So we have this alternative argument

1    that even if the government's positions are accepted, RICU's

2    services are still eligible for payment.

3              THE COURT:  Okay.

4              MR. PANUCCIO:  With that, Your Honor, I'm happy to

5    go over the equitable factors, but you did indicate you had

6    a sense of the public interest in this.  Of course, nobody

7    disputes, and the government doesn't dispute, that there is

8    a tremendous -- before COVID and during -- and increasing

9    during COVID, there's a tremendous need for intensivists,

10   that intensivists' care saves lives, reduces the costs of

11   Medicare stays, reduces the time of stay, reduces both

12   mortality and morbidity, so I think the public interest

13   factor is all but conceded by the government.

14              And as for irreparable harm, RICU makes the case

15   in its declaration and the allegations in its complaint that

16   it is losing business right now.  Its 35 percent annual

17   growth has gone to zero since the critical care ban came

18   into place --

19              THE COURT:  So I have a question about that.  What

20   authority is there for the proposition that loss of future

21   growth or loss of future market share rather than loss of

22   profits is sufficient to satisfy the irreparable harm

23   standard?

24              MR. PANUCCIO:  Well, we cite a number of cases,

25   and I'm just trying to find the page in our preliminary

1    injunction brief, Your Honor.  But there are several cases

2    from this court that say where you cannot -- where the

3    defendant is immune from monetary damages, it is sufficient

4    to show --

5            THE COURT:  But usually those cases involve lost

6    profits or lost revenues.  Here it's a loss of future -- of

7    a future competitive advantage.  Your argument is that

8    hospitals are going to shift to companies that are able to

9    provide services that are reimbursable under Medicare.

10           MR. PANUCCIO:  Well, that's one argument, Your

11   Honor, but --

12           THE COURT:  That seems different than, you know,

13   we've lost 20 percent quarter over quarter profits as a

14   result of the government's actions.

15           MR. PANUCCIO:  Thank you, Your Honor.

16           If you look at the Paragraphs 34 through 41 of the

17   Rabinowitz declaration, he does talk about what is going to

18   happen in the market, but he also speaks about what's

19   happening right now, and what he says is, "We have hospital

20   clients that right now have reduced our business citing the

21   inability to get Medicare reimbursement now that the waiver

22   is in place."  And he also says, "Our growth, up until and

23   during the first month of the COVID-19 pandemic, was 35

24   percent per year or more, and we have now gone down to zero

25   growth since that time."

1          So Mr. Rabinowitz points to the actual economic

2     harm that is being inflicted on the company right now, not

3     just predictions of future harm.

4          THE COURT:  But RICU has never been able to get

5     Medicare reimbursement for its critical care services

6     abroad, correct?

7          MR. PANUCCIO:  Correct.

8          THE COURT:  So how is it inconsistent with its

9     business plan, since it's been in business for the last

10    however many years, to continue a regime where it cannot

11    receive Medicare reimbursements for its services?  I mean,

12    clearly that wasn't part of the business plan to begin with,

13    so why has the business plan been changed at all?

14         MR. PANUCCIO:  Because just like the *Regeneron*

15    case a few months ago out of the SDNY, the action of the

16    government has changed the playing field and competitive

17    marketplace by making one set of competitors' services,

18    exactly the same services, cheaper.  So once Medicare starts

19    reimbursing for these services for RICU's domestic

20    competitors, it is now cheaper for the hospitals to contract

21    with those competitors because they can say, "Great.  We'll

22    contract with you.  We'll pay you whatever our rate is

23    because now we get it reimbursed on the back end from

24    Medicare."  So it is cheaper to hire RICU's domestic

25    competitors --

```
1              THE COURT:  But hasn't that always been the case?

2              MR. PANUCCIO:  No, because -- I'm sorry, Your

3    Honor.

4              THE COURT:  Oh, I see, because the telehealth list

5    has just been -- has recently been expanded, okay.

6              MR. PANUCCIO:  Exactly, Your Honor.

7              THE COURT:  All right.

8              Mr. Dodge.

9              MR. DODGE:  Thank you, Your Honor.

10             Turning back to the merits, I'd like to hone in on

11   a few of the issues that the plaintiff raised.

12             As we explain in our brief, there are these two --

13   at least two -- statutory bars that prohibit Medicare from

14   paying for RICU's services as it has chosen to constitute

15   them through its overseas model.  The first (feed breaks up)

16   in any way amended, restricted, or limited to telehealth,

17   and the second is the telehealth statute itself, which, as

18   we explain in our briefing, contemplates paying the

19   physician based on their --

20             THE COURT:  Mr. Dodge, I'm going to ask you to

21   slow down just a little bit for the benefit of the court

22   reporter.  Thanks.

23             MR. DODGE:  Of course.

24             Now, turning to the telehealth statute itself.  As

25   I think you just heard from my colleague, the heart of their
```

1    claim is that the telehealth statute fixes the site of

2    service in a single categorical place in all instances and

3    that that place happens to be the originating site, which,

4    for their services, is within the United States.  Now, that

5    is simply not correct.  Nothing in the telehealth statute --

6    they cite no provision that purports to define where service

7    occurs as a singular matter.

8           Here rather, as Your Honor alluded to, the

9    telehealth statute oftentimes refers to care being furnished

10   at both the distant site where the physician is located but

11   also at the originating site, and we also cite to a number

12   of examples in the statute where it says that.

13          RICU's counsel just told you that the only

14   illusion to furnishing care to the distant site is the

15   payment provision in (m)(2)(A).  That is not correct.  There

16   are multiple other provisions which we lay out in our reply

17   at Page 14.

18          For example, Subsection (m)(8)(B) says that,

19   quote, a federally qualified health center or rural health

20   clinic serves as a distant site that furnishes a telehealth

21   service.  The referent there is the federally qualified

22   health center serving as a distant site that furnishes

23   telehealth care.

24          In the same subsection, (m)(8)(A), the statute

25   says, "The term 'distant site'" -- so again, their defining

1    the term "distant site" here, or amending the definition at

2    least -- "includes a federally qualified health center or

3    rural health clinic that furnishes a telehealth service."

4    So there it expressly says the term "distant site" includes

5    the kind of health facility that furnishes a telehealth

6    service.

7             And so the point here, Your Honor, is simply that

8    the telehealth statute never purports to define "service" as

9    occurring exclusively at either the distant site or the

10   originating site, and that's consistent with the payment

11   regime that Congress adopted in the telehealth statute,

12   which again has two sets of issues.  It makes one payment

13   for the physician paying them the same amount they would

14   otherwise be paid, which under Medicare's normal rules under

15   the normal fee schedule rules is based on their location and

16   includes a geographic practicing cost index that has been

17   mandated by Congress such that a physician practicing in

18   Boston is paid something different than a physician

19   practicing in San Antonio.  But then there's also this

20   second payment, this facility fee payment to the originating

21   site.  And so that twin payment regime is reflective of the

22   fact that, as you alluded to, Your Honor, the care is

23   furnished both at the distant site but also at the

24   originating site.

25             And so really that is the central tenet of the

1    plaintiff's statutory interpretation argument; that there's

2    this single site of service, and it's simply not correct.

3            Turning to the alternatives alluded to by the

4    plaintiff, I heard my colleague say that, well, at a minimum

5    Medicare should have to make a payment to the originating

6    sites which here are in the United States.  I would note

7    that nothing in RICU's complaint requests any relief on

8    behalf of the originating site.  Their relief is exclusively

9    for payment to their physicians overseas, and that's for the

10   very good reason that they do not represent the originating

11   sites here.  Those are third parties who have not brought a

12   claim.

13           If they feel that they are entitled to the

14   originating site fee, they can bring a claim.  RICU has

15   certainly not pled any sort of third-party standing on their

16   behalf, nor could it.  Nothing impedes those originating

17   site facilities from bringing their own claim.

18           With respect to the exception to the foreign

19   payment bar that the plaintiff raised, there are a number of

20   predicates that fall within that exception, and in

21   particular, the statute and the rules for that exception --

22           THE COURT:  I'm sorry.  Can you -- when you were

23   rustling your papers, we were having a hard time hearing

24   you.

25           MR. DODGE:  Yes, I think it was my papers.

1          THE COURT:  There you go.

2          MR. DODGE:  The foreign payment exception that

3     RICU alleges it falls within contains several criteria that

4     RICU cannot meet.  First, it requires inpatient hospital

5     services provided by a hospital located outside the United

6     States when that foreign hospital is closer than the nearest

7     hospital within the United States.

8          There are a number of problems with RICU's theory

9     here.  The first is that they concede that distant sites are

10    not regulated and do not have to be hospitals.  In fact, I

11    heard my colleague say that a distant site could be a

12    physician's basement.  A physician's basement does not meet

13    the definition of a hospital under Medicare; and so

14    therefore, if their argument is, well, even if the

15    government is right and, you know, some of the care is

16    furnished at the distant site, that exception requires that

17    distant site facility or whatever foreign facility provided

18    care under the exception be a hospital as defined by

19    Medicare.

20         RICU does not allege that its distant sites are

21    hospitals.  As Mr. Panuccio just said, they could be a

22    basement.  They could be an office.  They could be an

23    apartment complex.  They could be a warehouse.  And, Your

24    Honor, this goes back to why the agency needs to consider

25    RICU's claim in the context of a specific claim for payment,

1    to be able to go through and see if the claim meets the

2    various requirements.

3             And another such requirement that RICU did not

4    address is that for the exception to apply the patient must

5    receive inpatient care at the foreign hospital, and there

6    are two problems with that, Your Honor.

7             One, that also is a case-specific determination.

8    "Inpatient" has a specified definition under the Medicare

9    laws.  It's a service that requires the patient to be

10   present for two consecutive midnights.  That is a claim-

11   specific determination.  One of RICU's patients at an

12   originating site may not receive --

13            THE COURT:  So is it the government's view that

14   this exception is essentially designed or was designed by

15   Congress to enable folks who live near the Canadian border

16   or the Mexican border to receive services in a hospital

17   there and still get -- if that's the most convenient place

18   or the most successful place?

19            MR. DODGE:  Correct, Your Honor, and that's

20   unambiguously what the House and Senate reports say the

21   purpose of it was.  And, in fact, the legislative history

22   titles that section "Special Provisions Per Residents."

23            We don't claim that it is categorical or that

24   anything in the statutory text expressly limits it, but the

25   legislative history made very clear that that was what the

1  purpose was.  And accordingly, the rules governing that

2  exception similarly reflect the determination of whether a

3  hospital is nearer to one or the other is based on physical

4  proximity.  It looks at things like road conditions,

5  transportation facilities, physical distance.  It does not

6  adopt this more ephemeral digital definition of accessible,

7  which moreover would still be a case-by-case determination

8  which just re-emphasizes the need for the agency to consider

9  this claim under a specific set of facts which RICU has not

10  provided.

11        Turning back to the telehealth statute itself, I

12  think it's very important here, Your Honor, that RICU is

13  never able to actually explain how it believes the foreign

14  payment -- the payment regime, rather, adopted by Congress

15  in the telehealth statute would actually operate under its

16  reading.  You know, as we explained, there are these two

17  payments.  There is a payment based on the originating site

18  that is statutorily described and has no geographic

19  component, but then there's also a payment to the physician.

20  And, you know, all that section says is you pay the

21  physician what they ordinarily would be paid, and what

22  physicians are ordinarily paid is a fee under the physician

23  fee schedule that accounts for their geographic costs such

24  that, again, a doctor in Boston gets paid differently than a

25  doctor in Galveston.  There are no fee schedule amounts to

1    pay physicians who are located in as-to-be determined

2    locations, whether --

3              THE COURT:  Right.

4              MR. DODGE:  -- whether it be London or Tel Aviv or

5    Sydney.

6              THE COURT:  Well, how does CMS arrive at that

7    figure for providers who provide services under the

8    exception that we just spoke about if they're in Montreal or

9    Toronto or at a community hospital in Canada someplace?

10   There must be a way to determine what the fee schedule at

11   the distant site ought to be.

12             MR. DODGE:  There is, Your Honor.  There is not a

13   fee schedule per se.  Instead, you know, they pay a certain

14   amount based on an itemized bill that the claimant has to

15   submit along with numerous other loops that they have -- or

16   hoops, rather, that they have to jump through to be able to

17   submit one of those claims.  There isn't a fee schedule

18   that, you know, incorporates a geographic practice cost

19   index, which is what Congress intended to be the default

20   rule for physicians providing services under Medicare.

21             And very importantly, Your Honor, HHS promulgated

22   that rule under an express command, an unambiguous command

23   from Congress that this was going to be the rare case where

24   Medicare would pay for overseas services, and thus it

25   overcame the default assumption against extraterritorial

1    application of U.S. law.

2            There is nothing here, Your Honor.  There is

3    nothing in the telehealth statute in any provision that

4    indicates that Congress intended for telehealth services to

5    be provided overseas, and for that reason the foreign

6    payment bar remains the default backdrop rule, and that's

7    reinforced by the industry data, which is as constituted

8    under the normal Medicare physician payment scheme where the

9    physician fee schedule cannot lawfully or practically pay

10   RICU's physicians a specified fee schedule amount tied to

11   their location.

12           And just the bottom line here, Your Honor, is

13   that, you know, RICU's interpretation of the statute sets

14   these payment provisions -- you know, it sets different

15   provisions of the statute against one another.  It prevents

16   sort of a coherent reading of the statute.

17           THE COURT:  All right.  I'm going to cut you off

18   there.

19           Mr. Panuccio, I'll give you the last bite at the

20   apple.

21           MR. PANUCCIO:  Thank you, Your Honor, and I'll

22   keep it brief.

23           THE COURT:  Okay.

24           MR. PANUCCIO:  There's one rebuttal point that I

25   think I need to make because it came up for the first time

1    in the government's reply brief, and my friend just noted it

2    again.  He points to Subsection (m)(8)(B), as in boy, of the

3    statute, and I would just note two things, Your Honor.

4            One, if Your Honor is interested in this

5    provision, since it was raised for the first time in reply,

6    we would welcome the chance to brief it specifically, but in

7    short, that provision was added as part of the CARES Act, as

8    part of the response to COVID.  It is not -- was not in the

9    statute from the beginning, as far as I can tell, in terms

10   of help in defining what that is about.

11           And if you look at what's going on there -- and

12   it's a little bit complex -- I believe it is saying these

13   rural hospitals used to be originating sites because you

14   telehealth into rural hospitals.  That's the whole point.

15   But now that everyone has to be at home, these providers at

16   rural hospitals may actually have to become the place where

17   the physicians are, and then it's also about setting a

18   special payment rule for them in particular only during the

19   COVID-19 emergency, as far as I can tell, to make sure

20   they're getting extra funds.  I believe it was a way to

21   channel extra funds.

22           So this notion that that, you know, late-breaking

23   provision somehow defines what this statutory scheme meant

24   20 years ago I think is incorrect, Your Honor, and we would

25   welcome the chance to brief it, if you would like that.

1          THE COURT:  Okay.  We'll take a look at it; and if

2     we think we need additional briefing, we'll get something

3     out to you.

4          MR. PANUCCIO:  Thank you, Your Honor.  Nothing

5     further from plaintiff.

6          THE COURT:  All right.  The Court will take

7     this -- take both motions under advisement, and we will get

8     something out hopefully sooner rather than later, and we'll

9     let you know if supplemental briefing will be needed.  All

10    right?

11         Well-briefed on both sides.  Have a good day, and

12    we're adjourned.

13                   (Whereupon the hearing was

14                    concluded at 11:13 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8       **NOTE:**  This hearing was held during the COVID-19

9    pandemic stay-at-home restrictions and is subject to the

10   technological limitations of court reporting remotely.

11               Dated this 7th day of September, 2021.

12

13
                             <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                           Official Court Reporter
                             United States Courthouse
15                           Room 6718
                             333 Constitution Avenue, NW
16                           Washington, DC 20001

17

18

19

20

21

22

23

24

25